UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RACHEL ECKERT,

          Plaintiff,

    v.                                                          22-CV-540-LJV
                                                                    DECISION & ORDER

CITY OF BUFFALO, *et al.*,

          Defendants.

_____

On July 11, 2022, the *pro se* plaintiff, Rachel Eckert, commenced this action raising many claims against many defendants. Docket Item 1. Each of Eckert's claims stems from a long-running feud with her neighbor, defendant Carolette Meadows, that led Meadows to commence similar litigation against Eckert and others in this Court as well. *See Meadows v. Buffalo Police Dep't*, 21-cv-449, Docket Item 1 (W.D.N.Y. Mar. 29, 2021).

In the case at bar, Eckert alleges that Meadows and numerous government officials violated Eckert's rights in several ways. Docket Item 1. She asserts claims under 42 U.S.C. §§ 1983 and 1985-1986 and Title VI of the Civil Rights Act of 1964, as well as for negligent hiring, training, and supervision; negligent infliction of emotional distress; and intentional infliction of emotional distress. Docket Item 3.

After Eckert amended her complaint, *id.*, this Court granted Eckert's motion to proceed *in forma pauperis* and screened the amended complaint under 28 U.S.C. § 1915(e)(2). Docket Item 4. In that screening order, the Court dismissed several of Eckert's claims but allowed other claims to proceed to service. *Id.* And since that screening order was issued, the parties have been prolific in filing motions.

On November 3, 2022, defendants Erie County, John Garcia, Timothy Howard, and April Baskin (the "Erie County defendants") moved to dismiss the claims against them.  Docket Items 9-11.  On November 28, 2022, Eckert responded, Docket Item 16; and on December 9, 2022, the Erie County defendants replied, Docket Item 20.  Eckert then moved to disqualify the Erie County defendants' attorney.  Docket Item 39.

On March 7, 2023, Meadows and defendant Denise Walden, both proceeding *pro se*, moved to dismiss the claims against them and asked this Court to revoke Eckert's *in forma pauperis* status.  Docket Items 35-36.  On March 30, 2023, Eckert responded, Docket Items 40-41; and on April 14, 2023, Eckert moved to strike Meadows's and Walden's declaration in support of their motion to dismiss, Docket Item 43.

In the meantime, Eckert asked this Court to reconsider the dismissal of some of her claims and moved to amend her complaint a second time.  Docket Items 5, 24-25, 49, 54.  She also moved for an extension of time to serve certain defendants, Docket Item 34, and for alternative service of those defendants, Docket Item 32.

On February 13, 2023, Eckert asked the Clerk of the Court to enter a default against defendant James Comerford, Docket Item 30, which the Clerk did the following day, Docket Items 31-33.  About two months later, Comerford moved to vacate the default, Docket Item 45, and answered the complaint, Docket Item 46.  Eckert then moved to strike most of the defenses asserted in Comerford's answer, Docket Item 51, and Comerford responded to that motion, Docket Item 56.

Finally, Eckert has requested electronic filing privileges or, in the alternative, that this Court require Comerford to accept electronic filings or bear the cost of personal

service of future filings, Docket Item 53; and that this Court appoint her counsel, Docket Item 16 at 7.

For the following reasons, (1) the Erie County defendants' motion to dismiss is granted in part and will be granted on all Eckert's claims against the Erie County defendants unless Eckert files an amended complaint correcting the issues noted below, and Eckert's motion to disqualify the Erie County defendants' attorney is denied without prejudice; (2) Meadows's and Walden's motion to dismiss is denied without prejudice and deemed an answer to the amended complaint, Meadows's and Walden's motion to revoke Eckert's *in forma pauperis* status is denied, and Eckert's motion to strike Meadows's and Walden's declaration is denied; (3) Eckert's motion for reconsideration is denied, and her motion to amend the complaint is granted in part and denied in part; (4) Comerford's motion to vacate the default against him is granted, and Eckert's motion to strike the defenses asserted by Comerford is denied without prejudice; (5) Eckert's motion to extend the time to serve certain defendants is granted, and her motion for alternative service is granted in part and denied without prejudice in part; and (6) Eckert's motions for electronic filing privileges, to compel Comerford to accept electronic filings or bear the cost of personal service, and for the appointment of counsel are denied without prejudice.

## **FACTUAL BACKGROUND**[1]

This action arises from what appears to be a bitter feud between two neighbors: Eckert and Meadows.  *See generally* Docket Item 3.  Eckert says that during the feud,

---

[1] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs*

the defendants discriminated, retaliated, and conspired against her; violated her rights under the Second, Fourth, Sixth, and Fourteenth Amendments; and caused her emotional distress.  *Id.*  She sues numerous defendants in addition to her neighbor Meadows: the City of Buffalo; Erie County; former Erie County Sheriff Timothy Howard; Erie County Sheriff John Garcia; Buffalo Mayor Byron Brown; Chairwoman of the Erie County Legislature April Baskin; former Buffalo Police Department ("BPD") Commissioner Byron Lockwood; former BPD Chief Robert Joyce; BPD Officers Melissa Kurdziel, Corey Dixon, James Nightingale-Griffin, Jacob Salazar, Mark Costantino, Walker Skrzvnski, and John and Jane Does 1-23; BPD Lieutenants Jeff Rinaldo and Michael Farley; Buffalo Commissioner of Permits and Inspections James Comerford; Buffalo Chief Building Inspector Timothy Curtin; Buffalo Building Inspector Sean Myers; Buffalo Fuel Device Inspector Frank Bifaro; and Chair of the Buffalo Police Advisory Board Denise Walden.[2]  *Id.*

---

*Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  In deciding the motion, the court may consider any written documents that are attached to the complaint, incorporated by reference, or integral to it.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

[2] This Court already dismissed the claims against several other defendants: New York State; New York State Attorney General Letitia James; the BPD; Erie County District Attorney ("DA") John Flynn; Erie County Assistant District Attorney ("ADA") Kristen Elmore; and New York State Supreme Court Justices Jeanette Ogden, Catherine Nugent-Panepinto, Mark Grisanti, and Donna Siwek.  Docket Item 4.

I.      THE INITIAL PIPE DISPUTE

Eckert's feud with Meadows began on March 28, 2020, when Meadows "cut the exhaust pipe to [Eckert's] newly installed furnace."[3]  *Id.* at 56.  Meadows falsely claimed that the pipe was on her property when it actually "protruded [only] about an inch or two" from Eckert's house.  *Id.*  Defendant Officer Salazar "filed a report," presumably against Meadows, "for criminal mischief, trespassing, and harassment" in connection with the cut pipe.  *Id.*

The next day, Meadows "pounded" on Eckert's door and threatened to "beat her up."  *Id.*  Defendant Officer "Kurdziel responded and advised Meadows to stay off Eckert's property" and "return the pipe."  *Id.*  Eventually, Meadows, who said she was "tired of these white bitches moving in[to] the neighborhood," "whipped the pipe toward[] [Eckert], trying to hit her" but instead striking Eckert's house.  *Id.*

When Eckert "tried to make emergency repairs to her furnace" later that day, Meadows "shoved" her.  *Id.* at 57.  Another officer, sued as defendant "Doe (1)," arrived and "told [Eckert] she could not make the repairs to her furnace and that she'd be trespassing" if she tried to fix the pipe.  *Id.*  "Doe (1)" advised Eckert to "deal with [the issue] in civil court."  *Id.*

On March 30, 2020, when Eckert again attempted to repair the pipe, another officer, sued as defendant "Doe (2)," "threatened to arrest [her] for trespassing" and told her "to contact the Buffalo City Building Inspectors" to obtain authorization for the repairs.  *Id.*  So Eckert contacted defendant Buffalo Chief Building Inspector Curtin, as

---

[3] Some capitalization has been omitted from quotations taken from the amended complaint.

well as her real estate lawyer, Todd Potter.  *Id.*  After speaking with Potter, Eckert

"removed a fence from her property to gain access to the damaged exhaust pipe."  *Id.*

But after the "police were called," Kurdziel "threatened to arrest" Eckert for removing the

fence and "forced" her to reinstall it.  *Id.*  Meadows recorded the "humiliating"

interaction—which lasted at least 15 minutes—and posted the video "to social media."

*Id.*

Later that evening, a relative of Eckert called the BPD and told a lieutenant that if

the pipe were not repaired, Eckert's family would risk carbon monoxide poisoning.  *Id.* at

58.  The lieutenant "agreed . . . that the repair needed to be made" and told the relative

that when Eckert "was ready to make the repairs," the BPD "would send a squad car out

to . . . make sure there weren't any problems."  *Id.*  But when Eckert called the BPD the

next day, she was told that it "would not dispatch a car."  *Id.*

Instead, defendants Curtin and Buffalo Building Inspector Myers "came out to

Eckert's house" to determine whether Eckert could repair the pipe "without a court

order."  *Id.*  The two building inspectors determined that Eckert "owned at least 1.5 feet

on the north[ ]side of her home and [that] it was critical her exhaust pipe be repaired."

*Id.* at 58-59.  But when Eckert later called the BPD, she was told that Curtin and Myers

had told the BPD to arrest her if she "[went] on that side of her house again."  *Id.* at 59.

Around that time, Eckert's children were diagnosed with carbon monoxide

poisoning.  *Id.*  Eckert reported the carbon monoxide poisoning to BPD Detective

Lauren McDermott, who indicated that she would charge Meadows with "endangering

the welfare of two minors."  *Id.*  But two days later, McDermott informed Eckert that her

6

supervisor[4] said not to charge Meadows with child endangerment because the BPD

"didn't know [Meadows's] intent."[5]  *Id.*

On April 20, 2020, defendant Buffalo Fuel Inspector Bifaro inspected Eckert's

furnace and found that it was "up to code."  *Id.* at 61.  But on May 12, 2020, Bifaro

called Eckert to "demand[] she relocate her existing furnace pipe because [] Meadows

was complaining."  *Id.*  Eckert "refused to cooperate without a court order," and Bifaro

told her "to either 'relocate the pipe or go to court.'"  *Id.*  A few days later, a BPD officer,

sued as defendant "Doe (4)," "threatened to file charges" against Eckert if she did not

move her vent pipe.  *Id.* at 62.  Eckert again refused to comply without a court order.[6]

*Id.*

## II.    THE RESULTING PHYSICAL ALTERACTION

On May 20, 2020, Meadows called the BPD when Eckert "removed a fence off

[sic] [Eckert's] property."  *Id.* at 62-63.  Defendant Salazar, the responding officer, told

Eckert that the fence belonged to Meadows even though—according to Curtin's and

Myers's survey—the fence was on Eckert's property.  *Id.* at 63.  Salazar also said that

---

[4] Although it is not clear from the complaint, the supervisor may be defendant "Doe (3)," who Eckert alleges conspired with other defendants "to deprive [Eckert] of her lawful rights causing serious injuries to her minor children [sic]."  Docket Item 3 at 60.

[5] Eckert insists that because Meadows is a nurse who "is aware what carbon monoxide poisoning can do," she "intentionally and without regard to the consequences cut the exhaust pipe that ventilates [Eckert's] home."  Docket Item 3 at 60.

[6] Eckert experienced a similar issue in January 2022, when the Buffalo Permits and Inspections Department sent her a letter "attempting to get her to make modifications to her gutters," which "were newly installed in December [] 2021 and were installed to code."  Docket Item 3 at 100.  Eckert believes that the letter was retaliation by Comerford, Curtin, and Myers.  *Id.*

Eckert must allow Meadows to "trespass" so Meadows could park her car even though there was no record of an easement on Eckert's property.  *Id.*  That same day, Meadows "covered [Eckert's] security cameras with paper towels" then "ran down the walkway while pounding on [Eckert's] house."  *Id.*  Eckert called 911, and the responding officer, sued as defendant "Doe (5)," told Meadows "to leave Eckert's cameras alone" but did not file a report.  *Id.*  The next day, Meadows again covered Eckert's cameras, entered Eckert's backyard, and "pound[ed] on [Eckert's] house."  *Id.* at 64.

On May 23, 2020, Eckert noticed that the privacy fence in her backyard was missing a panel, saw the panel in Meadows's yard, and called 911.  *Id.*  Two officers, sued as defendants "Doe's (6-7) [sic]," retrieved the panel from Meadows's yard and returned it to Eckert, but they would not file a report against Meadows.  *Id.*  In fact, one officer claimed that the wind had damaged the fence and that Meadows merely had picked up the damaged panel.  *Id.*

That evening, Meadows entered Eckert's backyard with an electric saw and cut the fence panel that the officers had retrieved.  *Id.* at 65.  When Eckert "ran outside," Meadows "attacked" her with the saw.  *Id.*  Eckert fought back "in self-defense" but suffered "multiple contusions and wounds."  *Id.*  Eckert's son and a neighbor called 911 while another neighbor intervened and separated Meadows and Eckert.  *Id.*

When the police arrived, Meadows falsely told the responding officers, including defendant Officer Dixon, that Eckert had "snuck up behind her with a skillet and battered her."  *Id.*  Dixon, who is Black, refused to take witness statements from three white witnesses, "threatened" to tase a "concerned (white) citizen," and "called [Eckert] a liar."

*Id.*  Dixon and defendant Officer Nightingale-Griffin then arrested Eckert and charged her with felony assault.[7]  *Id.* at 65-66.

Nightingale-Griffin told Eckert that she could not press charges against Meadows unless Eckert allowed Meadows to press charges against her.  *Id.* at 65.  What is more, the responding officers told Eckert that Meadows "was getting the ambulance that was dispatched" and that if Eckert wanted an ambulance, "she'd have to 'wait hours because it was busy.'"  *Id.*  Eventually, Eckert sought medical attention independently.  *Id.*

## III.    ECKERT'S OTHER CONFRONTATIONS WITH MEADOWS

Following the physical altercation, Eckert and Meadows were in near-constant conflict.  During that time, Meadows trespassed on Eckert's property,[8] damaged and

---

[7] The officers "issued Meadows a warrant card against Eckert [sic] for felony assault," but the "warrant card was later reduced" by the Erie County DA's Office. Docket Item 3 at 66.  At the time Eckert commenced this action, Meadows still had an image of the "warrant card"—which includes Eckert's unlisted phone number—posted on her Facebook page.  *Id.*

[8] Docket Item 3 at 72, 82; *see also id.* at 77 (Meadows entered Eckert's backyard "topless and braless" and "dump[ed] leaves into [the] backyard"); *id.* at 91 (Meadows swept trash into Eckert's front yard).

stole Eckert's property,[9] harassed Eckert and her family,[10] hung "harassing tarps" with vulgar messages directed at Eckert,[11] defamed Eckert,[12] and assaulted Eckert.[13]  At some point, Meadows called Eckert "white trash" and a "cracker."  *Id.* at 42.

Each time the BPD responded to the conflicts, the officers failed to remedy the situation to Eckert's satisfaction.[14]  *See, e.g.*, *id.* at 79 (alleging that Salazar told Eckert

---

[9] Docket Item 3 at 68 (Meadows hit Eckert's house with her vehicle); *id.* (Meadows "sawed" pipes that Eckert had installed on Eckert's property); *id.* at 69 (Meadows "loosened the fence post on Eckert's property" and again "sawed" a pipe on Eckert's property); *id.* (Meadows cut a hole into the siding of Eckert's house); *id.* at 71 (Meadows broke into Eckert's shed and stole Eckert's "gardening tools and gas grill"); *id.* at 74 (Meadows "stole Halloween decorations off Eckert['s] porch"); *id.* (Meadows damaged the fence in Eckert's yard and stole a fence panel); *id.* at 80 (Meadows "drilled PVC pipe into [Eckert's] fence"); *id.* at 82 (Meadows "hit [Eckert's] home security cameras with a hammer"); *id.* at 83 (Meadows "snatched" Eckert's camera and threw it to the ground); *id.* at 97 (Meadows "started an uncontained fire directly behind [Eckert's] newly installed fence"); *id.* (Meadows "opened a package of [Eckert's] that was accidentally delivered to [Meadows's] home" and "removed several items"); *id.* at 98 (Meadows stole "tools" from Eckert's "front lawn").

[10] Docket Item 3 at 69 (Eckert's daughter thought Meadows was "coming to kill her" when she saw Meadows carrying a saw on Eckert's property); *id.* at 73 (Meadows harassed Eckert "in [S]ave-a-[L]ot"); *id.* at 75 (Meadows "parked her car directly in front of" Eckert's house and "blared the radio for over an hour"); *id.* at 81-83 (Meadows twice "extended a metal pole . . . from her roof to [Eckert's] roof"); *id.* at 97 (Meadows "threatened to 'beat Eckert's ass'").

[11] Docket Item 3 at 77-78 (Meadows hung a tarp that read "Rachel Eckert is a stalking bitch"); *id.* at 80; *id.* at 91 (Meadows hung a tarp that read "bitch" facing Eckert's yard); *see also id.* at 78 (Meadows wrote, "Like what you see bitch" on the side of her garage facing Eckert's backyard); *id.* at 80 (Meadows hung a tarp that read, "got charges you mad [sic]"); *id.* at 81 (Meadows "painted 'bitch' on [Eckert's] rear window").

[12] Docket Item 3 at 77-78 (Meadows defamed Eckert "during a town meeting"); *id.* at 92 (Meadows "posted defamatory posts to [Eckert's] business pages on [Y]elp, [G]oogle, and Facebook").

[13] Docket Item 3 at 101 (Meadows "battered" Eckert during a court proceeding); *id.* at 103 (Meadows assaulted Eckert in front of Eckert's house).

[14] The responding officers included defendants "Doe's (7-8) [sic]", Docket Item 3 at 77; "Doe (9[)]," *id.* at 80; "Doe's (10-11) [sic]," *id.* at 81; "Doe (12)," *id.* at 83; "Doe

that Meadows's behavior was "not harassment or offensive" and that he would "be pretty mad too" if his neighbor "had cameras pointing at his house"); *see also id*. at 23 ("There were several times defendants filed charges against Meadows that did not meet the incident complained of."). The BPD failed to act even after a restraining order was issued against Meadows. *See id*. at 74 (alleging that defendant Officer Skrzvnski and defendant Officer Costantino told Eckert that because the restraining order was not "in the system," they could not charge Meadows with violating it); *id*. at 75 (alleging that BPD officers stated that they did not want to report Meadows for violating the restraining order and that Eckert and Meadows should "work [their issues] out instead"); *id.* at 81 (alleging that a BPD lieutenant told Eckert that unless Meadows physically assaulted her, the BPD would not file "any further violations of the order of protection").

In fact, on several occasions, the BPD filed charges against Eckert rather than Meadows. *See id*. at 83 (alleging that Salazar and "Doe (13)" arrested Eckert); *id.* at 91-92 (alleging that after Meadows threatened to assault Eckert and her son, "Doe (16) . . . falsely charged Eckert with possession of a chemical or biological weapon and criminal contempt in the second degree"). Those charges resulted in a restraining order against Eckert requiring her to surrender two firearms to her father. *Id.* at 37. But eventually, the criminal charges against Eckert were dismissed. *Id.* at 37, 101.

---

(13)," *id.*; "Doe (14[)]," *id.* at 91; "Doe (15)," *id.*; "Doe (16)," *id.*; "Doe (17)," *id.* at 92; "Doe (18)," *id.*; "Doe (19)," *id.* at 93; "Doe (20)," *id.* at 97; "Doe (21)," *id.* at 98; and "Doe[s] (22-23)," *id.*

IV.     **ERIE COUNTY DEMOCRATIC COMMITTEE CONFLICT**

On February 22, 2021, Eckert learned that Meadows "is an Erie County Democratic Committee Member." *Id.* at 84.  Eckert believed that Meadows used a false address—one belonging to defendant Walden—"to unlawfully vote and sit on the [C]ommittee." *Id.* at 84-85.  Eckert notified the Committee that "Meadows sits on an assembly [sic] in a [d]istrict she does not even reside in," but the Committee did not remove Meadows from her position. *Id.* at 85.  Eventually, Eckert was referred to the Erie County DA's Office, which falsely told her that it could not file charges based on her concerns. *Id.*

V.      **STATE COURT PROCEEDINGS**

In addition to the cases both have filed in this Court, Eckert and Meadows are regular litigants in New York State Supreme Court, Erie County. *See id.* at 89 (alleging that Meadows "abuses the processes of the courts to harass, annoy, and alarm" others).  Meadows has commenced at least two actions against Eckert in state court. *See id.* at 68, 89; *see also id.* at 102.  And Eckert has commenced at least three actions against Meadows in state court. *See id.* at 90 (June 2021 defamation action, July 2021 nuisance action); *id.* at 103 (May 2022 defamation action).

Eckert says that she "has not been treated fairly" in state court and that the various justices who have presided over their cases are biased in favor of Meadows. *Id.* at 68.  For example, Justice Grisanti "granted Meadows poor person relief" in one lawsuit even though he knew or should have known that Meadows falsified her "poor person application." *Id.*  In contrast, "[e]very poor person application [Eckert] filed was

denied." *Id.*  As a result, Eckert was required to "pay for records that were provided to Meadows free of charge." *Id.* at 68, 103.

The unfair treatment of Eckert extended to the justices' substantive decisions: "every lawsuit [Eckert] filed was thrown out" and "nobody would sign her order[s] to show cause." *Id.* at 68.  For example, Grisanti "refused to sign [Eckert's] order to show cause" in her nuisance action, *id.* at 90-91, and Justice Nugent-Panepinto "threw out" one of Eckert's actions, "causing significant prejudice" to Eckert,[15] *id.* at 94.  Grisanti ordered Eckert "to immediately stop posting content" about her and Meadows "to social media," *id.* at 100, and "granted Meadows an easement on [Eckert's] property," *id.* at 101.  And in May 2022, Justice Siwek "threw out" Eckert's defamation case without "provid[ing] a reason for her decision." *Id.* at 104.

## VI.   ECKERT'S GOVERNMENT COMPLAINTS

Eckert also has requested the assistance of, and filed complaints with, various government entities.  She filed several complaints with the "Buffalo Common Council," but she never received a response.  *See id.* at 61-63, 67.  She spoke with the Erie County DA's Office, *see id.* at 61, 72, 77, and she filed two complaints with the United States Department of Justice, *see id.* at 67, 98.  She also complained to the Erie County Executive's Office, *see id.* at 62; the City of Buffalo, *see id.* at 64, 68; the New York State Public Integrity Bureau, *see id.* at 67; defendants Curtin and Comerford, *see id.* at

---

[15] Eckert moved for Nugent-Panepinto's recusal, and Nugent-Panepinto recused herself because she "had knowledge of disputed evidentiary facts of the proceeding." Docket Item 3 at 96.  Several other judges, including defendant Justice Ogden, also have recused themselves from cases involving Meadows and Eckert.  *Id.* at 33, 93.

72; defendant Bifaro, *see id.* at 80; the Erie County Ethics Board, *see id.* at 86; and the Erie County Board of Elections, *see id.*

But Eckert most frequently contacted the BPD.  In addition to the contact noted above, Eckert sent several "notice[s] of non-spoliation" to the BPD and its officials, asking the BPD to "preserve specific body camera data" from the officers who responded to her and Meadows's calls.  *See, e.g.*, *id.* at 60-61, 67, 70.  Likewise, she asked for the camera footage under the New York State Freedom of Information Law. *Id.* at 71-72, 78.  But those requests were unsuccessful.  *See, e.g.*, *id.* at 71-72 (alleging that the BPD "lost or destroyed all evidence [Eckert] asked [it] to preserve").  Eckert also filed multiple complaints about the conduct of BPD officers.  *See id.* at 61-62, 68-69, 73, 80-81; *see also id.* at 69 (alleging that by mid-June 2020, Eckert had "reached out" to BPD Internal Affairs or individual BPD officials "over fifteen times").

Much like the other government entities that Eckert contacted, the BPD did not provide a satisfactory response to her inquiries and complaints; in fact, she often received no response at all.  *See, e.g.*, *id.* at 61, 69-71, 73; *see also id.* at 88 (noting that the letter closing one of Eckert's complaints "did not even address [the] initial complaint and gave a generic response").

## PROCEDURAL BACKGROUND

On March 29, 2021, Meadows sued Eckert and others in this Court.  *Id.* at 86-87; *see also Meadows*, 21-cv-449, Docket Item 1.  A little more than a year later, Eckert commenced this action.  Docket Item 1.

As noted above, this Court already has dismissed several of Eckert's claims. *See* Docket Item 4.  More specifically, this Court dismissed the following claims without

leave to amend: Eckert's claims for money damages against New York State, *id.* at 3; Eckert's claims against the BPD, *id.* at 4; Eckert's claim against New York Attorney General James for her failure to investigate and initiate a lawsuit on Eckert's behalf, *id.* at 4-5; Eckert's individual-capacity Title VI claim against Dixon, *id.* at 5-6; Eckert's claims against New York State Supreme Court Justices Ogden, Nugent-Panepinto, Grisanti, and Siwek, *id.* at 6-9; Eckert's claims under the federal criminal code, *id.* at 9; and Eckert's claims against Erie County DA Flynn and ADA Elmore relating to their prosecution of Eckert and failure to prosecute Meadows, *id.* at 9-12.

The parties then filed the various motions and requests described above and addressed below.

## DISCUSSION

## I.    MOTION FOR RECONSIDERATION

Eckert urges this Court to reconsider its dismissal of her claims against New York State, James, Flynn, Nugent-Panepinto, Ogden, Siwek, and Grisanti, arguing that the dismissal was "a manifest injustice."  Docket Items 5, 54-1; *see* Docket Item 4 (dismissing the claims against those defendants based on sovereign immunity, prosecutorial immunity, and judicial immunity).  This Court disagrees: Eckert's motion for reconsideration is denied, as is her request to orally argue that motion.

"As explained by the Second Circuit, 'the standard for granting a motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'"  *Kharshiladze v. Philips*, 2021 WL 1525869, at *1 (W.D.N.Y. Apr. 19, 2021)

(alterations omitted) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice."  *Id.* (quoting *Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court."  *Id.* (quoting *Boyde v. Osborne*, 2013 WL 6662862, at *1 (W.D.N.Y. Dec. 16, 2013)).

### A.    New York State, James, and Flynn

Eckert argues that her claims against New York State, James, and Flynn should proceed because she seeks "both injunctive and declaratory relief" against those defendants.  Docket Item 5 at 1.

Unless an exception applies, the Eleventh Amendment bars suits against a state regardless of whether the plaintiff seeks money damages or injunctive relief.  *See Cory v. White*, 457 U.S. 85, 90-91 (1982) ("[T]he Eleventh Amendment by its terms clearly applies to a suit seeking an injunction.").  So Eckert cannot revive her claims against New York State.  Instead, she must pursue any claims against New York State in which she seeks injunctive relief by suing the relevant state officials.  *See CSX Transp., Inc. v. N.Y. State Off. of Real Property Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) ("The doctrine of *Ex Parte Young* is a limited exception to the general principle of sovereign immunity and allows 'a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law' under the theory that such a suit is not 'one against the

[s]tate,' and therefore not barred by the Eleventh Amendment." (alteration omitted) (quoting *Ex Parte Young*, 209 U.S. 123, 154 (1908))).

Eckert has done that here by suing James and Flynn.  But those claims are barred for other reasons, Docket Item 4 at 4-5 (dismissing claims against James because "government lawyers . . . cannot be held liable for failure [to pursue private complaints], absent a violation of some explicit statutory mandate" (citation omitted)); *id.* at 10-12 (dismissing claims related to "Flynn's decision to prosecute [Eckert]" because they are barred by prosecutorial immunity), and Eckert provides no reason for this Court to reconsider its dismissal of the claims against those defendants.  Instead, she simply refers to the amended complaint which this Court already addressed, *see* Docket Item 5 at 2 ("Plaintiff made several allegations throughout her pleadings that she has been deprived of both due process . . . and equal protection."), and asserts new claims which are addressed below.

Therefore, and for the reasons stated in this Court's previous order, Docket Item 4 at 4-5, 10-12, Eckert's motion for reconsideration is denied as it relates to (1) her claims against New York State, (2) her claims against James for failure to prosecute and failure to investigate, and (3) her claims against Flynn for malicious prosecution.

## B.   New York State Justices

Eckert also argues that this Court incorrectly dismissed the claims against Justices Nugent-Panepinto, Ogden, Siwek, and Grisanti as barred by judicial immunity. Docket Item 5 at 4-9; Docket Item 54-1 at 9-18.  But again, Eckert provides no reason for this Court to revisit its decision.

First, Eckert argues that Nugent-Panepinto "acted in the 'clear absence of all jurisdiction'" when she did not recuse herself from presiding over a case in which she had "personal knowledge of disputed evidentiary facts concerning the proceedings." Docket Item 5 at 4-6.  Similarly, she argues that Ogden is not entitled to judicial immunity related to Ogden's refusal to recuse herself from a state court proceeding. Docket Item 54-1 at 17-18.  But "a judge's decision to recuse (or not to recuse) is [] a judicial act" that entitles the judge to judicial immunity.  *See Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011).

Next, Eckert argues that she should be allowed to pursue her claims that Nugent-Panepinto and Siwek treated her less favorably than other *pro se* litigants.  Docket Item 5 at 6, 8; *see also* Docket Item 54-1 at 10 (alleging that Nugent-Panepinto "did not even read" Eckert's state court amended complaint before dismissing it); *id.* at 13 (alleging that Nugent-Panepinto "dismissed a meritorious cause of action for personal gain").  But the justices' treatment of Eckert within their courtrooms is "related[] to individual cases before" them and therefore is "judicial in nature."  *See Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009).  Eckert again provides no reason to think otherwise.

Finally, Eckert argues that Grisanti is not immune because his decisions and orders were unconstitutional.  Docket Item 5 at 6-8 (arguing that Gristanti violated Eckert's constitutional property rights and free speech rights).  But Grisanti's judicial decisions—unconstitutional or not—were just that: *judicial* decisions.  And he therefore is immune from claims arising from those decisions.  *See Bliven*, 579 F.3d at 210.

Eckert's motion for reconsideration therefore is denied as it related to Justices Nugent-Panepinto, Ogden, Siwek, and Grisanti.

18

## II.    ECKERT'S MOTION TO AMEND

Eckert also has moved to amend her complaint.  *See* Docket Items 5, 24-25, 49. Because "the court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), that motion is granted in part.  But leave to amend is denied with respect to several "futile" claims that Eckert raises in her motion.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [the plaintiff's] cause of action is substantive; better pleading will not cure it. . . . Such a futile request to replead should be denied.").

### A.    New Claims Against Dismissed Parties

Eckert wants to assert new claims against several parties that have been dismissed from this action: New York State, James, Flynn, Nugent-Panepinto, and Siwek.  Docket Item 5 at 2-5, 8.

First, Eckert asserts that she "has been deprived of equal protection" in connection with several sections of the New York Penal Law: sections 210.15 (perjury in the first degree), 210.45 (making a punishable false written statement), 215.51 (criminal contempt in the first degree), and 485.05 (hate crimes).  Docket Item 5 at 3.  But she does not explain how her rights were violated under the first three sections, nor does this Court see a basis for an equal protection challenge under any of those sections.  If Eckert means to assert claims against Flynn for prosecuting her under those sections, those claims are barred by prosecutorial immunity.  *See* Docket Item 4 at 10-12.  Eckert therefore may not amend her complaint to assert an equal protection claim based on Penal Law sections 210.15, 210.45, and 215.51.

Eckert better explains the equal protection claim she intends to make regarding section 485.05: she asserts that hate crimes have "be[en] committed against her and [that] she is not provided equal protection under" that law.  Docket Item 5 at 3.  But as this Court already explained, Eckert does not have "a judicially cognizable interest in the prosecution or nonprosecution of another," even if she has been the victim of a crime. *See* Docket Item 4 at 10.  So she cannot assert claims against Flynn based on his failure to prosecute the individual—presumably Meadows—who allegedly committed "hate crimes" against Eckert.

To the extent that Eckert intends to challenge section 485.05 as facially discriminatory, *see* Docket Item 5 at 3 ("This state law is in direct conflict [with] the equal protection clause [of] the Fourteenth [] Amendment."), that claim also fails.  Eckert implies that section 485.05 is facially discriminatory because it "does not provide protection to [C]aucasians as a class of people" but protects "other classes of people." *Id.*  But that is incorrect:  Section 485.05 defines "hate crimes" as certain acts committed "because of" the victim's "race, color, national origin, ancestry, gender, religion, religious practice, age, disability[,] or sexual orientation," N.Y. Penal Law § 485.05(1), regardless of what those characteristics are.  So section 485.05 does not facially discriminate against white people; rather, it provides broad protections based on "race, color, [and] national origin." *Id.*  Eckert therefore may not amend her complaint to allege that section 485.05 is facially discriminatory.

Next, Eckert says that she is entitled to pursue a claim against Flynn because he is "not [] allow[ing her] to participate in programs which are federally funded," such as "the Victim/Witness Services Bureau."  Docket Item 5 at 3-4.  She also says that Flynn

20

retaliated against her by "label[ing] her [] 'persona non-grata'" and that the Erie County DA's Office "unlawfully disseminated [her] private and personal information" to Meadows, including an "inaccurate criminal RAP sheet" and possibly her Social Security number. *Id.* But the amended complaint says nothing about those claims. *See* Docket Item 3. Eckert therefore may amend her complaint to assert claims against Flynn related to those allegations. If Eckert amends her complaint, this Court will screen her new claims against Flynn and determine whether they may proceed to service.

Finally, Eckert says that she wants to bring claims against Nugent-Panepinto and Siwek for interfering with interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951. Docket Item 5 at 6, 8. "[T]he Hobbs Act does not support a private cause of action," *see Barge v. Apple Computer*, 1997 WL 394935, at *2 (S.D.N.Y. July 15, 1997) (collecting cases), so Eckert is denied leave to amend her complaint to allege violations of the Hobbs Act by Nugent-Panepinto and Siwek.

### B.   Addition of New Parties

Eckert also has moved to amend her complaint to add two plaintiffs, Docket Item 25, and one defendant, Docket Item 49.

Eckert asks to join Jody and Alyssa Wolfson—who also "have been harassed, assaulted, stalked, [and] defamed" by Meadows—as plaintiffs. Docket Item 25. Federal Rule of Civil Procedure 20(a) allows "[p]ersons [to] join in one action as plaintiffs" under certain circumstances. But "a *pro se* plaintiff," such as Eckert, "cannot represent other plaintiffs." *See Adams v. U.S. Bank, NA* 2013 WL 5437060, at *7 (E.D.N.Y. Sept. 27, 2013). Moreover, Eckert's request to join the Wolfsons as plaintiffs is not signed by the Wolfsons and does not bear any other indication that the Wolfsons consent to be joined

as *pro se* plaintiffs.  *See* Docket Item 25.  Eckert's motion to amend her complaint to

join Jody and Alyssa Wolfson as plaintiffs therefore is denied.

But Eckert's motion to amend her complaint to add allegations against a new

defendant, the Buffalo Common Council, is granted.

## III.   THE ERIE COUNTY DEFENDANTS' MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

Eckert asserts multiple causes of action against the Erie County defendants.

*See* Docket Item 3 at 37-55.  The Erie County defendants have moved to dismiss each

of those claims.  Docket Items 9-11.  In response, Eckert argues that those claims

survive because her amended complaint "adequately identified the acts and events that

entitle her to relief from the [Erie County] defendants."[16]  Docket Item 16 at 1.

---

[16] Eckert also has moved to disqualify Jeremy C. Toth, the attorney representing
the Erie County defendants, on the ground that he "may have a conflict[] of interest" due
to his involvement with the "Police Advisory Board."  Docket Item 39.  Eckert made
numerous complaints to the Police Advisory Board in connection with the events
underlying this action.  *See* Docket Item 3 at 76, 80, 84, 86, 89, 94, 99.

Based on Eckert's bald allegations and speculation, *see* Docket Item 39, this
Court does not believe that a conflict of interest prevents Toth from representing the

### A.    Section 1983 Claims

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Moreover, the theory of *respondeat superior* is not available in a section 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  Instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d at 618.

Eckert alleges the Erie County defendants violated her constitutional rights in several ways.  More specifically, she alleges that (1) Erie County deprived her of her Second Amendment right to bear arms, Docket Item 3 at 37; (2) Erie County and Baskin violated her Sixth Amendment right to a speedy trial, *id.* at 38-41; (3) all four Erie County defendants violated her Fourteenth Amendment right to equal protection, *id.* at

---

Erie County defendants or that Toth will likely be a witness in this case.  Eckert's motion to disqualify Toth therefore is denied without prejudice.

41-43; and (4) Erie County maliciously prosecuted her in violation of the Fourth Amendment, *id.* at 44-46.  This Court addresses the section 1983 claims against each Erie County defendant in turn.

### 1.   Garcia

The Erie County defendants argue that the section 1983 claims against Garcia must be dismissed because Eckert made "no allegation of [Garcia's] personal or official involvement" in the events giving rise to this action.  Docket Item 11 at 4.

Indeed, in her 107-page amended complaint, Eckert does not make any allegations about Garcia's specific conduct.  *See generally* Docket Item 3.  Rather, she alleges only that (1) he "was acting within the scope of his employment and official capacity as the Sheriff at the time of the latest incident giving rise to this lawsuit," *id.* at 10; and (2) he "claimed 'race was the determining factor'" in charging an individual with a hate crime in an unrelated case, *id.* at 42.  The first allegation is too vague to establish Garcia's personal involvement in any of the events underlying this action.  And the second likewise does not establish that Garcia was personally involved *in this case*.

In her response, Eckert highlights a specific paragraph of her amended complaint.  *See* Docket Item 16 at 2-3 (citing Docket Item 3 at "Page 25, ¶ 66 lines 7-10").  But that excerpt does not even mention Garcia.  *See* Docket Item 3 at 25.  The only other argument Eckert makes in opposing the dismissal of the claims against Garcia is that "she was relying on subpoena power to obtain exact dates of [his] involvement" and that Garcia "had a duty to uphold a court issued order of protection, a duty to maintain the peace, and a duty to enforce the laws that Buffalo police were

refusing to enforce."  Docket Item 16 at 3.  But none of that establishes Garcia's personal involvement in any way.

Eckert's section 1983 claims against Garcia therefore are subject to dismissal and will be dismissed unless Eckert amends her claims as noted below.

### 2.    Baskin

Eckert's section 1983 claims against Baskin fail for a similar reason: as the Erie County defendants argue, "Eckert failed to provide factual details of Baskin's involvement" in the underlying events.  *See* Docket Item 11 at 4-6.

The crux of Eckert's allegations about Baskin is that Baskin and Meadows are friends because they both are members of the Erie County Democratic Committee and that Baskin "abused" her political power "to protect" Meadows.  Docket Item 3 at 26; *see also id.* at 99 (alleging that Baskin and Meadows share a "partisan interest").  Eckert repeatedly alleges that Baskin "coerced" or "conspired [with]" various other defendants to deprive Eckert of her rights.  *See, e.g.*, Docket Item 3 at 27 (alleging that Baskin "coerced" Nugent-Panepinto, Grisanti, and Siwek); *id.* at 36 (alleging conspiracy between Baskin and several other defendants); *see also id.* at 39, 61, 76, 78-79, 81, 83-84, 86, 91, 94, 96, 100, 104.  But those allegations are unsupported and conclusory: Eckert does not allege that Baskin took any specific actions to coerce or conspire with other defendants.  In other words, Eckert does not say *how* Baskin coerced or conspired with anyone.

In her response to the Erie County defendants' motion to dismiss, Eckert argues that Baskin, Brown, and Meadows "came to a meeting of the mind[s] and used their political influence" to affect Grisanti's, Siwek's, and Nugent-Panepinto's judicial

25

decisions.  Docket Item 16 at 4-5.  Eckert also says that Baskin "failed to provide equal protection of the law" to Eckert "due to the color of her skin," Docket Item 3 at 42, and that Baskin directed other defendants "to ignore the issues complained of by [Eckert]," *id.* at 81, 83.  But again, she provides nothing to make any of those conclusory allegations plausible.[17]  *See generally* Docket Item 16.  And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim.  *Iqbal*, 556 U.S. at 678.  Eckert's vague allegations of coercion and conspiracy therefore do not establish Baskin's personal involvement in the deprivation of Eckert's rights.[18]

Eckert's section 1983 claims against Baskin therefore are subject to dismissal and will be dismissed unless Eckert amends her claims as noted below.[19]

### 3. Howard

The Erie County defendants advance the same argument in favor of dismissal of the section 1983 claims against Howard: that Eckert failed to allege his personal involvement in the underlying events.  *See* Docket Item 11 at 6.  Again, this Court agrees.

---

[17] Likewise, Eckert provides no support for her bald allegation that Baskin "pay[s] [Meadows] off the books to avoid proper taxation and reporting."  Docket Item 16 at 5.

[18] In her response, Eckert raises a First Amendment claim against Baskin.  Docket Item 16 at 5-6.  Eckert may amend her complaint to add such a claim.

[19] Baskin also argues that she is entitled to legislative immunity "for official action undertaken in the sphere of legitimate legislative activity."  Docket Item 11 at 4-5.  Because it is not clear whether Eckert's claims against Baskin arise from actions taken in Baskin's legislative capacity, this Court does not reach the question of Baskin's legislative immunity.

Like her allegations against Garcia and Baskin, Eckert's allegations against Howard are vague and conclusory and thus insufficient to establish Howard's personal involvement.  *See* Docket Item 3 at 26 (alleging that Howard and other defendants "allowed [Meadows] to deprive [Eckert] of her legal and lawful property rights"); *id.* at 86 (alleging that Howard "conspired" with several other defendants "in an attempt to deprive [Eckert] of her legal and lawful rights").  Indeed, other than those vague and conclusory assertions, Eckert says nothing about what Howard did or did not do.

Eckert's section 1983 claims against Howard therefore are subject to dismissal and will be dismissed unless Eckert amends her claims as noted below.

### 4.    Erie County

Finally, Eckert has not raised a viable section 1983 claim against Erie County because she has not alleged that Erie County has an official policy or custom that resulted in the deprivation of her constitutional rights.

A municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy or custom.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  To state such a claim, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983)).  "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials," such as "the persistent failure to discipline subordinates who violate [persons'] civil rights."  *Id.* (alteration in original) (second excerpt quoting *Batista*, 702 F.2d at 397).

27

Eckert first alleges that her Second Amendment rights were violated when an "order of protection" was issued against her and, as a result, she was forced to surrender her firearms.  Docket Item 3 at 37.  But she alleges that defendants Dixon and Nightingale-Griffin made the arrest that led to the order of protection, *id.*, and those officers are employed by the City of Buffalo, not Erie County.  Similarly, the charges against Eckert presumably were brought by the Erie County DA's Office, which is an arm of New York State, not Erie County, for purposes of *Monell* liability.  *See Kellner v. City of New York*, 2021 WL 4251343, at *17 (E.D.N.Y. Sept. 17, 2021) (noting that the Second Circuit has "consistently held that 'inherently prosecutorial functions (i.e., decisions whether to prosecute) are controlled by state policies for purposes of *Monell*'" (citation omitted)); *see also id.* ("[A] prosecutor's decision whether to prosecute an individual may not form the basis for *Monell* liability.").

Eckert also argues that Erie County's "officers, agents, servants, employees, and/or their specialized units were in possession" of evidence related to her arrest. Docket Item 16 at 9.  But she does not explain who possessed that evidence or say how that possession of evidence involved Erie County in her prosecution or the surrender of her weapons.  Eckert therefore has not alleged that her Second Amendment rights were violated by Erie County in any way, let alone pursuant to an official policy or custom.

Eckert alleges that Erie County also is liable for violating her rights under the Fourth Amendment as a result of her arrests and prosecutions.  Docket Item 3 at 44-46. But she alleges that the BPD—not Erie County—was responsible for her arrests.  *See id.* at 64-65 (alleging that on May 23, 2020—the date of Eckert's first arrest—Lockwood, Joyce, and several BPD officers "conspired together to deprive [Eckert] of her rights");

*id.* at 83 (alleging that on January 18, 2021, Salazar and Doe (13) "maliciously arrested [Eckert]"); *id.* at 91-92 (alleging that on September 20, 2021, Doe (16) "falsely charged [Eckert] with possession of a chemical or biological weapon and criminal contempt in the second degree").  Likewise, Eckert does not allege that Erie County was responsible for the continued prosecution of those criminal charges.  *See generally* Docket Item 3. So while she insists that she has "properly plead[ed], with particularity, [that] criminal proceedings were initiated against her," Docket Item 16 at 24, that assertion does not establish *Erie County's* involvement in those proceedings.  Eckert therefore has not alleged that her Fourth Amendment rights were violated by a wrongful arrest or malicious prosecution pursuant to an Erie County custom or policy.[20]

Eckert also alleges that her Sixth Amendment rights were violated when Erie County failed to provide her a speedy trial on the criminal charges against her.  Docket Item 3 at 38-41.  But her only allegation of Erie County's involvement in her allegedly delayed prosecution is that Erie County "conspired" with other defendants "to cause the unnecessary delays."  *Id.* at 39.  That assertion does not plausibly allege—nor even plead—that Eckert's Sixth Amendment rights were violated pursuant to an official policy or custom of Erie County.

---

[20] Any state law malicious prosecution claim fails for a similar reason: Eckert has not alleged that Erie County commenced or continued criminal proceedings against her. *See Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) ("To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show," *inter alia*, "the commencement or continuation of a criminal proceeding *by the defendant* against the plaintiff." (emphasis added) (citations omitted)).  Likewise, Eckert cannot assert a false arrest claim against Erie County because she has not alleged that it was involved in her arrest.  *See Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (noting that a plaintiff asserting a claim for false arrest must allege that the defendant "intended to confine" her).

Finally, Eckert alleges that Erie County violated her right to equal protection when the Erie County Sheriff's Office told her that "the laws do not apply to her because she is white." *Id.* at 41.  Based on the context of that allegation and the rest of Eckert's filings, the Court assumes that the "laws" to which Eckert refers are New York State's laws criminalizing hate crimes.  But Eckert alleges only one instance in which an Erie County official told her she was not entitled to protection under those laws.  *Id.*  That single allegation does not suggest that Erie County had an official policy or custom of failing to investigate hate crimes against white people.  *See Tuttle*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

Because Eckert has not plausibly alleged that Erie County violated her constitutional rights pursuant to an official policy or custom, her section 1983 claims against the County are subject to dismissal.  Those claims will be dismissed unless Eckert amends them as noted below.

### B.      Section 1985 and Section 1986 Claims

Eckert alleges that the Erie County defendants conspired to interfere with her rights in violation of 42 U.S.C. § 1985.  *See* Docket Item 3 at 31-32.  And she alleges that those defendants also are liable under 42 U.S.C. § 1986, *see* Docket Item 3 at 33-34, which "imposes liability on an individual who has knowledge of discrimination prohibited under [section] 1985," *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996).

To bring a claim under section 1985, a plaintiff must allege:

1) conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006).

Again, Eckert's vague and conclusory allegations are insufficient to make her claims plausible and therefore viable. As already noted several times, Eckert repeatedly asserts that the defendants conspired against her. *See, e.g.*, Docket Item 3 at 36, 78-79, 104. But such assertions of a conspiracy, without more, are not enough to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim].")

In an attempt to plead acts taken to further the conspiracy here*, see Britt*, 457 F.3d at 269 n.4, Eckert says that the defendants engaged in

stonewalling [her] and not allowing any lawful complaints to be filed, stonewalling [her] as a victim and would not let her be heard nor participate in any victim rights, ordering [her] to immediately stop posting about political corruption to social media sites in an attempt to silence her, witness statements in an assault were thrown out to cover up a false arrest and malicious prosecution, all lawsuits filed by [Eckert] were thrown out to interfere and deprive her of receiving justice and denying her the right to sue, her property rights were unlawfully taken away prior to due process and then unlawfully transferred against common law, she was blackmailed, her order of protection was not upheld and then went missing, her supporting depositions went missing, and several other acts. [sic]

Docket Item 3 at 32. Eckert does not say which defendants were responsible for those actions; instead, she directs the Court to the timeline of events attached to her

complaint.[21]  *See id.* ("Plaintiff asserts the defendants' actions and conduct were plead[ed] within Exhibit A.").

But this Court has reviewed Eckert's timeline, and it seems that the Erie County defendants were not involved in the acts that allegedly furthered the conspiracy. Indeed, Eckert's conspiracy claim seems to focus on the conduct of the New York State Supreme Court justices who presided over Eckert's and Meadows's state court cases, not on the Erie County defendants.

Because she has not alleged any act by them in furtherance of the conspiracy, Eckert cannot maintain a section 1985 claim against the Erie County defendants.  And because a section 1986 claim is "contingent on a valid [section] 1985 claim," *Graham*, 89 F.3d at 82, her section 1986 claims against the Erie County defendants likewise fail. Eckert's section 1985 and section 1986 claims against the Erie County defendants therefore are subject to dismissal and will be dismissed unless Eckert amends her claims as noted below.

---

[21] Eckert argues that her "timeline is neither vague nor ambiguous and paints a clear picture and inference of actionable claims."  Docket Item 16 at 7.  And it is true that Eckert describes many of the underlying events in great detail.  But her detailed timeline is peppered with conclusory and vague assertions and claims.  For example, Eckert argues that "she has properly alleged a racial animus motivating [the defendants'] actions."  *Id.*  But to support that argument, she cites sections of the complaint that make only conclusory allegations of discrimination.  *See, e.g.*, Docket Item 3 at 34 ("Furthermore, plaintiff alleges certain defendants . . . failed to act as they were unlawfully discriminating against [Eckert] due to her color.").

### C.    Negligent Hiring, Supervision, and Training Claim

Eckert asserts a negligent hiring, supervision, and training claim against Erie County based on the conduct of Howard, Garcia, and Baskin.  Docket Item 3 at 48-49. That claim also fails.

"To state a claim for negligent hiring, training, and supervision, a plaintiff must allege," *inter alia*, that "the tort-feasor and the defendant were in an employee-employer relationship."  *Lawton v. Town of Orchard Park*, 2017 WL 3582473, at *13 (W.D.N.Y. Aug. 18, 2017) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiuam)).

Here, the Erie County defendants argue that Garcia, Baskin, and Howard "are elected officials and not Erie County employees," Docket Item 11 at 12, suggesting that Eckert has failed to establish that Erie County "hired" those defendants or has any obligation to "train" or "supervise" them.  That argument makes intuitive sense: Erie County did not hire—and cannot terminate—Garcia, Baskin, and Howard, so it should not be held liable for failing to "train" or "supervise" them.[22]

Eckert's negligent hiring, supervision, and training claim against Erie County therefore is dismissed.  And because better pleading will not change the nature of the relationship between Erie County and Garcia, Baskin, and Howard, leave to amend is denied.  *See Cuoco*, 222 F.3d at 112.

---

[22] Sheriffs like Garcia and Howard may be held liable for the "failure to train or supervise [their] subordinates," *see Ryan v. Moss*, 2013 WL 956722, at *19 (W.D.N.Y. Mar. 12, 2013), but Eckert does not assert a negligent hiring, training, or supervision claim against Garcia or Howard, *see generally* Docket Item 3.

**D.      Negligent- and Intentional-Infliction-of-Emotional-Distress Claims**

Eckert also asserts negligent- and intentional-infliction-of-emotional-distress claims against the Erie County defendants.  *See* Docket Item 3 at 50-55.  The Erie County defendants argue that those claims must be dismissed because "Eckert failed to plead specific actions committed personally by Garcia, Howard, Baskin, and Erie County by which any of them personally and directly inflicted emotional distress upon her."  Docket Item 11 at 13.

Under New York law, a plaintiff alleging negligent or intentional infliction of emotional distress must show (1) extreme and outrageous conduct by the defendant; (2) a causal connection between that conduct and the plaintiff's injury; and (3) severe emotional distress.[23]  *Rich*, 939 F.3d at 122; *Truman v. Brown*, 434 F. Supp. 3d 100, 122 (S.D.N.Y. 2020).  Because Eckert has not alleged any specific acts taken by the Erie County defendants, she certainly has not alleged that they committed "extreme and outrageous" acts.  *See supra* 22-30. Eckert therefore has failed to plead an essential element of her claims for negligent and intentional infliction of emotional distress.

Eckert's negligent- and intentional-infliction-of-emotional-distress claims against Garcia, Howard, Baskin, and Erie County are subject to dismissal for that reason, and those claims will be dismissed unless Eckert amends them as noted below.

---

[23] A plaintiff alleging intentional infliction of emotional distress also must show "intent to cause, or disregard of a substantial probability of causing, severe emotional distress."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019).

### E.      Leave to Amend Claims Against the Erie County Defendants

In sum, Eckert's negligent hiring, supervision, and training claim against Erie

County is dismissed without leave to amend, and her remaining claims against the Erie

County defendants are subject to dismissal.  But in light of her *pro se* status, *see*

*Cuoco*, 222 F.3d at 112, Eckert may amend the following claims against the Erie County

defendants: (1) her section 1983 claims against all Erie County defendants; (2) her

section 1985 and 1986 claims against all Erie County defendants; and (3) her negligent-

and intentional-infliction-of-emotional-distress claims against all Erie County defendants.

## IV.   MEADOWS'S AND WALDEN'S FILINGS

### A.      Meadows's and Walden's Motion to Dismiss

Defendants Meadows and Walden have jointly filed what they describe as a Rule

12(b)(6) motion to dismiss.[24]  Docket Items 35-36.  This Court has reviewed the

declaration in support of that "motion," however, and finds the filing better classified as

an answer.

Rather than argue that Eckert's claims against them fail as a matter of law,

Meadows and Walden dispute the facts presented in the amended complaint.  *See,*

*e.g.*, Docket Item 36 at 4 ("Meadows has never and would never call plaintiff a cracker

. . ."); *id.* at 5 ("Meadows is, in no way, shape, form, or fashion, related to . . . [Justice]

Ogden . . ."); *id.* at 6 ("Meadows is not 'friends' with Legislator April Baskin.").  What is

more, the supporting memorandum is formatted as an answer: Meadows and Walden

_____

[24] They also have asked this Court to revoke Eckert's *in forma pauperis* status.
Docket Item 36 at 7.  The Court declines to do so.

respond to the allegations in the amended complaint paragraph by paragraph, "confirm[ing]" or "den[ying]" them.  *See generally* Docket Item 36.

This Court therefore denies Meadows's and Walden's motion to dismiss without prejudice and instead deems it an answer to the amended complaint.  Accordingly, the Court need not and does not address the substance of that filing—or Eckert's response, *see* Docket Item 40—at this time.

### B.   Eckert's Motion to Strike

Eckert has moved to strike Meadows's and Walden's declaration on the ground that it "is unsigned by either party; unverified; and injects offensive material which constitutes an inappropriate attempt to abuse the Court's process to attack an individual personally."  Docket Item 43 at 2.  But Meadows and Walden have signed their filings, *see* Docket Item 35; Docket Item 36 at 7-8; and despite Eckert's concerns about the content of the filings, this Court does not believe that content to be a reason to strike them.  Eckert's motion to strike therefore is denied.

## V.   ECKERT'S MOTIONS RELATING TO SERVICE

Although this action was commenced nearly a year ago, many defendants remain unserved: the City of Buffalo, Brown, Lockwood, Joyce, Kurdziel, Dixon, Nightingale-Griffin, Salazar, Costantino, Skrzvnski, Rinaldo, Farley, Curtin, Myers, and Bifaro (the "unserved city defendants").  *See* Docket Item 32.  Eckert has twice attempted to serve those defendants by certified mail.  *See* Docket Items 15, 23.  After the unserved city defendants did not accept service by mail and the second set of summonses was returned unexecuted, Eckert moved for alternative service of those

defendants "via [m]ail, [e]-[m]ail and/or [f]ax," Docket Item 32, and for an extension of time to serve those defendants, Docket Item 34.

While service by those methods may be permitted under certain circumstances, Eckert has not yet tried to personally serve the unserved city defendants. For that reason, and because personal service is more likely to provide actual notice of a lawsuit to a defendant than service by mail, email, or fax, Eckert's motion for alternative service is denied without prejudice. But this Court also construes Eckert's motion as requesting personal service by the United States Marshals Service, and it grants that request. The Clerk of the Court therefore shall cause the United States Marshals Service to personally serve the unserved city defendants at the most recent addresses provided by Eckert for each defendant. If the Marshals Service is unable to effect personal service, Eckert may renew her motion for leave to serve the unserved city defendants via mail, email, or fax.

Furthermore, Eckert's motion for an extension of time to serve the unserved city defendants is granted. The time for Eckert to effect service is extended to the later of 90 days from the date of this order or, if Eckert files a second amended complaint, 90 days from the date of that filing.

## VI.  COMERFORD'S MOTION TO VACATE DEFAULT

Comerford has moved to vacate the default entered against him. Docket Item 45. Eckert has not responded to that motion, and her time to do so has now expired.[25] *See* Docket Item 47.

---

[25] Eckert has, however, moved to strike eleven of the fifteen defenses Comerford asserts in his answer. Docket Item 51; *see* Docket Item 46 (Comerford's answer).

37

Federal Rule of Civil Procedure 55(c) permits the court to "set aside an entry of default" when the moving party shows "good cause."  Deciding whether to set aside a default is "left to the sound discretion of [the] district court."  *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  But "defaults are generally disfavored and are reserved for rare occasions," *id.* at 96, and the Second Circuit has a strong "preference for resolving disputes on the merits," *id.* at 95.  *See also Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981) ("[T]he extreme sanction of a default judgment must remain a weapon of last, rather than first, resort.").  Thus, "when doubt exists as to whether a default should be . . . vacated, the doubt should be resolved in favor of the defaulting party."  *Enron Oil Corp.*, 10 F.3d at 96.

The Second Circuit has established three criteria to consider in deciding whether to set aside a default: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."  *Id.*  Here, those criteria counsel in favor of granting Comerford's motion.

---

A court "may strike from a pleading an insufficient defense."  Fed. R. Civ. P. 12(f).  Nevertheless, "[m]otions to strike under Rule 12(f) are generally disfavored and granted only if there is strong reason to do so."  *Kochan v. Kowalski*, 478 F. Supp. 3d 440, 450-51 (W.D.N.Y. 2020) (citation omitted).  Eckert has not provided such a reason here.  For example, she has not shown that "the inclusion of the [] defense[s] will prejudice [her]."  *See id.* at 450.  Rather, she argues that Comerford's defenses are legally or factually insufficient.  *See, e.g.*, Docket Item 51 at 2 (arguing that Eckert's claims are not barred by the statute of limitations); *id.* at 5 (arguing that Eckert has "done everything in her power to mitigate the damages" she allegedly suffered); *id.* (arguing that Eckert "did not break any laws[ or] violate anyone's rights").

Eckert may continue to argue that Comerford's defenses are insufficient as this case proceeds.  But as Comerford argues, her motion to strike those defenses at this stage "is premature," and Eckert "has not shown that inclusion of the defenses will prejudice her."  Docket Item 56 at 6.  Eckert's motion to strike Comerford's defenses therefore is denied without prejudice.

First, the default clearly was not willful.  Comerford asserts that he served Eckert with his answer "by regular mail on January 4, 2023," Docket Item 45 at 2; *see* Docket Item 45-1 (copy of Comerford's answer with certificate of service dated January 4, 2023), but inadvertently failed to file it, Docket Item 45 at 2.  The Court accepts that assertion.  Additionally, setting aside the default would not prejudice Eckert, especially because the action remains in its earliest stages.  And because the default was entered against only one of many defendants, Eckert's pursuit of her case will be little different with Comerford added.  Finally, there is no reason to believe that Comerford cannot proffer a meritorious defense to the claims against him.

For all those reasons, and given the Second Circuit's strong "preference for resolving disputes on the merits," *see Enron Oil Corp.*, 10 F.3d at 95, there is good cause to vacate the default.  Comerford's motion to vacate the default therefore is granted.

## VII.  ECKERT'S MOTION FOR ELECTRONIC FILING PRIVILEGES

Eckert has requested access to the Court's electronic filing system.  Docket Item 53.  In the alternative, she asks this Court to require Comerford to (1) accept service of future filings "electronically"—presumably by email—or (2) bear the costs of service.  *Id.*  Comerford opposes the motion to the extent Eckert seeks an order compelling him to accept service via email.  Docket Item 55.

The Federal Rules of Civil Procedure provide that a *pro se* party "may file electronically only if allowed by court order or by local rule."  Fed. R. Civ. P. 5(d)(3)(B)(i).  This Court's Local Rules of Civil Procedure incorporate by reference the Court's CM/ECF Administrative Procedures Guide, which in turn provides the

39

requirements and procedures for electronic filing.  *See* Loc. R. Civ. P. 5.1.  The

Administrative Procedures Guide provides that "[t]ypically only registered attorneys, as

Officers of the Court, will be permitted to file documents electronically."  W.D.N.Y.

Administrative Procedures Guide for Electronic Filing, amended October 2022.  The

Administrative Procedures Guide further provides that a Court "may, *[in its] discretion*,

grant a *pro se* litigant *who demonstrates a willingness and capability to file documents

electronically[]* permission to register do so."  *Id.* (emphasis added).

 Eckert cites the expense of service as justification for her request.  Docket Item

53 at 2-3 ("Plaintiff asserts due to there being numerous [d]efendants, having to serve

each one with the pleadings causes a financial hardship on the [p]laintiff and creates a

manifest injustice.").  And she invokes Federal Rule of Civil Procedure 5(c), which

provides that in cases "involv[ing] an unusually large number of defendants," the court

may order that (1) "defendants' pleadings and replies to them need not be served on

other defendants"; (2) "any crossclaim, counterclaim, avoidance, or affirmative defense

in those pleadings and replies to them will be treated as denied or avoided by all other

parties"; and (3) "filing any such pleading and serving it on the plaintiff constitutes notice

of the pleading to all parties."

 Eckert argues that Rule 5(c) "vests this Court with the power to order pleadings

and replies to them need not be served on other [d]efendants."  Docket Item 53 at 3.

But Eckert misunderstands the rule, which is intended to address the burden on

defendants: it provides that *defendants* need not serve every filing on co-defendants,

not that a plaintiff need not serve defendants.

This Court understands that litigation can burden a plaintiff, and it therefore encourages the defendants to allow Eckert to serve her filings on them via email—an easily extended courtesy.  But at this time, it will not force the defendants to do so.  Nor will it require the defendants to bear the cost of service.

With regard to Eckert's request for electronic filing privileges, the Local Rules specifically allow only registered attorneys, not *pro se* parties, to file electronically. Moreover, this case remains in its early stages, and several defendants have not yet been served.  So the Court declines to exercise its discretion to grant Eckert electronic filing privileges.  *See Miller v. Sacramento City Unified Sch. Dist.*, 2021 WL 3883916, at *2 (E.D. Cal. Aug. 31, 2021) (denying request for electronic filing privileges at motion to dismiss stage).

Eckert's motion for electronic filing privileges and to compel Comerford to accept electronic service or bear the cost of service therefore is denied without prejudice.

## VIII.   ECKERT'S MOTION FOR APPOINTMENT OF COUNSEL

Finally, Eckert has asked this Court to appoint her counsel because she "is not a lawyer and [is] not entirely familiar with legalese."  Docket Item 16 at 7.

In deciding whether to appoint counsel, courts first assess the indigent plaintiff's likelihood of success on the merits of her claim.  *See Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986).  If the claim meets this threshold requirement, courts consider a number of other factors, including "the nature of the factual issues the claim presents[,] . . . the plaintiff's apparent ability to present the case[,] . . .  whether appointment of counsel would lead to a quicker and more just result by sharpening the issues and shaping examination[,] . . . [and the plaintiff's] efforts to obtain counsel."  *Id.*

41

Although this action was commenced almost a year ago, most of the defendants have not yet answered the allegations in the complaint.  Therefore, the only facts upon which this Court may base its decision as to whether this lawsuit has merit are Eckert's bare allegations.  And many of Eckert's claims are subject to dismissal as noted above. At this stage, the Court lacks sufficient information to consider the factors stated in *Hodge*.  Eckert's request for appointment of counsel therefore is denied without prejudice as premature.

## CONCLUSION

For the reasons stated above, the Erie County defendants' motion to dismiss, Docket Item 9, is GRANTED in part.  Eckert's negligent hiring, training, and supervision claim against Erie County is dismissed, and Eckert's other claims against the Erie County defendants will be dismissed, unless, within 45 days of the date of this order, Eckert files a second amended complaint correcting the deficiencies noted above.  The Erie County defendants may answer, move against, or otherwise respond to any amended complaint within 30 days of its filing.  If Eckert does not file a second amended complaint within 45 days of the date of this order, then her claims against the Erie County defendants will be dismissed and the Clerk of the Court shall terminate Erie County, Garcia, Howard, and Baskin as defendants in this case.

Meadows's and Walden's motion to dismiss, Docket Item 35, is DENIED without prejudice and deemed an answer to the amended complaint.  Their motion to revoke Eckert's *in forma pauperis* status, Docket Item 36, is DENIED.  Eckert's motion to strike Meadows's and Walden's supporting declaration, Docket Item 43, is DENIED.

42

Eckert's motion to disqualify attorney Toth, Docket Item 39, is DENIED without prejudice.

Eckert's motion for reconsideration, Docket Items 5, 24, 54, is DENIED.

Eckert's motion to amend her complaint, Docket Items 5, 24-25, 49, is GRANTED in part and DENIED in part.  **Within 45 days of the date of this order**, Eckert may amend her complaint to add plausible allegations establishing: (1) claims against Flynn based on his exclusion of her from government programs and the Erie County DA's Office's alleged dissemination of her personal information; (2) claims against the Buffalo Common Council; (3) claims against the Erie County defendants (a) under 42 U.S.C. §§ 1983 and 1985-1986, and (b) for negligent and intentional infliction of emotional distress.  But leave to amend is denied with respect to Eckert's claims against New York State, James, Nugent-Panepinto, Ogden, Siwek, and Grisanti, as well as with respect to her motion to join Jody and Alyssa Wolfson as plaintiffs.

Eckert is advised that an amended complaint is intended to ***completely replace*** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect."  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)*; see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Therefore, any amended complaint must include all allegations against each defendant so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

Eckert's motion for alternative service of the unserved city defendants, Docket Item 32, is GRANTED in part and DENIED without prejudice in part.  If Eckert does not file a second amended complaint within 45 days of the date of this order, the Clerk of

the Court shall cause the United States Marshals Service to personally serve copies of the summons; the amended complaint, Docket Item 3; this Court's prior order, Docket Item 4; and this order upon the unserved city defendants at the most recent address provided by Eckert for each unserved city defendant, *see* Docket Item 17.  If Eckert files a second amended complaint, the Clerk of the Court shall cause the United States Marshals Service to personally serve copies of the summons; this Court's prior order, Docket Item 4; this order; and the second amended complaint upon the unserved city defendants at the most recent address provided by Eckert for each unserved city defendant, *see* Docket Item 17.  Additionally, Eckert's motion for an extension of time to serve the unserved city defendants, Docket Item 34, is GRANTED.  The time to serve the unserved city defendants is extended to the later of 90 days from the date of this order or 90 days from the filing of a second amended complaint.  It is Eckert's responsibility to inquire of the Marshal at 716-348-5300 as to whether service has been made and, if necessary, to request a further extension of time for service.

Comerford's motion to vacate the default, Docket Item 45, is GRANTED.  The Clerk's entry of default against Comerford is vacated.  Eckert's motion to strike the defenses asserted in Comerford's answer, Docket Item 51, is DENIED without prejudice.

Eckert's motion for electronic filing privileges, Docket Item 53, is DENIED without prejudice.  Eckert's motion to compel Comerford to accept electronic filings or bear the cost of service, *id.*, is DENIED without prejudice.  And Eckert's motion for the appointment of counsel, Docket Item 16, is DENIED without prejudice.

SO ORDERED.

Dated:   June 5, 2023
         Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                       _____
                                       LAWRENCE J. VILARDO
                                       UNITED STATES DISTRICT JUDGE