UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RACHEL ECKERT,

        Plaintiff,

  v.

CITY OF BUFFALO et al.,

        Defendants.

22-CV-540-LJV
AMENDED DECISION &
ORDER[1]

---

In March 2020, as COVID-19 turned the world upside down, two neighbors in the

City of Buffalo—the pro se plaintiff, Rachel Eckert, and one of the defendants, Carolette

Meadows—got into a dispute about a pipe.  *See* Docket Item 58 at 143; *see also*

*Meadows v. Buffalo Police Dep't*, Case No. 21-cv-449, Docket Item 134 at 8-9

(W.D.N.Y. Mar. 31, 2023).  The rest, as they say, is history—or, in this case, a series of

state and federal lawsuits brought by either Eckert or Meadows against the other as well

as various government actors who one way or another became embroiled in the

dispute.

This particular action was filed by Eckert on July 11, 2022.  Docket Item 1.  She

asserted claims under 28 U.S.C. §§ 1983, 1985, and 1986; Title VI of the Civil Rights

Act of 1964, 42 U.S.C. § 2000d ("Title VI"); and New York State law against Meadows,

New York State, Erie County, the City of Buffalo, and a number of state, county, and city

---

[1] This decision and order was amended on October 6, 2025, to correct the list of defendants upon whom the United States Marshals Service shall serve copies of the summons; this Court's previous orders, Docket Items 4, 57, and 120; the second amended complaint and accompanying RICO Statement, Docket Items 58 and 59; and this decision and order.

entities, officers, and officials. *See id.*; Docket Item 3 (amended complaint). This Court screened Eckert's amended complaint under 28 U.S.C. § 1915(e)(2), dismissing her claims against New York State, the City of Buffalo Police Department, New York State Attorney General Letitia James, Erie County District Attorney John Flynn, Assistant District Attorney Kristen Elmore, and New York State Supreme Court Justices Jeanette Ogden, Catherine Nugent Panepinto, Mark Grisanti, and Donna Siwek. Docket Item 4.

After Eckert's remaining claims proceeded to service, Erie County, Erie County Sheriff John Garcia, former Erie County Sheriff Timothy Howard, and former Chairwoman of the Erie County Legislature April Baskin moved to dismiss the amended complaint. Docket Item 9. In addition, Denise Walden, Co-Chair of the Police Advisory Board, and Meadows, both proceeding pro se, moved to dismiss the amended complaint. *See* Docket Items 35 and 36. In June 2023, this Court issued a decision and order on those motions as well as several others. *See* Docket Item 57. More specifically, it dismissed Eckert's negligent hiring, supervision, and training claim against Erie County and held that her remaining claims against Erie County, Howard, and Baskin would be dismissed unless she filed an amended complaint addressing the deficiencies that the Court identified. *Id.* at 35, 42. The Court also granted Eckert's motion to amend her complaint to add new claims against Flynn and the Buffalo Common Council.[2] *See id.* at 22-23. And because it "deemed [Meadows's and Walden's motion to dismiss] an answer to the amended complaint," it "denie[d that

---

[2] The Court denied Eckert's motion to amend her complaint to add other claims and parties. *See* Docket Item 58 at 19-22.

motion] without prejudice" and without "address[ing] the substance of that filing." *Id.* at 35-36.

Eckert timely filed a second amended complaint. Docket Item 58. Rather than simply addressing the deficiencies in her previous pleading, however, Eckert's second amended complaint—which spans more than 200 pages and asserts 22 causes of action—includes a host of new parties and claims. *See id.* Indeed, Eckert asserted claims for the first time under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and she filed a separate 37-page RICO statement. Docket Item 59. Eckert also asserted new claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, *id.* § 552a. Docket Item 58 at 129-131; *see also id.* at 132-33 (referring to those statutes).

Eckert's second amended complaint reiterated her claims against Meadows, Walden, Erie County, Baskin, Garcia, and Howard. Docket Item 58 at 1, 3-4. She also reiterated claims against the City of Buffalo and several of its officers and officials: former Mayor Byron Brown; Fuel Device Inspector Frank Bifaro; Commissioner of Permits and Inspections James Comerford; Chief Building Inspector Timothy Curtin; Building Inspector Sean Myers; Commissioner of the Buffalo Police Department ("BPD") Byron Lockwood; BPD Captain Robert Joyce;[3] BPD Lieutenant of Internal Affairs Michael Farley; BPD Freedom of Information Law ("FOIL") Response Officer Jeff Rinaldo; BPD Officers Mark Costantino, Corey Dixon, Walter Skrzvnski, Jacob Salazar,

---

[3] Eckert refers to Joyce as the "Chief of Police of the A- District Buffalo Police Department." Docket Item 58 at 4. The Court takes judicial notice, based on the BPD website, that Joyce is a police "captain." But Joyce's position in the BPD is irrelevant to the Court's analysis here.

James Nightingale-Griffin, and Melissa Kurdziel; and more than 20 other John and Jane Doe BPD officers.  Docket Item 58 at 1-12; *see* Docket Item 3 at 1-5.

In addition, as permitted by the Court's previous order, Eckert asserted new claims against Flynn[4] and the Buffalo Common Council.  Docket Item 58 at 2, 10-11. She also added claims against the New York State Commission on Judicial Conduct and its Agency Administrator and Counsel, Robert Tembeckjian; the Buffalo Commission on Citizens' Rights and Community Relations and its Executive Director, Jason Whitaker; the Buffalo Police Advisory Board; BPD Lieutenant Patrick Morrow; BPD Officers Chad Cullen, Kyma Dickinson, Marc DiPasquale, Kyle Moriarity, James Reese, and Keenan Redmon; and a "Doe" defendant whom Eckert described as "an employee of [the New York State Supreme Court, Erie County]" (the "Erie County Doe").[5]  Docket Item 58 at 1-12.

Erie County, Flynn, Garcia, Howard, and Baskin (the "Erie County defendants") then moved to dismiss Eckert's second amended complaint, Docket Item 70; Meadows

---

[4] The second amended complaint also asserts claims against the Erie County District Attorney's Office.  *See* Docket Item 58 at 23.  But "[i]n New York State, a district attorney's office is not a separate legal entity capable of being sued."  *Richir v. Vill. of Fredonia, N.Y.*, 2008 WL 2778920, at *2 (W.D.N.Y. July 14, 2008); *see Conte v. County of Nassau*, 2008 WL 905879, at *1, n.2 (E.D.N.Y. Mar. 31, 2008).  The Court therefore dismisses Eckert's claims against the Erie County District Attorney's Office.  But reading the pleading as broadly as possible in light of Eckert's pro se status, *see Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006), the Court deems her allegations against that office to be brought against Flynn and Erie County.

[5] Eckert refers to the "Erie County Courts," *see* Docket Item 58 at 8, but this Court assumes she means the New York State Supreme Court, Erie County.  *See* Docket Item 58 at 8, 137.  Eckert also alleges, somewhat contradictorily, that she "has reason to believe that this Doe is actually . . . Baskin, and [that] she abused her power to obtain private, confidential information from the [New York Courts]."  *Id.* at 137. Eckert does not explain the basis for this belief.

also moved to dismiss, Docket Item 68; and Walden, now represented by counsel, moved for judgment on the pleadings, Docket Item 110.[6]  Eckert responded to each of those motions, *see* Docket Items 75, 76, and 111, and both Meadows, *see* Docket Items 77 and 78, and Walden, *see* Docket Item 113, replied.[7]  On August 22, 2025, Eckert moved to "join[] Buffalo Police Officer R.T. Maureen Wojtanik . . . as a defendant in this matter."  Docket Item 121.  Eckert also filed several motions related to case deadlines—that is, a motion opposing certain defendants' receiving additional time to answer and a motion for a status conference regarding service issues and case deadlines.  *See* Docket Items 90 and 115.

For the reasons that follow, the Erie County defendants' motion to dismiss is granted in part and denied in part; Meadows's motion to dismiss is granted in part and denied in part; and Walden's motion for judgment on the pleadings is granted.  In addition, the Court screens Eckert's new claims under 28 U.S.C. § 1915(e)(2), dismissing several of those claims while allowing others, including the claims against Wojtanik, to proceed.  Eckert's motions involving case deadlines, Docket Items 90 and 115, are denied as moot.

---

[6] Before moving for judgment on the pleadings, Walden answered the second amended complaint.  Docket Item 66.

[7] The Erie County defendants did not reply.

## BACKGROUND[8]

Eckert says that she "seeks relief for a pattern of continuous conduct" by the defendants that began in early spring 2020 and "continues to this very day, unabated." Docket Item 58 at 43.  She alleges that the defendants, acting in concert, have violated her rights and harmed her in myriad ways; indeed, she says, the conduct about which she complains "is far beyond all possible bounds of human decency . . . and utterly intolerable." *Id.* at 43-44.  The Court summarizes her allegations below.

### I.   THE INITIAL PIPE DISPUTE

Eckert's feud with Meadows began on March 28, 2020, when Meadows "cut Eckert's furnace flu pipe entirely off," claiming that the pipe was on Meadows's property. *Id.* at 143.  Eckert called the police, and defendant Officer Salazar "filed a report for criminal mischief, trespassing, and harassment"—presumably against Meadows although Eckert does not specify.  *See id.*  The next day, "Meadows, without cause, pounded on Eckert's front door [and] threaten[ed] to assault her."  *Id.*

---

[8] On a motion to dismiss, courts "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  The following facts are taken from the second amended complaint, Docket Item 58, and Eckert's RICO statement, Docket Item 59.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (some internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))).

In light of Eckert's pro se status, her filings are "construed 'liberally' and 'interpreted . . . to raise the strongest arguments that they suggest.'"  *Triestman*, 470 F.3d at 474 (alteration omitted) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  Throughout this decision and order, some capitalization has been omitted when quoting from the second amended complaint.

Eckert again called the police; this time, defendant Officer Kurdziel responded. Kurdziel told Meadows "to stay off Eckert's property," but Meadows said that she "owned the pipe because it was on her property." *Id*.  After Kurdziel ordered Meadows to "return the pipe," Meadows "whipped the pipe towards Eckert" and told Kurdziel that she was "tired of these white bitches moving in[to] the neighborhood," apparently referring to Eckert, who is white. *Id*.; *see also id*. at 108 (Eckert's identifying herself as "a white woman").  Later that day, Eckert put up a sign on her lawn stating, "PRIVATE PROPERTY No Trespassing KEEP OUT." *Id*. at 143.

Eckert attempted to "repair . . . her furnace," but Meadows prevented her from doing so by "shov[ing] her off the property." *Id*. at 144.  So Eckert "called the police" a third time. *Id*.  Defendant Officer Doe No. 1 responded to the call and told Eckert that "she could not make repairs to her furnace because [that would] be trespassing" and that she had to "deal with it in civil court." *Id*.  Either Doe No. 1 or another officer not named as a defendant told defendant Building Inspector Myers "to handle the property line issue." *Id*.

Matters continued to escalate.  On March 30, 2025, Defendant Officer Doe No. 2 "threatened to arrest [Eckert] for trespassing when attempting to make necessary repairs to her home." *Id*. at 145.  He "told [her] to contact" Myers and defendant Chief Building Inspector Curtin to "get authorization to" repair her furnace. *Id*.  After speaking with her lawyer and contacting Curtin, Eckert "removed a fence from her property to gain access to the damaged exhaust pipe." *Id*. at 145.  Meadows then called the police, and Kurdziel responded, "threaten[ing] to arrest [Eckert] for removing the fence and forc[ing] her to [put] the fence back . . . against [Eckert's] will." *Id*.  Kurdziel then

"remained at Eckert's residence for a prolonged period of time . . . , humiliating her in front of all her neighbors." *Id.* Meadows recorded the incident and posted it on social media. *Id.* at 145. The encounter "caused undue stress" to Eckert and "emboldened" Meadows. *Id.* at 146.

That same night, one of Eckert's family members called the police and spoke to "an unknown [BPD] lieutenant," warning about "the dangers of the . . . exhaust pipe being disconnected" and stating that the lieutenant would "be responsible for three deaths [presumably Eckert's and her children's] in the event of carbon monoxide poisoning." *Id.* The lieutenant "agreed . . . that the repair needed to be made" and said that Eckert should call the BPD "when she was ready to make the repairs so they could send a squad car out to meet [her to] make sure there were[ not] any problems." *Id.* But the next day—March 31—when Eckert called the police for that assistance, she was told that the BPD would not help her. *Id.* at 147. Instead, Curtin and Myers "c[a]me out to inspect [Eckert's] property" based on the BPD's recommendation, and they "verified [that Eckert] owned at least 1.5 feet on the north[ ]side of her home and [that] it was critical [for] her exhaust pipe [to] be repaired." *Id.* at 147.

Eckert then called the BPD to "inquire[]" about what Curtin and Myers had "advised [the] BPD." *Id.* "In a very nasty and hostile tone," Officer Wojtanik said that Curtin and Meyers had told the BPD that Eckert owned the 1.5-foot area at issue "but that [Eckert was] not allowed over there"—Eckert does not say exactly where "there" was—and that she would be "arrested for trespassing" if she tried to go over "there" or "tried to remove the fence . . . off her property again." *Id.* at 148. Curtin and Myers then "told [Eckert that] she was not allowed to put up [her own] fence to protect her property .

. . and if she put one up, they would rip it down," something for which they "later apologized," explaining that they "did not [realize the dispute with Meadows] was that serious."  *Id.* at 149-50.  Eckert reached out to counsel for the City of Buffalo about these threats but she "did not receive a response."  *See id.* at 150, 153.

On the same day—March 31, 2020—Eckert and one of her children "began vomiting," so "[s]he and her children went to the Erie County [Medical Ambulatory Care] Center."  *Id.* at 148.  Blood tests showed that "her children [had] sustained carbon monoxide poisoning," and Eckert then informed "Detective Lauren McDermott"[9] of that fact.  *Id.*  McDermott told Eckert that Meadows would be charged with "endangering the welfare [of] two minors."  *Id.*  But two days later, McDermott told Eckert that her supervisor"—defendant Doe No. 3—"said not to charge Meadows with child endangerment because the BPD "didn't know [Meadows's] intent."  *Id.*

Several weeks later, on April 20, 2020, defendant Inspector Bifaro inspected Eckert's furnace and found that it was "up to code."  *Id.* at 150-51.  But on May 12, 2020, Bifaro called Eckert on Curtin's behalf to "demand[ that] she relocate her existing furnace pipe because Meadows was complaining" about it.  *Id.* at 151.  Eckert "refused to cooperate without a court order," and Bifaro told her "to either 'relocate the pipe or go to court for not having a permit.'"  *Id.*  Eckert "has since remediated the permit issue." *Id.*  About a month later, a BPD officer, defendant Doe No. 4, "threatened to file

---

[9] Eckert does not say whether McDermott worked for the BPD, but given Eckert's pattern of contacting that department, the Court assumes that she did.  McDermott is not named as a defendant.  *See* Docket Item 58 at 1-12.

charges" against Eckert if she did not move her vent pipe.  *Id.* at 62.  Eckert again refused to comply without a court order.[10]  *Id.* at 153.

## II.    THE RESULTING PHYSICAL ALTERCATION

On May 20, 2020, Meadows called the BPD when Eckert "removed a partial fence structure [from Eckert's] property."  *Id.* at 154.  Salazar, the responding officer, told Eckert that the fence belonged to Meadows even though—according to Curtin's and Myers's survey—the fence was on Eckert's property.  *Id.*  Salazar also said that Eckert must allow Meadows to "trespass" so that Meadows could park her car even though there was no record of an easement on Eckert's property.  *Id.*  This was part of a pattern:  Kurdziel, Salazar, defendant Captain Joyce, defendant Officer Dixon, defendant Lieutenant Farley, and the Doe defendants all have inhibited Eckert's ability to "exclude people from [and to control] her property."  *Id.*

That same day, Meadows "covered [Eckert's] security cameras with paper towels" and "began pounding on [Eckert's] house."  *Id.* at 155.  Eckert's son called 911, and the responding officer, defendant Doe No. 5, told Meadows "to leave Eckert's cameras alone" but did not file a report.  *Id.*  The next day, Meadows again covered Eckert's cameras, entered Eckert's backyard, and "pound[ed] on [Eckert's] house."  *Id.* at 155-56.

---

[10] Eckert experienced a similar issue in January 2022, when the Buffalo Permits and Inspections Department sent her a letter "attempting to get her to make modifications to her gutters," which "were newly installed in December . . . 2021 and were installed to code."  Docket Item 58 at 216-17.  Eckert believes that the letter was retaliation by Comerford, Curtin, and Myers.  *Id.*

On May 23, 2020, Eckert noticed that the privacy fence in her backyard was missing a panel, saw the panel in Meadows's yard, and called 911. *Id.* at 156. Salazar and defendant Cullen responded, "retrieved the panel," "returned it to" Eckert, but "refused to file a police report [against Meadows] for theft." *Id.* Instead, they "intimidated [Eckert]," said that the wind had damaged the fence, and claimed that Meadows merely had picked up the damaged panel. *Id.* at 157.

That evening, Meadows entered Eckert's backyard with an electric saw and cut the fence panel that Salazar and Cullen had retrieved. *Id.* When Eckert "ran outside" and ordered Meadows to "get out of her yard," Meadows began "threaten[ing] her," "chased her," and—once she had Eckert cornered—"lunged towards [her] . . . with the saw." *Id.* at 157-58. Eckert fought back "in self-defense" but was unable to prevent Meadows from "bit[ing Eckert] in the neck, breaking the skin"; "grabb[ing] her by the hair"; "punch[ing] her several times in the head"; and "pinch[ing] her." *Id.* at 158.

Both Eckert's son and a neighbor called 911, and the neighbor pulled Meadows off Eckert. Several officers arrived, including Dixon who was the first on the scene; when his car pulled up, Meadows "ran up to his car screaming[,] 'This white bitch just attacked me and I want her arrested.'" *Id.* Dixon "called [Eckert] a liar" and accused Eckert of "concoct[ing] a story." *Id.* at 159. In addition, Dixon, whom Eckert notes is Black, "refused and/or failed to take statement[s] from" three witnesses, all of whom were white, and even "threatened to ta[s]e a concerned . . . citizen," who also was white. *Id.* at 158. And all the responding officers "attempted to delay if not deny [Eckert] medical attention," telling her that Meadows would "get[] the ambulance" that was coming and that if Eckert "wanted one, she[ would] have to 'wait hours because it

11

was busy.'" *Id.* at 159.  After some time, Eckert "agreed to take herself [to the emergency room] due to the pain." *Id.*

Defendant Officer Nightingale-Griffin also "intimidated" Eckert, telling her that "the only way [Eckert] could press charges [against] Meadows [wa]s if . . . Meadows [could] press charges [against] her." *Id.*  But Eckert was not told what she would be charged with.  More than six months later, on December 5, 2020, defendant Officer Reese arrested Eckert and charged her with felony "assault in the second degree" based on the May 2020 incident even though Eckert had acted only in "self-defense." *Id.* at 68. Eckert says that Dixon, Nightingale-Griffin, and Meadows "conspired" to get Eckert falsely arrested and maliciously prosecuted. *Id.* at 159.  She says that in the aftermath of the physical altercation, Dixon and Meadows "discuss[ed] the George Floyd movement and [that] Meadows falsely [told] Dixon that . . . [Meadows] was receiving disparate"—presumably unfavorable—"treatment." *Id.* at 159-60.  Meadows "also mentioned [defendant] Baskin's name to Dixon, asserting that Baskin could vouch for Meadows['s] claims that [Eckert was] 'getting away with stuff because she is white.'" *Id.* at 160.

## III. ECKERT'S OTHER CONFRONTATIONS WITH MEADOWS

Following the physical altercation, the feud between the neighbors only got worse.  Eckert says that she "has several videos of Meadows hitting [Eckert's] house with her . . . vehicle, causing damage to the . . . siding and gutters." *Id.* at 162.  In an effort to prevent "further damage[]," Eckert "installed plumbing pipes from her porch to the end of her property line" and "posted a . . . sign" that said "NO PARKING." *Id.*  This was to no avail:  Meadows "sawed the pipes off [Eckert's] house while [Eckert] was at

work." *Id.* Unnamed BPD officers "filed an incident report but did not follow up." *Id.* When Eckert again tried to install the pipe, the same thing happened: Meadows sawed it off—scaring Eckert's child in the process—and responding officers "filed a . . . report but did not follow up." *Id.* at 163.

The pattern repeated itself. Over the ensuing months, Meadows continued to harass Eckert, including by trespassing on Eckert's side of the property line, covering Eckert's cameras, stealing Eckert's things, damaging Eckert's property, "blar[ing] the radio," and making threatening comments and gestures. *See, e.g.*, *id.* at 164, 167-73, 176-87, 200-02, 211, 213-14, 221. She "h[ung] a tarp between her[] and [Eckert's] house[s]" and called Eckert a "bitch." *Id.* at 177, 179-81. She spoke at a "town meeting held by [the Buffalo Common Council]" that "was streamed [on] the[ Common Council's] Facebook account"—"publicly defam[ing Eckert] in front of potentially millions of viewers."[11] *Id.* at 177-78. In a word, she made Eckert's life miserable.

Despite this onslaught from Meadows, Eckert says, BPD officers continuously failed to respond adequately and, in fact, actively thwarted Eckert's efforts to get relief. *See, e.g.*, *id.* at 163-64, 167-77, 179-81, 183, 185, 187. The BPD failed to act even after a restraining order was issued against Meadows. *See id.* at 51 (alleging that defendant Morrow told Eckert that unless Meadows physically assaulted her, the BPD would not "enforce the order [of protection]"); *id.* at 171-72 (alleging that defendants Skrzvnski and Costantino told Eckert that because the restraining order was not "in the system," they could not charge Meadows with violating it).

---

[11] Without minimizing the potential harm of such an experience regardless of the viewer count, the Court suspects that "potentially millions of viewers" may overestimate the number of people tuning into a livestream of Buffalo Common Council proceedings.

In fact, on several occasions, just as occurred after Meadows assaulted her on May 23, the BPD filed charges against Eckert rather than Meadows. *See, e.g.*, *id.* at 68-69. On January 18, 2021, for example, Salazar arrested Eckert "without probable cause" and "charged [her] with [two m]isdemeanors": "petit larceny and criminal mischief." *Id.* at 69, 187-88. Defendants Joyce, Farley, and Commissioner Lockwood conspired in the unconstitutional arrest. *Id.* at 187-88. Months later, on September 20, 2021, Eckert was arrested by defendant Moriarity, again "without probable cause," and "charged with . . . [felony] criminal possession of a chemical . . . or biological weapon in the first degree." *Id.* at 69.

Further, Eckert says, the City of Buffalo, District Attorney Flynn, and a number of BPD officers were "aware" or "in possession of exculpatory evidence including eyewitness statements, testimonies, and AXON body camera data." *Id.* at 69-70. Dixon and Nightingale-Griffin "suppressed a statement by a witness, even though her legal guardian gave express permission [for them] to speak with her."[12] *Id.* at 70. As a result of Eckert's arrests, Meadows "was issued an order of protection against [Eckert]," which required Eckert "to turn over" two firearms "to her father" in March 2021. *See id.* at 99. She was not able to get her weapons back until July 2022. *See id.* Eventually, the "petit larceny, criminal mischief, and second-degree assault" charges were dismissed. *Id.* at 99, 227.

---

[12] Eckert also says that she was "falsely arrested" by Morrow, Dixon, Nightingale-Griffin, and DiPasquale, as well as defendants Reese and Redmon. Docket Item 58 at 99. It is not clear to this Court whether Eckert refers to a separate incident in which she was arrested by all those officers or whether she is simply naming all the officers involved in arrests described elsewhere in the complaint.

## IV.    STATE COURT PROCEEDINGS

As the feud escalated, both Eckert and Meadows became regular litigants in New York State Supreme Court, Erie County.  *See generally id.* at 197 (alleging that Meadows "abuses the processes of the courts to harass, annoy, and alarm" others).  Meadows has commenced at least two actions against Eckert in state court,[13] *see id.* at 162, 197, 207, 219, and Eckert has commenced at least three actions against Meadows, *see id.* at 199 (June 2021 defamation action, July 2021 nuisance action); *id.* at 222 (May 2022 defamation action).  Eckert says that she also has been treated unfairly in state court and that the various judges and justices who have presided over their cases are biased in favor of Meadows.[14]  *See, e.g.*, *id.* at 64, 85, 88-89, 95-96, 217, 221, 223, 226, 230-32, 234.

## V.    ECKERT'S ATTEMPTS TO GET HELP

On February 22, 2021, Eckert learned that Meadows "is an Erie County Democratic Committee Member."  *Id.* at 189.  She then filed complaints with that committee "regarding Meadows['s] behavior," telling the committee that Meadows did not even "live in the Masten District" but "was using [another] address to unlawfully vote and sit on the committee."  *Id.* at 189-90.  Eckert eventually spoke to Jeremy Zellner,

---

[13] As noted above and in Eckert's second amended complaint, Meadows also commenced an action in this Court.  *See* Docket Item 58 at 193; *Meadows*, Case No. 21-cv-449, Docket Item 1 (Mar. 29, 2021).

[14] This Court dismissed Eckert's claims against New York State Supreme Court Justices Jeannette Ogden, Catherine Nugent Panepinto, Mark Grisanti, and Donna Siwek at the screening stage.  Docket Item 120 at 1.  And it since has denied two motions by Eckert to reconsider its dismissal of some or all of those claims.  *See* Docket Item 57 at 17-18; Docket Item 120 at 9-11.

the committee chair, about the matter.  *See id.* at 190.  But despite Eckert's best efforts, Meadows was not removed from her position:  Zellner said that "he did not care" about Meadows's violation of the rules.  *See id.*

Eckert also has requested the assistance of, and complained to, various government entities.  She filed several complaints with the Buffalo Common Council without a response, and when she tried to speak before the council, she was not allowed to do so.  *See id.* at 152, 155, 161, 166, 191, 196-99.  She spoke with the Erie County District Attorney's Office, *see id.* at 150, 152-53, 155-56, 168, 170, 177, 180, 189, 193-94, 198, 204, 208, 227-28, and she filed two complaints with the United States Department of Justice,[15] *see id.* at 160, 224.  She also complained to the New York State Public Integrity Bureau, *see id.* at 161, 189; the New York State Attorney General's Office, *see id.* at 217-18, 220; the New York State Office of the Inspector General, *id.* at 212, 220; Mayor Brown, *id.* at 161, 173-74; defendants Curtin and Commissioner of Permits and Inspections Comerford, *see id.* at 145, 152-53, 168; Bifaro, *see id.* at 181; the Civil Service Commission, *see id.* at 156; the Erie County Executive's Office, *see id.* at 152; the Erie County Ethics Board, *see id.* at 191; the Erie County Board of Elections, *see id.* at 191-92; the Erie County Sherrif's Office, *id.* at 192; and the Commission on Citizens' Rights and Community Relations through its executive director, Jason Whitaker, *id.* at 175, 188, 190, 193, 196.[16]  Eckert even tried to get help

---

[15] In reply, the Department of Justice sent her a "generic response" telling her to contact the Federal Bureau of Investigation" ("FBI").  Docket Item 58 at 160.  But the FBI also failed to do anything.  *See id.*

[16] In addition, after Meadows "stole [Eckert's] Halloween decorations off [her] porch," "Eckert filled a 311 complaint" with some unidentified official entity.  Docket Item 58 at 170.  But the matter was "just closed" and "[n]o officials followed[ ]up with her."  *Id.*

from the Buffalo Police Advisory Board, not realizing that its co-chair was Walden, a friend and relative of Meadows. *Id.* at 215-16. None of those efforts was successful; in fact, Eckert often received no response at all. *See generally id.*

Most of the time, however, Eckert would contact the BPD about her dispute with Meadows. In addition to the many contacts noted above, Eckert sent several "notice[s] of non-spoliation" to the BPD and its officials, asking them to "preserve specific body camera data" from the officers who responded to her and Meadows's calls. *See, e.g.*, *id.* at 150, 161, 165-166, 174. Likewise, she asked for body camera footage and other material under the New York State Freedom of Information Law, frequently contacting the BPD's FOIL officer, Rinaldo.[17] *See, e.g.*, *id.* at 129, 165-69, 178, 229-30, 233. Even those requests were unsuccessful. *See, e.g.*, *id.* at 166-68. Eckert also filed multiple complaints about the conduct of BPD officers. *See id.* at 169, 195, 210, 224; *see also id.* at 163-64 (alleging that by mid-June 2020, Eckert had "reached out" to BPD Internal Affairs and the Community Police Officer—not named as a defendant here— "over fifteen times since March 2020"). But like everyone else Eckert contacted, the BPD did not provide a satisfactory response to her inquiries and complaints; in fact, she often received no response at all. *See generally id.*

Eckert says that her inability to get help is no accident: Her second amended complaint is replete with claims that various defendants are conspiring to deprive her of her rights and otherwise harm her. *See generally* Docket Item 58. And as noted, she asserts RICO claims for the first time in her second amended complaint. *See* Docket

---

[17] Eckert filed FOIL requests with Erie County and City of Buffalo entities as well. *See, e.g.*, Docket Item 58 at 129, 175-76.

Items 58 and 59.  More specifically, she says that beginning as early as March 2020, four separate enterprises made up of different sets of defendants "collaborated [together] . . . with the common goal" of "corruptly and wrongfully violat[ing her] right to life, liberty, and property[;] impeding her ability to access the courts[;] and otherwise sabotaging her professional career."  Docket Item 59 at 3-5.

## VI.    RELIEF SOUGHT

Eckert seeks various relief, including $28,750,000 in damages; an injunction prohibiting the City of Buffalo and Erie County from preventing her "participation in FOIL [sic]"; and a declaration that "she is entitled to the same equal access and protection of laws as every other citizen in" Buffalo, Erie County, and New York State.  *See* Docket Item 58 at 138-142.

## LEGAL PRINCIPLES

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

The standard for deciding a Rule 12(c) motion is "the same . . . standard [that is] applicable to dismissals pursuant to [Rule] 12(b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). "Thus, [courts] will accept all factual allegations in the [c]omplaint as true and draw all reasonable inferences in [the plaintiff's] favor." *Id.* (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)).

## DISCUSSION

As noted above, Eckert asserts twenty-two causes of action against the defendants. But her claims can be grouped broadly into eight categories: (1) claims under section 1983, Docket Item 58 at 63-84, 93-109 (first, second, third, fourth, fifth, sixth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth causes of action);[18] (2) claims under sections 1985 and 1986, *id.* at 84-89 (seventh and eighth causes of action); (3) claims under Title VI, *id.* at 90-93, 109-114 (tenth and sixteenth causes of action); (4) RICO claims, *see* Docket Item 58 at 14; Docket Item 59;[19] (5) claims under FOIA and the Privacy Act, *id.* at 129-31 (twentieth cause of action); (6) claims under the New York State Personal Privacy Protection Law, *id.* at 131-38 (twenty-first cause of

---

[18] Eckert does not explicitly invoke section 1983 in all of these causes of action, sometimes referring only to a particular constitutional amendment. But the Court construes those causes of action as raising section 1983 claims because Eckert Is suing state, county, and municipal officials for violating her constitutional rights.

[19] Eckert does not list her RICO claim as one of the causes of action in the second amended complaint, although she does refer to those claims at points in that pleading. *See* Docket Item 58. Instead, she asserts her RICO claims only in her required RICO statement, Docket Item 59; *see* Loc. R. Civ. P. 9 (requiring any plaintiff asserting a RICO claim to file a RICO case statement with certain specified information "contemporaneously with the papers first asserting the party's RICO claim"). In light of Eckert's pro se status, this Court treats the RICO statement as the twenty-second cause of action.

action); (7) claims for negligent hiring, training and supervision under New York State law, *id.* at 114-120 (seventeenth cause of action); and (8) claims for intentional and negligent infliction of emotional distress under New York State law, *id.* at 120-128 (eighteenth and nineteenth causes of action).[20]

Also as noted above, the Erie County defendants and Meadows have moved to dismiss Eckert's claims, *see* Docket Items 68 and 70, and Walden has moved for judgment on the pleadings, *see* Docket Item 110. The Court addresses each of those motions in turn before screening Eckert's claims against the newly named defendants.

I.    **ERIE COUNTY DEFENDANTS' MOTION TO DISMISS**

Of the eight categories of claims described above, Eckert asserts each of them against at least one of the Erie County defendants. The Erie County defendants argue that for each cause of action naming one of them, Eckert's allegations fail to state a claim on which relief can be granted. *See* Docket Item 70. The Court examines each set of claims in turn.

A.    **Section 1983 Claims**

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and

---

[20] Eckert also asserts a ninth cause of action under 42 U.S.C. § 1988. *See* Docket Item 58 at 89-90. But she does not include any allegations in support of this cause of action. Even if she had, section 1988 "is a law that provides for awards of reasonable attorney's fees in certain cases," and "individuals [like Eckert] who are proceeding pro se are not entitled to attorney's fees under [that section]." *Cano v. City of New York (NYCDOC)*, 2023 WL 4134341, at *3 (S.D.N.Y. June 20, 2023) (italics omitted). Eckert "therefore [has] not" stated—and cannot state—"a claim under [s]ection 1988 upon which relief may be granted," *see id.*, and her claims under that section are dismissed.

(2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

Eckert alleges that the Erie County defendants violated her constitutional rights in various ways. She names them in her first, thirteenth, and fifteenth causes of action, which charge all defendants with violating her rights under the First, Second, Fifth, Sixth, and Fourteenth Amendments. Docket Item 58 at 64-66, 100-101, 106-09. She more specifically alleges that Baskin and Flynn violated her First Amendment rights, *see id.* at 75-81, 93-98 (fifth and eleventh causes of action), and that Flynn also violated her Sixth and Fourteenth Amendment rights when he "malicious[ly] prosecut[ed]" her, committed "prosecutorial misconduct" against her, and denied her right to a speedy trial, *id.* at 68-75, 101-05 (third, fourth, and fourteenth causes of action).[21] And she asserts a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against Erie County. *See id.* at 81-84 (sixth cause of action).

---

[21] Eckert does not specifically refer to the Fourteenth Amendment in asserting these claims against Flynn, but the Court infers it from the context of her allegations, which center on misconduct in Eckert's criminal proceedings. *See* Docket Item 58 at 72-75. In any event, regardless of the constitutional basis for those claims, they are barred by prosecutorial immunity as described below.

### 1.    Claims against Flynn

This Court addressed Eckert's claims against Flynn related to her prosecutions at the screening stage. Docket Item 4 at 10-12. As the Court explained, Eckert "takes issue with the when, where, and how of Flynn's decision to prosecute—precisely the type of conduct that prosecutorial immunity is designed to protect." *Id.* at 12. And for that reason, it held that any amendment of those claims would be "futile" and dismissed them without leave to amend. *Id.* (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Eckert then moved for reconsideration of that dismissal, Docket Item 5 at 1, and to amend her complaint to add new claims against Flynn, *see id.* at 3-4. The Court denied those motions except in one narrow respect: It held that Eckert "may amend her complaint to assert claims against Flynn" for "retaliat[ing] against her by labeling her persona non-grata" and for "unlawfully disseminat[ing] her private and personal information to Meadows." *See* Docket Item 57 at 16-17, 19-21 (internal quotation marks and italics omitted).

Eckert's second amended complaint nonetheless reasserts the same claims against Flynn, including for "malicious prosecution" and "prosecutorial misconduct." *See* Docket Item 58 at 68-75. She cannot assert those claims for the reasons already explained in the Court's previous orders. *See* Docket Item 4 at 10-12; Docket Item 57 at 16-17.

Eckert stresses in her second amended complaint that Flynn was "aware of exculpatory evidence" that could "establish her innocence"; that he "attempted to get [her] to take a plea deal"; and that he "cause[d] unnecessary delays" in her proceedings. *See* Docket Item 58 at 68-75, 104. She says that he did all this "to retaliate against her for exercising her [First Amendment] rights." *Id.* at 70. But those claims about what

Flynn did or did not do in connection with Eckert's prosecution are no less barred by prosecutorial immunity than the ones Eckert asserted before. *See D'Alessandro v. City of New York*, 713 F. App'x 1, 7 (2d Cir. 2017) (summary order) ("[E]ven when a prosecutor is legally required to turn over evidence to opposing counsel, she still retains her absolute immunity for failing to provide that evidence."); *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986) (noting that "conduct of plea bargaining negotiations" falls within scope of prosecutorial immunity); *Gadreault v. Bent*, 2022 WL 943669, at *6 (D. Vt. Mar. 3, 2022) (holding that prosecutors were immune from suit for "[a]ny actions that they allegedly undertook in connection with [plaintiff's] prosecution— including their alleged delay of [his] trial—[because those actions were] within the ambit of their prosecutorial duties"), *report and recommendation adopted*, 2022 WL 910927 (D. Vt. Mar. 29, 2022).

The second amended complaint adds a new allegation that members of the Erie County District Attorney's Office, "under the supervision of Flynn, disseminated" Eckert's law enforcement records to Meadows. *See* Docket Item 58 at 132-35. Eckert says that this disclosure "violat[ed] . . . the Privacy Act" and was an "invasion of [her] privacy." *See id.*

Even assuming that this disclosure was made outside the context of an ongoing prosecution and that prosecutorial immunity therefore does not apply, Eckert still has failed to state a claim under section 1983 for at least two reasons. First, Eckert does not say that Flynn was personally involved in this disclosure; she says only that he was supervising those who were. *See* Docket Item 58 at 132-35. But to establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that

each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Second, while courts have recognized a constitutional right to privacy with respect to some kinds of information—such as "medical" or "financial" information"—"courts have held that th[is constitutional] right of confidentiality does not prohibit the disclosure of an individual's criminal history, including the individual's arrest records." *Kaminski v. Hayes*, 2009 WL 3193621, at *7 (D. Conn. Sept. 30, 2009) (collecting cases). So Eckert's allegations about prosecutors' disclosure of records fails to state a claim under section 1983.[22]

    For those reasons, Eckert has—once again—failed to state a section 1983 claim against Flynn, and any such claims are dismissed.

### 2.    Claims against Garcia and Howard

    "It is well settled that, in order to establish a defendant's individual liability in a suit brought under [section] 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (italics omitted). Indeed, as just explained, to state a section 1983 claim, a plaintiff must show that the defendant violated the plaintiff's rights "through the official's own individual actions." *Tangreti*, 983 F.3d at 618. It is not enough to assert that the defendant is a "link[] in [a] chain of command." *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). And the theory of respondeat

---

[22] The Court addresses Eckert's claim that this disclosure nonetheless violated her rights under federal and New York State privacy laws below.

superior is not available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

In its previous decision, this Court held that Eckert had failed to sufficiently allege Garcia's, Howard's, or Baskin's personal involvement in any constitutional violation. *See* Docket Item 57 at 23-27.  It therefore held that her section 1983 claims against those defendants were subject to dismissal but in light of her pro se status gave her leave to amend to correct that deficiency.  *See id.*

The Erie County defendants say that "Eckert has failed once again to provide facts as to a specific action taken by any of the Erie [County] defendants to deny her of [any constitutional] rights."  Docket Item 70-1 at 11.  Except for one allegation addressed below, this Court agrees.

Eckert includes no specific facts showing that either Garcia or Howard was involved in any constitutional violation.  Instead, Eckert says that each was the Erie County Sheriff at the time of some of the incidents she alleges, *see* Docket Item 58 at 23-24, and that both were negligent in hiring, supervising, and training certain individuals, *see id.* at 118-19.  Such allegations cannot state a claim under section 1983:  "Outside of a . . . claim [against a municipality under *Monell*] for a policy of negligent hiring or retention, a general claim of negligence is not actionable under [section] 1983."  *D.J. by Comfort v. Corning-Painted Post Area Sch. Dist.*, 722 F. Supp. 3d 148, 166 (W.D.N.Y. 2024) (collecting cases), *reconsideration denied*, 2024 WL

5244392 (W.D.N.Y. Dec. 30, 2024).  Eckert's section 1983 claims against Garcia and Howard therefore are dismissed.[23]

### 3.    Claims against Baskin

The Erie County defendants say that Eckert's claims against Baskin also should be dismissed because Eckert has "again made [only] conclusory, unsupported, vague, insufficient, and implausible" claims that the former Erie County Legislator violated her constitutional rights.  Docket Item 70-1 at 12.  But Eckert does allege that Baskin took at least one specific act against her:  She says that "at some point in 2021, Baskin blocked [Eckert] . . . from posting [on] her Facebook page, a public forum and government page, to avoid [Eckert's] criticisms" and that Baskin "then made her government page private so that a private citizen could not leave a review or public comment on [Baskin's page]."[24]  Docket Item 58 at 53.  Eckert alleges that this violated her First Amendment right to free speech.  *Id.* at 53-54.

"[T]he Supreme Court [recently] has . . . provided lower courts with some necessary guidance when dealing with First Amendment-based [section] 1983 claims involving government officials blocking and deleting comments on social media.  *Pinkhasov v. Vernikov*, 2024 WL 2188356, at *11 (E.D.N.Y. May 15, 2024) (citing

---

[23] Eckert's claim for negligent hiring, training, and supervision against Garcia and Howard is discussed below.  *See infra* Section I.G.

[24] Eckert says that Baskin also blocked several of Eckert's family members in response to their criticisms.  Docket Item 58 at 53.  But because Eckert is proceeding pro se, she cannot assert claims on behalf of others.  *See Adams v. U.S. Bank, NA*, 2013 WL 5437060, at *7 (E.D.N.Y. Sept. 27, 2013).  Thus, to the extent she is attempting to assert First Amendment claims on her family members' behalf, those claims are dismissed.

*Lindke v. Freed*, 601 U.S. 187 (2024)).  In *Lindke*, the Court held that social media activity is "attributable to the [s]tate"—and thus can constitute state action for the purposes of a section 1983 claim—"only if the official (1) possessed actual authority to speak on the [s]tate's behalf, and (2) purported to exercise that authority [in speaking] on social media."  601 U.S. at 191.

Therefore, the Court explained, whether a government official violates a plaintiff's First Amendment rights in "block[ing] and delet[ing] comments" depends on whether the government official was acting "in a private capacity" or in an "official" one when engaging in that activity.  *See id.* at 197.  The Court made clear that determining whether a particular page—or a particular post—was state or private action was a "fact-specific undertaking in which the post's content and function are the most important considerations."  *See id.* at 203.  And "[t]he nature of the technology [also] matters to the state-action analysis," the Court said.  *Id.*  Indeed, specifically with respect to blocking, the Court observed that "[b]ecause blocking [on Facebook] operate[s] on a page-wide basis," when a plaintiff alleges that she was blocked, "a court [must] consider whether [an official] had engaged in state action with respect to *any* post on which [the plaintiff] wished to comment."  *Id.* (emphasis added).  Thus, if a government officer has a page in which some posts are "personal" and some are "official," that officer "might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts."  *Id.*

It is not entirely clear from the second amended complaint whether Baskin was acting in her official capacity when she blocked Eckert:  Eckert says that she was blocked from Baskin's "government" page; she also says that the page—at least at

some point—became "private" and not open to "private citizens" at large, which may suggest that it was not, in fact, a government page. *See* Docket Item 58 at 53-54. But at this stage—drawing every inference in Eckert's favor—the Court finds that she has plausibly stated a claim that Baskin was acting as a state official when she blocked Eckert from her Facebook page based on the content of Eckert's speech (namely, her criticism of Baskin). Eckert's First Amendment claim against Baskin based on blocking Eckert on Facebook therefore may proceed.

But—as the Erie County defendants argue, Docket Item 70-1 at 11-12—Eckert's other claims against Baskin do not pass muster. Aside from the blocking, Eckert does not allege that Baskin took any other specific action that violated her rights. Instead, Eckert simply and repeatedly alleges that Baskin was involved in a conspiracy "to deprive [Eckert] of her rights under the Constitution."[25] *See* Docket Item 58 at 52-53; *see also, e.g., id.* at 73, 77, 79, 84-85. Indeed, according to the second amended complaint, Baskin—a County Legislator—had a hand in all sorts of actions by various branches of state and local government, and she wielded that power to harass and undermine Eckert. *See id.* at 52-53, 73, 77, 79, 84-85.

"[T]o state a claim for conspiracy under [s]ection 1983, a plaintiff must allege: (1) an agreement between two or more actors (at least one a state actor); (2) to act in concert to cause an unconstitutional injury; and (3) an overt act done in furtherance of that agreement, causing damages." *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 323 (W.D.N.Y. 2021) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-

---

[25] Eckert makes similar allegations against other defendants, including former Mayor Brown. *See, e.g.*, Docket Item 58 at 52.

25 (2d Cir. 2002)).  Although "[a]llegations of direct evidence of conspiracy are not necessary" to state a viable conspiracy claim, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of . . . constitutional rights are properly dismissed."  *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 363 (S.D.N.Y. 2017) (quoting *Ciambriello*, 292 F.3d at 325).

Other than self-serving conclusions and rank speculation, Eckert does not include anything to support her claim.  Indeed, Eckert offers not facts but only "conclusory, vague, or general" allegations about what Baskin did or did not do.  *See, e.g.*, *id.* at 73 (stating that she "believes Flynn conspired with Baskin and [former Mayor] Brown to withhold . . . evidence"); *id.* at 77 (stating that "Brown, Baskin, and [Justice Nugent] Panepinto[] conspired together to interfere and deprive [Eckert] of her substantive and due proce[ss] rights"); *id.* at 79 (stating that "Brown, Baskin, and [Justice] Siwek conspired together to interfere and deprive [Eckert] of her right to sue and to punish her for exercising her First Amendment right[s]"); *id.* at 84-85 (stating that Meadows conspired with Justice Ogden, Brown, Baskin, and several [other judges to] deny[ Eckert] equal protection of the laws and equal privileges" and that this was "racially and politically motivated for th[ose defendants'] personal gain and agendas").  Such allegations simply are not enough to state a viable claim.[26]  *See Teams*, 260 F. Supp. 3d at 363; *see also Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 437

---

[26] The only facts Eckert offers in support of Baskin's supposed alliance with Meadows are that the two are "good friends" and that both are part of the "Working Family Party and the Erie Democratic Committee."  Docket Item 58 at 51-52.  That is not enough to state a claim against Baskin.

(E.D.N.Y. 2021) (holding that plaintiffs' "repeated[] offer[ing of] . . . statements that [d]efendants "'conspired and agreed'" to do various things was "conclusory" and insufficient to state a section 1983 claim).

In sum—except as to her section 1983 claim based on the Facebook blocking—Eckert has failed to state a section 1983 claim against Baskin.[27]

### 4.    Claims against Erie County

As the Court explained in its previous order, *see* Docket Item 57 at 27, a municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy or custom. *See Monell*, 436 U.S. at 694. To state such a claim, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983)).

The second amended complaint alleges that both Erie County (including the Erie County District Attorney's Office) and the City of Buffalo[28] "engaged in conduct that constituted a[n unconstitutional] custom, usage, practice, procedure[,] or rule." Docket

---

[27] Eckert also alleges that the Erie County Doe who improperly disclosed Eckert's family members' sealed criminal record may be Baskin. *See* Docket Item 58 at 137. But those allegations do not state a claim under section 1983. For one thing, Eckert does not provide any facts in support of her conclusory allegation that Baskin is this "Doe." *See id.* For another, Eckert says that the Erie Count Doe improperly disclosed information about her family members—not about Eckert herself—and in any case, she does not say that the disclosure violated Eckert's constitutional rights. *See id.* The Court nonetheless considers whether Eckert has stated a state law claim based on that alleged disclosure below. *See infra* Section I.F.

[28] Eckert says that several specific City of Buffalo entities had these policies as well. *See* Docket Item 58 at 81-82.

Item 58 at 81-82.  Eckert then states that the purported unconstitutional policies

"include[] but are not limited to":

> arresting individuals without conducting a proper or reasonable investigation or due diligence; failing to question witnesses or other individuals who may have relevant information as to whether or not a crime was committed; arresting an innocent person, without probable cause or reasonable suspicion; failing to listen to the information given by [Eckert] which, if investigated in any manner, would have established that she should not be arrested or maliciously prosecuted; arresting innocent persons for perceived disrespect in violation of freedom of speech; and allowing police officers to provide false statements about conduct of an individual in support of an arrest; withholding exculpatory evidence; tampering with evidence; tampering with witnesses; conspiracy; obstructing court orders; obstruction of proceedings; scheme to defraud; and extortion.

*Id.* at 82-83.

To support a claim of an unconstitutional policy, custom, or practice under

*Monell*, a plaintiff must allege sufficient facts to raise an inference of "a practice so

persistent and widespread that . . . supervisory authorities must have been aware" of it.

*See Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary

order).  Indeed, the Second Circuit has noted that a policy of acquiescing in or ratifying

unlawful conduct "cannot be inferred from the failure of those in charge to discipline a

single . . . officer for a single incident of illegality; instead, there must be more evidence

of supervisory indifference, such as acquiescence in a prior pattern of conduct."

*Lucente v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020) (citation and internal

quotation marks omitted).

Eckert's delineation of the alleged unconstitutional policies reads more like a

laundry list of the ways that she believes that the defendants have wronged her than a

statement of policies, practices, or customs.  She does not specify which entity had

which policy, nor does she provide any examples of the alleged policies in action.  In

fact, the only allegations offered to support the supposed policies, customs, or practices are those underlying the alleged constitutional violations against Eckert, and she does not include anything about any other incidents where the defendants similarly violated the constitutional rights of others.  Thus, her allegations are not enough to state a viable *Monell* claim against Erie County.[29]  *See Wood v. Town of E. Hampton*, 2010 WL 3924847, at *24 (E.D.N.Y. Sept. 30, 2010) (plaintiff failed to state *Monell* claim against village based on allegations that defendants—led by village police officer with a personal "vendetta" against plaintiff—"filed or allowed to be filed a [m]isdemeanor [i]nformation containing false information that led to [p]laintiff's arrest").

But even if Eckert had sufficiently alleged the existence of an unconstitutional policy, she still would have failed to state a *Monell* claim against Erie County.  "A plaintiff cannot maintain a *Monell* claim where she has not established an underlying constitutional deprivation."  *Kilduff v. Rochester City Sch. Dist.*, 53 F. Supp. 3d 610, 617 (W.D.N.Y. 2014) (citing *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)).  Put another way, to assert a *Monell* claim, Eckert must establish that an Erie County official or officer—here, Garcia, Howard, or Baskin—violated her rights.[30]

---

[29] The Court does not reach the question of whether Eckert has sufficiently stated a *Monell* claim against the City of Buffalo.

[30] As this Court explained in its previous decision, for purposes of *Monell* liability, Flynn (indeed, any district attorney in New York) is treated as a state actor, not an Erie County actor, to the extent that he is engaging in prosecutorial, as opposed to administrative, activities.  *See* Docket Item 57 at 28; *See Kellner v. City of New York*, 2021 WL 4251343, at *17 (E.D.N.Y. Sept. 17, 2021) (noting that the Second Circuit has "consistently held that 'inherently prosecutorial functions (i.e., decisions whether to prosecute) are controlled by state policies for purposes of *Monell*'" (quoting *Bellamy v. City of New York*, 914 F.3d 727, 758 (2d Cir. 2019))).  Because the conduct about which Eckert complains here is prosecutorial activity, *see* Section VII.A, it cannot form the basis for a *Monell* claim.  In addition, any *Monell* claim based on any Erie County defendant's improperly disclosing records fails because that conduct did not violate

As explained above, however, Eckert has not stated a section 1983 claim against Garcia or Howard.  *See supra* Section I.A.2.  And her only surviving section 1983 claim against Baskin is that the legislator blocked Eckert on Facebook*, see supra* Section I.A.3, but Eckert does not suggest that Baskin's blocking was part of any Erie County policy, custom, or practice.  *See* Docket Item 58 at 81-84.  And so in the absence of any underlying constitutional violation based on an unconstitutional policy, custom, or practice, Eckert has failed to state a *Monell* claim against Erie County.

Eckert's section 1983 claim against Erie County therefore is dismissed.

### B.    Section 1985 and 1986 Claims

Eckert also asserts claims for "conspiracy to interfere with civil rights" under section 1985(3) and section 1986.  Docket Item 58 at 84.  To assert a claim under section 1985(3), a plaintiff must allege

> 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006).  "A section 1985(3) conspiracy must also be motivated by some racial or . . . otherwise class-based, invidious discriminatory animus behind the conspirators' action."  *Id.* (citation and internal quotation marks omitted).  A claim under section 1986, which "imposes liability on an individual who has knowledge of discrimination prohibited under [section] 1985," is

---

Eckert's constitutional rights and because Eckert specifically says that individual's actions were unlawful and not pursuant to any government policy.  *See* Docket Item 58 at 132-137.

"contingent on a valid [section] 1985 claim." *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996).

Eckert alleges that all defendants—including the Erie County defendants—engaged in a "conspiracy" to "deny[ her] equal protection of the laws and equal privileges." Docket Item 58 at 84-85. She says that the defendants' conduct in this regard was "racially and politically motivated," *id.*, and asserts elsewhere in the complaint that she was discriminated against by several defendants, including Baskin, because Eckert is white, *see id.* at 108-09 (Eckert's stating that Baskin and others "failed to provide [her] equal protection of the law due to the color of her skin," which she says is "racial prejudice" against her as a "white woman complaining of hate crimes by a [B]lack woman to [B]lack elected officials").

Like Eckert's section 1983 conspiracy claim against Baskin, Eckert's section 1985 claims of conspiracy and racial animus—at least as to the Erie County defendants—are entirely conclusory. For one thing, despite Eckert's frequent insistence that the Erie County defendants (and particularly Baskin) were involved in a plot against her, *see, e.g.*, *id.* at 51-53, 73, 76, 223, she does not provide any "particular facts from which it could plausibly be inferred that [the] defendants had entered into an agreement to achieve unlawful ends," *see Wik v. Vill. of Holley*, 2023 WL 6958794, at *8 (W.D.N.Y. Oct. 20, 2023) (finding that "plaintiff's conspiracy claims, whether construed as [section] 1983 or [section] 1985 claims, fail[ed]" because he did not allege any such facts). Eckert says that Meadows and Baskin are "good friends," Docket Item 58 at 215, and that Meadows invoked Baskin's name when speaking to BPD officers after the May 2020 physical altercation. Docket Item 58 at 160. But her second amended complaint

34

is devoid of "specific factual allegations respecting a meeting of the minds, specific communications between [Meadows and the Erie County] defendants, or even concerted activities or coordinated efforts between them." *Johnson v. City of New York*, 669 F. Supp. 2d 444, 451 (S.D.N.Y. 2009). And that is not enough to state a claim under section 1985. *See id.* ("A bare assertion that a conspiracy existed, unsupported by any specific factual allegations, is itself insufficient to state a plausible claim to relief.").

What is more, even if Eckert had sufficiently pleaded the existence of a conspiracy, she does not provide any facts suggesting that the conduct of any Erie County defendant was motivated by race. Eckert asserts that Meadows referred to Eckert's race—calling her a "white bitch[]," "white trash," and a "cracker"—and she implies that Meadows does not like her because she is white. *See* Docket Item 58 at 107, 143. But the second amended complaint does not include any facts suggesting that the Erie County defendants were involved in or even aware of that conduct. *See generally id.* And Eckert's statement that Baskin, like Meadows, is Black, while Eckert is white does nothing to change this analysis. *See Johnson*, 669 F. Supp. 2d at 450, 452 ("The mere fact that plaintiff and defendants are of different races, standing alone, is simply insufficient as a factual pleading to allege racially motivated discrimination.").

Eckert therefore has failed to state a claim against the Erie County defendants under sections 1985 and 1986.

### C.    Title VI Claims

Eckert next asserts a claim against Erie County under Title VI.[31]  Docket Item 58

at 109.  That statute provides that "[n]o person in the United States shall, on the ground

of race, color, or national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving

[f]ederal financial assistance."  42 U.S.C.A. § 2000d.  "To state a claim under Title VI, a

plaintiff must allege, inter alia, (1) that the defendant discriminated against h[er] on the

basis of race; (2) that [the] discrimination was intentional; and (3) that [the]

discrimination was a substantial and motivating factor for the defendant's actions."

*Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 531 (S.D.N.Y.

2013) (alteration and italics omitted) (quoting *Tolbert v. Queens Coll.,* 242 F.3d 58, 69

(2d Cir. 2001)).

Eckert says that in 2020 and 2021, Erie County—and specifically the Erie County

District Attorney's Office—received $247,644 and $87,000 in federal aid for the "Be

Safe program" and the "Federal Family Violence Prevention Services Act program,"

respectively.  Docket Item 58 at 110-111 (some capitalization omitted).  During the

same period, she says, that office received over $1,000,000 in federal money for "the

victim/witness assistance program."  *Id.* at 111.  And Eckert asserts that despite the

---

[31] Eckert does not appear to assert a Title VI claim against any of the individual
Erie County defendants, *see* Docket Item 58 at 90, 109, although she does refer to the
Erie County District Attorney's Office, *see id.* at 109.  To the extent that Eckert intends
to assert such a claim against Flynn or any other individual Erie County defendant,
however, she cannot do so:  "It is well established that, 'Title VI claims cannot be
asserted against an individual defendant because the individual is not the recipient of
federal funds.'"  *See D.C. by Conley v. Copiague Union Free Sch. Dist.*, 2017 WL
3017189, at *9 (E.D.N.Y. July 11, 2017) (quoting *Russell v. County of Nassau*, 696 F.
Supp. 2d 213, 238 (E.D.N.Y. 2010)).

provisions of Title VI, she was "denied . . . access" to and "subjected . . . to discrimination in" those programs. *See id.* at 111-13.

As discussed above with respect to Eckert's section 1985 and 1986 claims, the second amended complaint is devoid of any facts showing that any of the Erie County defendants discriminated against Eckert on the basis of race or otherwise acted with any racial animus. Nor does she allege facts showing that she was discriminated against based on national origin. *See generally* Docket Item 58. In other words, Eckert's assertion of discrimination in federally funded programs is entirely conclusory. And that is not enough to state a claim under Title VI. *See Manolov*, 952 F. Supp. 2d at 527 (holding that plaintiff's "conclusory allegations that . . . his professors blatantly discriminated against all white males, and that he felt the hostility of his professors towards him because of his sex, [we]re insufficient" to state a claim under Title VI (internal quotation marks omitted)).

Eckert's Title VI claims against the Erie County defendants therefore are dismissed.

### D.    RICO Claims

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of [s]ection 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir. 2001)). To show a violation of section 1962, in turn, a plaintiff must "allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity'

37

(5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an

'enterprise' (7) the activities of which affect interstate or foreign commerce."  *Moss v.*

*Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)).

"And to state a RICO conspiracy" claim under section 1962(d), "a plaintiff must allege

'the existence of an agreement to violate RICO's substantive provisions.'"  *Williams v.*

*Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Sessa*,

125 F.3d 68, 71 (2d Cir. 1997)).

    "A plaintiff's burden is high when pleading RICO allegations."  *Mackin v.*

*Auberger*, 59 F. Supp. 3d 528, 541 (W.D.N.Y. 2014).  "[G]iven RICO's damaging effects

on the reputations of individuals alleged to be engaged in RICO enterprises and

conspiracies," courts "look with particular scrutiny at [civil RICO] claims."  *Id.*; *see also*

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)

("Because the 'mere assertion of a RICO claim has an almost inevitable stigmatizing

effect on those named as defendants, courts should strive to flush out frivolous RICO

allegations at an early stage of the litigation.'" (alterations omitted) (quoting *Figueroa*

*Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990))); *Helios Int'l S.A.R.L. v. Cantamessa*

*USA, Inc.*, 2013 WL 3943267, at *5 (S.D.N.Y. July 31, 2013) (observing that "frivolous

RICO allegations are often manifested in the form of 'garden variety fraud or breach of

contract cases that some [p]laintiff has attempted to transform into a vehicle for treble

damages by resort to what has been referred to as the litigation equivalent of a

thermonuclear device'" (alterations and some internal quotation marks omitted) (quoting

*Goldfine v. Sichenza*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000))).

Eckert has failed to state a RICO claim against the Erie County defendants for at least three reasons.  First, she has failed to sufficiently plead the existence of an "enterprise."  Second, she has failed to plead any effect on "foreign or interstate commerce."  Third, she has failed to plead a RICO conspiracy claim because she has not provided any facts to suggest an "agreement" between or among the defendants.

### 1.    Existence of an Enterprise

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. § 1961(4)).  "A racketeering enterprise is proven through 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *Id.* at 307 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "Thus, evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise."  *Id.* (citing *Turkette,* 452 U.S. at 583)).

"[A] governmental unit can be a RICO enterprise."  *Id.* at 307-08 (citing *United States v. Angelilli*, 660 F.2d 23, 30-35 (2d Cir. 1981)).  But "[i]t is well established . . . that, under § 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct."  *Id.* (citation omitted); *cf. also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) ("As [the Second Circuit has] long recognized, the plain language and purpose of the statute contemplate that a *person* violates the statute by conducting an *enterprise* through a pattern of criminality.  It thus follows that a corporate person cannot violate the statute by corrupting itself.").

The "RICO enterprise" and the "RICO activities" also must be distinct. As the Supreme Court has explained, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages," and "[t]he existence of an enterprise at all times remains a separate element" of a RICO claim. *Turkette*, 452 U.S. at 583. "Accordingly, '[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation.'" *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood v. Inc. Vill. of Patchogue*, 311 F.Supp. 2d 344, 357 (E.D.N.Y. 2004)).

Eckert's RICO statement alleges the existence of five distinct enterprises. Docket Item 59 at 3-4. First, she says that Baskin, Bifaro, Brown, Comerford, Curtin, Myers, Farley, Dizon, Kurdziel, Rinaldo, Salazar, Meadows, and Walden are a part of one RICO "enterprise." Docket Item 59 at 3. And she says that the Buffalo Common Council, the City of Buffalo, Erie County, and New York State each constitutes its own enterprise. *See id.* at 3-4.

Eckert has not adequately pleaded the existence of a RICO enterprise. For one thing, her allegations that Buffalo Common Council, the City of Buffalo, Erie County, and New York State are each a RICO enterprise clearly flunk the requirement that the RICO enterprise be distinct from the RICO "persons." Eckert cannot simply assert that those entities are enterprises without alleging the particular defendants who ran each enterprise. *Cf. DeFalco*, 244 F.3d at 307 (finding "requirement of distinctiveness between the defendants and the enterprise . . . met" where "jury could reasonably have concluded that the RICO persons . . . were a separate and distinct assortment of public

40

officials, private individuals[,] and corporations who used their political power to influence the" enterprise, the Town of Delaware).

Eckert's allegation of the existence of an enterprise-in-fact comprised of Meadows and various government officials fares no better because she has failed to plead that the alleged RICO enterprise and the alleged RICO activities are "distinct." *Turkette*, 452 U.S. at 583. On the contrary, she says that the sole purpose of the enterprise is to harm her and violate her rights, including by "concoct[ing] a false narrative that [Eckert is] racist and assaulted Meadows." *See* Docket Item 59 at 3, 9. And the alleged racketeering activities are all instances of the defendants engaging in disconnected acts that, in Eckert's view, harmed her and violated her rights. *See id.* at 12-15. So the enterprise that Eckert alleges "'would [not] still exist were the predicate acts removed from the equation.'" *Mackin*, 59 F. Supp. 3d at 544 (quoting *Wood*, 311 F. Supp. 2d at 357); *see Newkirk v. Vill. of Steger*, 2004 WL 2191589, at *16 (N.D. Ill. Sept. 24, 2004) (plaintiffs failed to allege existence of enterprise where "asserted 'purpose' [wa]s nothing more than a laundry list of the alleged predicate acts . . . [and p]laintiffs offer[ed] nothing to show that [d]efendants ever functioned as an ongoing RICO organization or had any goals separate from the alleged predicate acts").

For all those reasons, Eckert has failed to plead the existence of an enterprise.[32]

---

[32] This analysis would not change even if this Court very liberally construed the second amended complaint as alleging the existence of a single enterprise made up of the four entities and all the individuals in the association-in-fact: Eckert still would have failed to allege an enterprise with a separate existence from the alleged racketeering activity.

## 2.    Affecting Foreign or Interstate Commerce

To state a RICO claim, the complaint also must "allege[] that the enterprise engaged in, or that its activities affected, interstate or foreign commerce." *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 160 (E.D.N.Y. 2024).  This burden is not high: "'[C]onduct having even a de minimis effect on interstate commerce suffices' to satisfy this element." *Id.* (alteration in original) (italics omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008)); *see also United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981) ("[T]o establish a violation of [section]1962, the courts have ruled that the impact need not be great.  So long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied.").  At the same time, this requirement is not meaningless, and a plaintiff must plead some facts showing an impact on interstate or foreign commerce to state a RICO claim.  *See Edmondson*, 751 F. Supp. 3d at 181 n.29 ("Although the burden to plead this element is minimal, the complaint still must offer sufficient facts to meet that burden." (internal citation and internal quotation marks omitted)).

Eckert says that the defendants' activities "affected interstate commerce" by "injur[ing her] both personally and professionally."  Docket Item 59 at 2.  For example, she says, the enterprises' activities "had a significant impact on [her] business," thus "obstruct[ing] and affect[ing] interstate commerce for a period of three . . . years."  *Id.* at 6, 36.  Likewise, she says that the defendants' acts of wire fraud were committed "by means of wire communication in interstate commerce of signals, sounds[,] or writings," *id.* at 15, and notes that she "regularly engages in interstate commerce," *id.* at 32.

Although she repeatedly refers to her business in her RICO statement, Eckert does not provide any details—either in that statement or in her second amended

complaint—about what the business is or how it operates in interstate or foreign commerce. *See generally* Docket Items 58 and 59. Further, while she states that the defendants' acts of wire fraud took place in interstate commerce, she does not say why that is so, and all the examples she provides appear to have taken place within New York State. *See* Docket Item 59 at 12-15. Last, the fact that Eckert herself participates in interstate commerce does not mean that any RICO scheme of which she was a victim takes place in interstate commerce.

In other words, Eckert has offered only conclusory allegations of an impact on interstate or foreign commerce, and that is not enough to state a RICO claim. *See Lally v. Leff*, 2018 WL 4445152, at *5 (E.D.N.Y. Sept. 18, 2018) (holding that because "[t]he allegations on which plaintiff relie[d] . . . contain[ed] only vague and conclusory assertions regarding mails, wires, and interstate commerce," they were "insufficient to meet even the low pleading threshold"); *Rubinov v. Suyunova*, 2025 WL 461353, at *2 (E.D.N.Y. Feb. 11, 2025) (holding that "[p]laintiff's conclusory allegation that defendants' actions affected interstate commerce because defendants either supported or transmitted, 'via interstate commerce (Instagram),' threats and intimidation towards plaintiff [wa]s not sufficient to establish the 'affect interstate commerce' prong of a RICO claim"); *O'Neill v. NYU Langone Hosps.*, 2024 WL 4216501, at *9 (E.D.N.Y. Sept. 17, 2024) (holding that plaintiff's statement that enterprise's "'activities affected interstate commerce,' for instance by 'us[ing] multiple facilities of interstate commerce, such as wire transfers of money, telephone calls, and emails'" was not sufficient to establish effect on interstate commerce).

### 3.    RICO Conspiracy

"[T]the core of a RICO civil conspiracy is an agreement to commit predicate acts." *Edmondson*, 751 F. Supp. 3d at176 (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)).  To show this, the plaintiff must plead that "each defendant 'knew about and agreed to facilitate' the pattern of racketeering activity." *Id.* (quoting *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003)).

Eckert has failed to allege any facts showing that each defendant agreed to enter into a conspiracy against her.  *See* Docket Item 59.  Indeed, much like her claims under sections 1985 and 1986, *see supra* I.B, any assertions of collusion are entirely conclusory.  Her RICO conspiracy claim therefore is dismissed.

### 4.    Conclusion

For all those reasons, Eckert has failed to state a RICO claim.  Indeed, Eckert's "allegations as to these claims are conclusory, without factual support, and suggest that [she] is merely dissatisfied with" actions by certain government officials, including the courts and police, and "how h[er] reputation may have suffered" as a result.  *See Masri v. Liebowitz*, 2024 WL 1639904, at *8 (S.D.N.Y. Apr. 15, 2024), *appeal dismissed sub nom. Masri v. Afriyie*, 2025 WL 1603359 (2d Cir. Feb. 24, 2025); *see also Mackin*, 59 F. Supp. 3d at 546 ("'[P]laintiff is simply attempting to craft a claim under RICO based upon purely personal disputes . . . .  [C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'" (quoting *Daskal v. Tyrnauer*, 37 Misc.3d 1214(A), at *38, 2012 WL 5276925 (Sup.Ct. Kings Cnty. Oct. 22, 2012)))).  That is not sufficient,

particularly in light of the high pleading standards that apply to RICO claims.  *See Mackin*, 59 F. Supp. 3d at 541.

This Court therefore dismisses Eckert's RICO claims against all defendants under 28 U.S.C. § 1915(e)(2).

### E.    FOIA and Privacy Act

Eckert also asserts claims against Erie County under FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Docket Item 58 at 129-131; *see also* 132-133 (also referring to these statutes).  Those claims fail as well.

Eckert cannot assert viable claims against Erie County under either of those statutes for a simple reason: They are federal laws that do not apply to state and local agencies.[33]  *See Brannon v. Delta Airlines, Inc.*, 434 F. Supp. 3d 124, 128 n.2 (S.D.N.Y. 2020) (stating that FOIA "applies to the federal government only and not to municipal or state agencies"); *Morales v. New York*, 22 F. Supp. 3d 256, 278 (S.D.N.Y. 2014) ("Th[e] Privacy Act] applies only to the *federal government,* not to state or local government agencies.").

---

[33] New York, of course, has its own freedom of information law, known as FOIL. But Eckert does not bring a FOIL claim here, *see generally* Docket Item 58, apparently because she is "time barred" from doing so, *see id.* at 130.  In any event, "federal courts do not have independent jurisdiction to enforce state laws granting public access to official state records."  *Morrison v. MTA New York City Transit*, 2024 WL 4450778, at *2 (E.D.N.Y. Oct. 9, 2024).  And "with respect to the question of constitutional due process and FOIL requests, 'adequate process is clearly available through an Article 78 proceeding to remedy an improper denial of disclosure.'"  *Blount v. Brown*, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010) (quoting *Ferrara v. Superintendent, N.Y. State Police Dep't.*, 26 F.Supp.2d 410, 414 n.3 (N.D.N.Y. 1998)).

Eckert does assert claims under New York's privacy law, the Personal Privacy Protection Law, and the Court discusses those claims below.  *See infra* Section I.F.

Eckert's claims under FOIA and the Privacy Act against Erie County therefore are dismissed. And because those claims fail to state a claim against any defendant for the same reasons, Eckert's FOIA and Privacy Act claims all are dismissed for failure to state a claim on which relief can be granted under 28 U.S.C. § 28(e)(2)(B)(ii).

### F.    New York Privacy Protection Law

Eckert asserts that Erie County, Flynn, and the Erie County Doe violated the New York State Privacy Protection Law by improperly "disseminat[ing] information protected by" that statute. Docket Item 58 at 131-32. More specifically, she says, the Erie County District Attorney's Office, "under [Flynn's] supervision," gave some of Eckert's personal information—including her rap sheet, mug shot, full name, address, and date of birth—to Meadows without obtaining Eckert's authorization. *Id.* at 132-34. And she says that the Erie County Doe—"an employee of the Erie County [c]ourts"—"without cause, justification, or proper authority, unsealed criminal records belonging to [Eckert's] family members" to "harass and intimidate [Eckert] and her family." *Id.* at 8, 137.

The Personal Privacy Protection Law was enacted to "establish[] standards regarding information that [s]tate agencies could collect and maintain on individuals, providing individuals the right to access and correct their records, and prohibiting disclosure of personal information except under specified circumstances." *Lawrence v. State*, 180 Misc. 2d 337, 341, 688 N.Y.S.2d 392, 395 (N.Y. Ct. Cl. 1999); *see* N.Y. Pub. Off. Law §§ 91-99. But the law applies only to "agencies," which are specifically defined as

> any state board, bureau, committee, commission, council, department, public authority, public benefit corporation, division, office or any other governmental entity performing a governmental or proprietary function for

the state of New York, *except the judiciary or the state legislature or any unit of local government and shall not include offices of district attorneys*.

N.Y. Pub. Off. § 92(1) (emphasis added).

Eckert asserts that the privacy violations at issue were committed by members of the Erie County District Attorney's office and the Erie County Doe, who is either an employee of the New York State Court System or Baskin, a County legislator.  *See* Docket Item 58 at 8, 132-34, 137.  She therefore cannot assert a claim under the Personal Privacy Protection Law. [34]  *See Spetalieri v. Kavanaugh*, 36 F. Supp. 2d 92, 110 (N.D.N.Y. 1998) (holding that plaintiff's claims under the [Personal Privacy Protection Law] must fail" because that law "does not apply to the defendants," including a district attorney and a municipal police department).

Eckert's claims against the Erie County defendants under that law therefore are dismissed.

### G.    Negligent Hiring, Training, and Supervision

Eckert asserts a claim against Howard and Garcia for negligent hiring, training, and supervision. [35]  Docket Item 58 at 114, 118-119.  She asserts that those defendants

---

[34] In any event, the Personal Privacy Protection Law does not allow for an award of damages.  *See* N.Y. Pub. Off. § 97(1)-(2) (providing that "[a]ny data subject aggrieved by any action taken under [the Personal Privacy Protection Law] may seek judicial review and relief [under Article 78 of the C.P.L.R.]" and may be entitled to "reasonable attorneys' fees" if that action is successful); *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 641 (2d Cir. 1989) ("[The] Personal Privacy Protection Law, which applies to violations by government agencies, does not provide for monetary damages" (citing N.Y. Pub. Off. § 97-a)); *see also Lawrence*, 180 Misc. 2d at 341-43, 688 N.Y.S.2d at 395-96 (holding that there is no private right of action under the Personal Privacy Protection Law).

[35] This Court previously dismissed Eckert's negligent hiring, supervision, and training claim against Erie County based on the conduct of Howard, Garcia, and Baskin because the latter were "elected officials and not Erie County employees."  Docket Item

"hired DOE() [sic] to work as agents of [Erie County]" and that they "knew, or . . . should have known, that said [d]efendants did not possess the temperament and psychological makeup to properly carry out their duties as . . . deput[ies] of the Erie County Sheriff's office." *Id.* at 118. And she says that Howard and Garcia "were negligent in the training" of the defendants about "the rights of citizens under the . . . Constitution in general and how to otherwise properly carry out their duties" and failed to adequately supervise them to prevent them from "violat[ing Eckert's] [in]alienable rights." *See id.* at 118-19.

"To state a claim for negligent hiring, training, and supervision, a plaintiff must allege, in addition to the elements of standard negligence, that '(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels.'" *Lawton v. Town of Orchard Park*, 2017 WL 3582473, at *13 (W.D.N.Y. Aug. 18, 2017) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004)).

The amended complaint is devoid of facts regarding any defendant who Garcia and Howard allegedly hired, trained, and supervised in a negligent fashion. In fact, the only "Doe" defendant associated with Erie County is the Erie County Doe who Eckert says either is employed by the New York State Supreme Court or is Baskin herself. Docket Item 58 at 8, 137. And she does not allege any other facts about Erie County

---

57 at 33. It noted that Eckert had not asserted a claim against Garcia or Howard for negligently hiring, training, or supervising their subordinates. *See id.* at 33 n.22. Eckert now asserts such a claim.

Sheriff's deputies or any other employees of Garcia and Howard who violated her rights or interacted with her in any way whatsoever. *See generally id.*; *see also* Docket Item 70-1 at 13-14 (Erie County defendants' arguing that "Eckert never mentioned a particular act carried out by [any such] 'Doe' that violated her rights"). And the absence of any such allegations dooms her negligent hiring and supervision claims. *See Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 361-63 (S.D.N.Y. 2021) (stating that "[u]nder New York law, it is not sufficient for [the p]laintiff to allege generally that the [d]efendant failed to exercise care in the screening, hiring, or supervision of employees" and dismissing claim for failure to allege specific facts about employee that "should have led it to know of the risk" of employee's misconduct); *Matthews v. City of New York*, 2016 WL 5793414, at *12 (S.D.N.Y. Sept. 30, 2016) (dismissing claim for negligent hiring and supervision where plaintiff failed to allege facts "indicating that [defendants] knew or should have known of the propensity of [employees to engage in harmful conduct] . . .or that there were deficiencies in employee training and supervision that caused harm").

### H.    Infliction of Emotional Distress

Eckert also asserts claims against the Erie County defendants for negligent and intentional infliction of emotional distress. *See* Docket Item 58 at 120-28. As an initial matter, any claims based on Flynn's acts in his capacity as a prosecutor are barred due to prosecutorial immunity for the reasons already discussed. *See supra* Section I.A.1. And this Court already dismissed Eckert's claims against Garcia, Howard, Baskin, and Erie County. *See* Docket Item 57 at 34. Finally, and for the reasons that follow, she again has failed to state a viable claim against any Erie County defendant.

1.    **Negligent Infliction**

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021); *see Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1, 6, 881 N.E.2d 1187, 1189 (2008) (discussing this standard). Moreover, "[n]egligent infliction of emotional distress requires that the emotional distress stem from either (1) physical injury or the threat of physical injury, or (2) breach of a special duty between [the] plaintiff and [the] defendant." *Campbell v. Bank of New York Mellon Trust Co., N.A.*, 2012 WL 2952852, at *11 (S.D.N.Y. May 8, 2012) (citing *Okocha v. HSBC Bank USA, N.A.*, 700 F. Supp. 2d 369, 376 (S.D.N.Y. 2010)).

"[A]n agency of government is not liable for the negligent performance of a governmental function unless there existed a special duty to the injured person, in contrast to a general duty owed to the public." *Bryant v. Ciminelli*, 267 F. Supp. 3d 467, 479 (W.D.N.Y. 2017) (quoting *McLean v. City of N.Y.*, 12 N.Y.3d 194, 199, 905 N.E.2d 1167 (2009) (internal quotation marks omitted)). To plead the existence of a "special duty," a plaintiff must allege a "special relationship between [herself] and the governmental entity." *Id.* (quoting *McLean,* 12 N.Y.3d at 199, 905 N.E.2d at 1171). Under New York law,

> [a] special relationship can be formed in three ways: (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the

municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation.

*Id.* (quoting *McLean*, 12 N.Y.3d at 199, 905 N.E.2d at 1171).  "It is the plaintiff's obligation to prove that" such a relationship—and thus, such a duty—existed.  *Id.* (alteration omitted) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 426, 995 N.E.2d 131, 135 (2013)).

Eckert has pleaded no facts showing that any Erie County defendant directly caused her physical injury (or the threat of one) or owed her a "special duty" beyond that owed to the general public.  *See generally* Docket Item 58.  For that reason, she has failed to state a claim for negligent infliction of emotional distress.

### 2.    Intentional Infliction

"To establish a claim for intentional infliction of emotional distress," on the other hand, "a plaintiff must allege (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  *Campbell*, 2012 WL 2952852, at *11 (citation and internal quotation marks omitted).  "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress."  *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 690 (E.D.N.Y. 2012*)* (citations omitted), *aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013).  In fact, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Chanko v. Am. Broad. Cos.*, 27 N.Y.3d 46, 56, 49 N.E.3d 1171, 1178 (2016) (citation omitted).

51

"[U]nder New York law, 'public policy bars claims alleging intentional infliction of emotional distress against governmental entities . . . .'" *Rodrigues v. Fam. Just. Centers (Manhattan & Queens)*, 2019 WL 1988526, at *4 (S.D.N.Y. May 6, 2019) (alterations omitted) (quoting *Black v. Ranley*, 2018 WL 2766138, at *11 (S.D.N.Y. June 8, 2018)). So Eckert cannot assert an intentional infliction of emotional distress claim against Erie County here.

Further, Eckert has not alleged any "extreme [or] outrageous" conduct on the part of any Erie County defendant.[36]  *See* Docket Item 57 at 34.  As discussed above, Eckert does not allege any specific action taken by Flynn, Howard, Garcia, or Baskin other than Baskin's blocking her on Facebook.[37]  *See supra* Section I.A.2-3.  And while such blocking might be enough to state a First Amendment claim—a matter that has yet to be determined—it is certainly not "extreme or outrageous" conduct sufficient to give rise to a tort claim.  *Cf. Lloyd v. Cannon*, 2022 WL 5161424, at *15 (N.D. Ohio Oct. 5, 2022) (campaign's blocking of plaintiff on Facebook was not so "extreme or outrageous" as to

---

[36] If she had alleged extreme or outrageous conduct, Erie County potentially could have been held liable for intentional infliction of emotional distress under a theory of respondeat superior.  *See Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 482 (E.D.N.Y. 2016) ("[U]nlike claims arising under Section 1983, a municipality may be vicariously liable for the common law torts of its employees.").

[37] As already noted, Eckert's second amended complaint does not provide any specific facts about Flynn's role in the alleged disclosure of her criminal history records to Meadows.  And in any event, such conduct does not rise to the level of "extreme and outrageous."  *Cf. Russo v. City of Hartford*, 158 F. Supp. 2d 214, 226 (D. Conn. 2001) (finding  allegations that defendants "set out on a course and conspiracy to destroy the [plaintiff's] character" and "disclosed [his] confidential information" not to be "extreme and outrageous" so as to state a claim for intentional infliction of emotional distress under Connecticut law).

state a claim for intentional infliction of emotional distress under Ohio law), *aff'd*, 2023 WL 7182130 (6th Cir. June 27, 2023).

For those reasons, Eckert's claims for intentional infliction of emotional distress against the Erie County defendants are dismissed.

### I.    Conclusion

In sum, the Erie County defendants' motion to dismiss is GRANTED as to all claims except Eckert's section 1983 claim against Baskin for allegedly blocking her from Baskin's government Facebook page.[38]

### II.    MEADOWS'S MOTION TO DISMISS

Eckert has asserted claims against Meadows under sections 1983 and 1985, under RICO, and for intentional and negligent infliction of emotional distress. *See* Docket Item 58 at 64, 84, 98, 100, 106, 120; Docket Item 59. Meadows has moved to dismiss Eckert's second amended complaint against her, but the only argument properly before the Court is Meadows's assertion that she not is a "state actor" for the purposes of her section 1983 claim. *See* Docket Item 68 at 1, 3-5. While Meadows

---

[38] Eckert's claims against the Erie County Doe also are dismissed for much the same reason that her claims against the Erie County defendants are dismissed. The only allegation regarding that individual is that the Erie County Doe is some kind of government official—perhaps Baskin—who disclosed a sealed criminal record about Eckert's family members. *See* Docket Item 58 at 137. Eckert cannot assert a claim under the Personal Privacy Protection Law for the reasons explained. Further, that allegation is not enough to show personal involvement in a constitutional violation sufficient to support a claim under section 1983, to show a "meeting of the minds" with any other defendant sufficient to plead a section 1985 or 1986 conspiracy claim, or to show violation of a special duty or "extreme and outrageous conduct" sufficient to support Eckert's tort claims. And because Eckert does not assert any other claims against the Erie County Doe, *see* Docket Items 58 and 59, that defendant shall be removed as a party to this case.

makes other arguments about why Eckert's claims cannot succeed, those arguments

turn on factual disputes between Eckert's and Meadows's stories. *See id.* at 2, 6-8.

Because factual disputes cannot be resolved on a motion to dismiss, this Court

addresses only Meadows's motion to dismiss the 1983 claims and for the reasons that

follow, grants that motion.  Meadows's motion is otherwise denied.

As already explained, section 1983 requires a plaintiff to "allege that the

challenged conduct (1) was attributable to a person acting under color of state law, and

(2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or

laws of the United States." *Whalen*, 126 F.3d at 405.  So to state a viable claim against

Meadows under section 1983, Eckert must first show that Meadows was "acting under

color of state law." *Id.*

The Second Circuit has "identified three main tests to determine" whether an

otherwise private entity or individual, such as Meadows, has engaged in state action:

> (1) whe[ther] the entity acts pursuant to the coercive power of the state or
> is controlled by the state ('the compulsion test'); (2) whe[ther] the state
> provides significant encouragement to the entity, the entity is a willful
> participant in joint activity with the state, or the entity's functions are
> entwined with state policies ('the joint action test' or 'close nexus test'); and
> (3) whe[ther] the entity has been delegated a public function by the state
> ('the public function test').

*See Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting

*Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).  "The fundamental question

under each test is whether the private entity's challenged actions are 'fairly attributable'

to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830,

838 (1982)).

In the second amended complaint, Eckert alleges that Meadows is involved in

local politics, that several local officials are her friends or family members, and that

Meadows called the police several times. *See generally* Docket Item 58. She also states—frequently, but without providing any facts to back up her assertions—that Meadows is involved in a plot with those government officials. *See id.* But none of that is enough to make Meadows a state actor for the purposes of section 1983.

To start, "merely conclusory allegation[s] that a private entity acted in concert with a state actor do[] not suffice to state a [section] 1983 claim against the private entity." *Alicea v. Yang*, 2023 WL 5994211, at *2 (2d Cir. Sept. 15, 2023) (summary order) (citation omitted). Moreover, "[t]he provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of [section] 1983." *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) (collecting cases). Nor are "communications between a private and state actor" enough "without facts supporting a concerted effort or plan between the parties." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order) (alterations and citation omitted).

So the fact that Meadows called and talked to the police and the allegation that she has relatives and friends in high places—at least with respect to local government and politics—are not enough to make her a state actor. And Eckert has not pleaded any other facts, as opposed to conclusory assertions, suggesting that Eckert's actions were part of a "concerted effort or plan" concocted with police, prosecutors, or other government officials. *See generally* Docket Item 58.

For much the same reason, Eckert has failed to viably plead that Meadows "was a state actor engaged in a conspiracy with other state actors under section 1983."

*Young*, 705 F. Supp. 2d at 197.  That theory requires a plaintiff to show "(1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Id.*  Although Eckert repeatedly asserts that all the defendants have conspired against her, *see* Docket Items 58 and 59, "[v]ague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed," *Young*, 705 F. Supp. 2d at 197.  And because the only facts that Eckert provides are not enough to show "an agreement" between Meadows and the state actors—much less "concerted acts to inflict an unconstitutional injury" upon her—Meadows is not a state actor for the purposes of section 1983.  *Id.*  Eckert's claims against Meadows for violation of her constitutional rights therefore are dismissed.

In sum, Meadows's motion to dismiss Eckert's claims against her is granted with respect to the section 1983 claims and is otherwise denied.  Except for the RICO claims which have been dismissed against all defendants as explained above, *see supra* Section I.D, Eckert's other claims against Meadows may proceed.

## III.    WALDEN'S MOTION FOR JUDGMENT ON THE PLEADINGS

Eckert asserts claims against Walden under section 1983, *see* Docket Item 58 at 7, 64, 93, 100; under sections 1985 and 1986, *see id.* at 84, 88; under Title VI, *see id.* at 90; and for negligent and intentional infliction of emotional distress, *see id.* at 120, 124.[39]  Walden moves for judgment on the pleadings as to all of Eckert's claims.  *See* Docket Items 110 and 110-3.

---

[39] Eckert also asserts RICO claims against Walden.  *See* Docket Item 59 at 3. While Walden's motion for judgment on the pleadings does not specifically address

A.      Section 1983 Claims

This Court already has explained the requirements to assert a section 1983

claim.  *See supra* Section I.A.  As Walden argues, Eckert has not stated a viable section

1983 claim against her here because Eckert does not allege facts showing that Walden

was personally involved in any constitutional violation.  *See* Docket Item 110-3 at 3-6, 9-

11.

The second amended complaint includes just a handful of allegations about

Walden.  *See* Docket Item 58.  First, Eckert says that on October 18, 2021, she "sent a

complaint" to the Buffalo Police Advisory Board, of which Walden is a Co-Chair, about

BPD officers' violations of various department rules and regulations.  Docket Item 58 at

11, 158, 204-05, 215-16.  A few months later, Eckert says, on January 3, 2022, Walden

"responded to [Eckert's] complaint[, stating that] she would reach back out to [Eckert]

after [the Board's] meeting."  *Id.* at 215.  Eckert says that she was dismayed to learn

that Walden was the person handling her complaint because Eckert knew that Walden

is "good friends" with Meadows; in fact, Eckert says, she later learned that the two are

"actually related" and in fact "sisters."  *See id.* at 92, 215.  Eckert says that her

complaint eventually was "dismissed," and Eckert believes that this was because

Walden, who is Black, discriminated against her as a white woman.[40]  *See id.* at 92.

---

Eckert's RICO claims, they are dismissed under section 1915 for the reasons explained
above.

[40] Eckert also says that Meadows is "using [Walden's] address to unlawfully vote
and sit on the [Erie County Democratic C]ommittee."  Docket Item 58 at 190.  But that
fact—even taken as true—does not imply any constitutional injury to Eckert.  Eckert
does not have a constitutional right in other individuals' adherence to Erie County
Democratic Committee rules.

Eckert's RICO statement explicitly asserts that "[p]resumably" during the Police Advisory Board's January meeting, Walden "dismissed the complaint" without a proper vote "to impede Eckert's rights and the investigation."  *See* Docket Item 59 at 22.

The second amended complaint does not allege what power or control, if any, Walden held over BPD officers or any other defendants.  *See* Docket Item 58.  Indeed, Eckert says that the Buffalo Police Advisory Board is simply "an independent advisory committee created by the [Buffalo Common Council] . . . to get community input regarding police reform."  *Id.* at 21.  The Board was "charged with making recommendations to the [Common] Council and the [BPD] on how community-police relationships can be improved" and in service of that goal, meets with both the public as well as "BPD leadership."  *See id.* at 21-22.  So it is not clear that Walden's position on the Police Advisory Board gave her any supervisory power over the BPD.  But even if it did, Eckert's allegations do not show that Walden was personally involved in any constitutional violation.

The Second Circuit has suggested that at least in some instances, specific factual allegations about a letter sent to a supervisory official may allow a court to "infer[]" that the official "became aware of the alleged conditions" about which the plaintiff complained, such that the failure to remedy those conditions was a constitutional violation.  *See Grullon*, 720 F.3d at 141.  But the Second Circuit since has clarified that a plaintiff's allegations must "provide[ a] factual basis that would allow [the court] . . . to impute to the . . . [d]efendants [specific] knowledge" about the complained-of conditions.  *See Darby v. Greenman*, 14 F.4th 124, 131 (2d Cir. 2021).

Eckert says that she sent a complaint to the Buffalo Police Advisory Board concerning police officers' violations of BPD rules and regulations. Docket Item 58 at 11, 158, 204-05, 215-16. But she does not include any facts that would allow this Court to infer that Walden had sufficient information such that her failure to act violated Eckert's rights. *See id.*; *see also Harrison v. Broderick*, 2022 WL 16837366, at *11 (W.D.N.Y. Aug. 18, 2022) ("Since *Tangreti* was decided, courts within the Second Circuit repeatedly have dismissed claims based on an asserted notification to a supervisory official of an alleged wrong by way of a letter, grievance, or appeal of a disciplinary action."), *report and recommendation adopted*, 2022 WL 16836406 (W.D.N.Y. Nov. 8, 2022); *Smart v. Annucci*, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (dismissing pro se complaint against two high-ranking prison officials who were alleged to have failed to act on the plaintiff's complaints because such allegations did not support an inference that the defendants, through their own individual actions, violated the Constitution). By her own admission, she complained only of violations of BPD's regulations, not of her constitutional rights. *See* Docket Item 58 at 215-16.

Finally, to the extent that Eckert is attempting to allege that Walden failed to intervene to prevent harm by Meadows, that that claim clearly fails. *Cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) ("[A s]tate's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.").

Walden therefore is entitled to judgment on Eckert's section 1983 claims.

B.    **Section 1985 and Section 1986 Claims**

Eckert asserts that Walden engaged in a conspiracy to deprive Eckert of her civil rights in violation of section 1985(3) and section 1986.  *See* Docket Item 58 at 84, 88. But Eckert has failed to plead a section 1985(3) claim against Walden for the same reason that Eckert failed to plead one against the Erie County defendants, *see supra* Section I.B, and for much the same reason that she failed to plead a claim against Walden under section 1983, *see supra* Section III.A.  That is, Eckert has failed to allege specific, non-conclusory facts suggesting that Walden was engaged in a conspiracy against her.  *See generally* Docket Item 58.  And because Eckert has failed to state a claim under section 1985 against Walden, she necessarily has failed to state a claim under section 1986.  *See Graham*, 89 F.3d at 82.

Walden therefore is entitled to judgment on Eckert's section 1985 and section 1986 claims.

C.    **Title VI Claim**

Eckert next asserts a claim against Walden under Title VI.  *See* Docket Item 58 at 90.  But as Walden argues, such claims can "be brought [only] against institutional, not individual[,] defendants."  Docket Item 110-3 at 8; *see supra* note 28.

Walden therefore is entitled to judgment on Eckert's Tile VI claim.

D.    **Negligent and Intentional Infliction of Emotional Distress**

Finally, Eckert's claims for negligent and intentional infliction of emotional distress against Walden fail for much the same reason those claims fail against the Erie County defendants.  *See supra* Section I.H.  Eckert has not alleged facts showing that

Walden's actions caused her a physical injury (or placed her under the threat of one), nor has she alleged that she and Walden were in a "special relationship" such that Walden had a special duty to her, as required to state a negligent infliction of emotional distress claim. *See Bryant*, 267 F. Supp. 3d at 479; *see also* Docket Item 110-3 at 11-13. And Eckert's intentional infliction of emotional distress claim fails because none of Eckert's allegations about Walden involve "extreme and outrageous" conduct: A board member's failing to respond to a civilian complaint may be objectionable, but it certainly is not unusual, let alone "outrageous."

Walden therefore is entitled to judgment on Eckert's negligent and intentional infliction of emotional distress claims.

### E.    Conclusion

For the reasons stated above, Walden's motion for judgment on the pleadings is granted.

## IV.    SCREENING NEW CLAIMS

As noted above, in addition to Eckert's new claims under RICO, FOIA, and the Privacy Act, which this Court already has dismissed, *see supra* Section I.D-E, the second amended complaint asserts claims against several new defendants. The Court therefore screens those claims under 28 U.S.C. § 1915(e). Eckert also has moved to join another yet defendant, Wojtanik, *see* Docket Item 121, and this Court therefore screens those claims as well.

Section 1915(e)(2) "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall

dismiss a complaint in a civil action "at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *See* 28 U.S.C. § 1915(e)(2).  As when evaluating a motion to dismiss, in screening claims under section 1915, the court accepts all factual allegations as true and draws all inferences in the plaintiff's favor.  *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999).

### A.    Buffalo Common Council

Eckert asserts claims against the Buffalo Common Council under sections 1983, 1985, and 1986; under Title VI; for negligent hiring, training, and supervision; and for negligent and intentional infliction of emotional distress.  Docket Item 58 at 63-64, 75, 81, 84, 88, 90, 109, 114, 120, 124.  She alleges that the Buffalo Common Council "deprived her [of] the right to participate in public meetings and to table concerns regarding [the City of Buffalo]" and of "the right to equal resources to obtain transparency from [the City]."  *See id.* at 113, 177-78, 189, 191-92, 195-97.

"In New York, a suit against a municipal legislative body is considered the functional equivalent of a suit against the municipality itself, since a plaintiff who prevails must look to the government entity as the real party in interest."  *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003) (citing *Kaczmarek v. Conroy,* 218 A.D.2d 97, 101, 635 N.Y.S.2d 310, 312 (3rd Dep't 1995)).  Thus, Eckert's claims against the Buffalo Common Council are redundant of her claims against the City of Buffalo and therefore are dismissed.  *See id.*

**B.    New York State Commission on Judicial Conduct**

Eckert asserts claims against the New York State Commission on Judicial

Conduct under sections 1983, 1985, and 1986; under Title VI; for negligent hiring,

training, and supervision; and for negligent and intentional infliction of emotional

distress.  Docket Item 58 at 64, 81, 84, 88, 100, 109, 114, 120, 124.  None of those

claims may proceed.

As an initial matter, the Commission on Judicial Conduct is an "arm" of New York

State.  *See Scales v. N.Y. State Comm'n on Jud. Conduct*, 2024 WL 1639398, at *2

(S.D.N.Y. Apr. 15, 2024), *appeal dismissed*, 2024 WL 4924954 (2d Cir. Oct. 10, 2024).

As an arm of the state, the Commission is immune from suit under the Eleventh

Amendment and "may not be sued in federal court" unless the state has "waived [that]

immunity" or "Congress has abrogated [it]."  *See id.* (quoting *Gollomp v. Spitzer*, 568

F.3d 355, 366 (2d Cir. 2009)).

Eckert does not allege that New York's Eleventh Amendment immunity has been

waived by the state or abrogated by Congress with respect to sections 1983, 1985, or

1986 or with respect to the tort claims.  *See* Docket Item 58.  And, in fact, New York's

sovereign immunity applies with full force with respect to those claims.  *See Allah v. City

of New York*, 2016 WL 676394, at *3 (E.D.N.Y. Feb. 17, 2016) ("Congress has not

abrogated sovereign immunity from claims brought under 42 U.S.C. §§ 1981, 1983,

1985, and 1986, nor has New York waived immunity with respect to such claims."); *Cruz

v. New York*, 24 F. Supp. 3d 299, 305 (W.D.N.Y. 2014) (dismissing plaintiff's claim for

negligent hiring, training, and retention claim against New York State on sovereign

immunity grounds); *Barry v. City Univ. of New York*, 700 F. Supp. 2d 447, 453 (S.D.N.Y.

2010) (holding that claims for intentional infliction of emotional distress against the City University of New York were barred by state sovereign immunity); *Y.D. v. N.Y.C. Dep't of Educ.*, 2016 WL 698139, at \*3-4 (S.D.N.Y. Feb. 19, 2016) (holding that plaintiff's intentional and negligent infliction of emotional distress claims against several New York State entities were barred by sovereign immunity). Those claims therefore cannot proceed against the Commission on Judicial Conduct.

Congress did waive Eleventh Amendment immunity with respect to Title VI. *See Y.D.*, 2016 WL 698139, at \*4. But as explained above, *see supra* Section I.C, to state a Title VI claim here, Eckert must allege that the Commission on Judicial Conduct deprived her of access to a federally funded program based on her race, color, or national origin. Because she does not allege any such facts here, *see* Docket Item 58, she has failed to state a Title VI claim against the Commission on Judicial Conduct.

Eckert's claims against the Commission on Judicial Conduct therefore are dismissed.

### C.    Tembeckjian

Eckert also asserts claims under sections 1983, 1985, and 1986 and for negligent and intentional infliction of emotional distress against the Agency Administrator and Counsel of the New York State Commission on Judicial Conduct, Tembeckjian. *See* Docket Item 58 at 64, 120, 124. But other than identifying his title, *see id.* at 11-12, the second amended complaint includes no facts about Tembeckjian's role in any of these events, *see generally id.* Eckert's claims against him therefore are dismissed.

64

### D.    Buffalo Commission on Citizens' Rights and Community Relations

Eckert asserts claims under sections 1983, 1985, and 1986; Title VI; and New York State law against the Buffalo Commission on Citizens' Rights and Community Relations.  *See* Docket 58 at 64, 84, 88, 100, 106, 109, 114, 120, 124.  But because that entity may not be sued, those claims are dismissed.

Eckert says that the Commission on Citizens' Rights and Community Relations was created by former City of Buffalo Mayor Anthony Masiello in 2000 "to address race relations in the City of Buffalo" and that it "functions as a statutory agency of the City [of Buffalo]."  *Id.* at 22.  But "[t]he only proper defendant in a lawsuit against an agency of a municipality is the municipality itself, not the agency through which the municipality acted, . . . because, '[u]nder New York law, departments that are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot be sued.'"  *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) (quoting *Santiago v. City of N.Y.*, 2008 WL 2854261, at *3 (S.D.N.Y. July 21, 2008)).  So the Commission on Citizens' Rights and Community Relations is not a proper defendant here, and Eckert's claims against that entity are dismissed.

### E.    Buffalo Police Advisory Board

While Eckert asserts various claims against the Buffalo Police Advisory Board, *see* Docket 58 at 64, 84, 88, 90, 93, 100, 106, 109, 114, 120, 124, they all are based on Walden's actions:  Eckert does not assert claims based on any conduct involving the Board other than that of Walden.  *See generally* Docket Item 58.  Because the Court has dismissed the claims against Walden, it dismisses the claims against the Buffalo Police Advisory Board as well.

F.    **Whitaker**

Eckert asserts claims against Whitaker, the Executive Director of the

Commission on Citizens' Rights and Community Relations, under section 1983, section

1985, and for intentional and negligent infliction of emotional distress.  *See* Docket Item

58 at 64, 120, 124.

Eckert's allegations against Whitaker parallel those against Walden, except that

she does not even suggest that Whitaker has any ties to Meadows.  Instead, she says

simply that Whitaker did not respond to her complaint in a way that she wanted.  And

that clearly is not enough.

More specifically, Eckert says that sometime in 2020, she made a complaint to

the Commission on Citizens' Rights and Community Relations and that when she

"followed up [on that] complaint" in December 2020, she spoke with Whitaker, who told

her that her complaint was "still under review."  *Id.* at 181.  A month later, when she

followed up again to "raise new concerns of prejudice and bias within the [BPD],"

Whitaker told her that her complaint was "still under review" but that he would "follow[

]up" with the BPD.  *Id.* at 188.  And a month after that, when Eckert again contacted

Whitaker about "concerns she had about political corruption," Whitaker told her to

contact the Erie County District Attorney's Office.  *See id.* at 190.  She contacted him

once more in May 2021 to "get assistance with Farley not responding to [a] complaint,"

although she does not say what the outcome of that contact was. *See id.* at 196-97.

Eckert makes conclusory assertions that Whitaker discriminated against her,

deprived her of her rights, and collaborated with other defendants, namely Brown and

Baskin.  But because she does not include any specific facts to support these

allegations—other than Whitaker's apparently not providing her the help that she requested—she has failed to state a claim under sections 1983, 1985, or 1986 or for intentional or negligent infliction of emotional distress for the same reasons that she failed to state such claims against Walden. *See supra* Section III.

### G.   Morrow, Cullen, Dickinson, DiPasquale, Moriarity, Reese, Redmon, and Wojtanik

Finally, Eckert asserts claims under sections 1983, 1985, and 1986 and New York State law against eight defendants associated with the BPD: Lieutenant Morrow and Officers Cullen, Dickinson, DiPasquale, Moriarity, Reese, Redmon, and Wojtanik.[41] *See* Docket Item 58 at 64, 66, 68, 84, 88, 98, 100, 106, 120, 124.

With respect to all these defendants except Dickinson, Eckert's second amended complaint presents "colorable claim[s]" and therefore survives screening under 28 U.S.C. § 1915(e)(2). *See Benitez v. Wolff*, 907 F.2d 1293, 1295 (2d Cir. 1990) ("Sua sponte dismissal of a pro se complaint prior to service of process is a draconian device [that] is warranted only when the complaint lacks an arguable basis either in law or in fact [or is] frivolous on its face or wholly insubstantial." (internal citations, internal quotation marks, and italics omitted)); *see also Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (explaining that dismissal under Federal Rule of Civil Procedure 12(b)(6) still may be appropriate notwithstanding a court's earlier finding that the complaint was not "frivolous" for purposes of section 1915(e)(2)). Eckert's claims against Dickinson, however, are dismissed because other than stating that he is a BPD officer, she

---

[41] Because this Court is allowing Eckert to add Wojtanik as a defendant, her second amended complaint shall be deemed to incorporate the allegations she included in her motion for joinder. *See* Docket Item 121; *L-7 Designs, Inc.*, 647 F.3d at 422.

includes no facts whatsoever about anything he did or did not do.  *See generally* Docket

Item 58.   Indeed, Eckert does not even hint about the role that he played in the

underlying incidents or anything else.  *See generally id.*

## V.    LEAVE TO AMEND

It is well established that a district court must construe pro se complaints

"liberally" and that it "should not dismiss without granting leave to amend at least once

when a liberal reading of the complaint gives any indication that a valid claim might be

stated."  *Cuoco*, 222 F.3d at 112.  But "[l]eave to amend . . .may properly be denied" for

"repeated failure to cure deficiencies by amendments previously allowed or futility of

amendment, among other reasons."  *Ngambo v. Chase*, 2023 WL 1767463, at *5

(S.D.N.Y. Feb. 3, 2023) (quoting *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir.

2008) (internal quotation marks omitted)).

Eckert already has amended her complaint twice, *see* Docket Items 3 and 58;

she has moved for reconsideration of this Court's dismissals of her claims, *see* Docket

Item 5 at 4-9; Docket Item 54-1 at 9-18; Docket Item 87; and most recently, she has

moved to join a new defendant, Docket Item 121, something the Court allowed her to

do.  This Court therefore declines to afford Eckert further leave to amend.  Should she

wish to amend her complaint again, she must move for leave to amend and attach to

her motion a proposed amended complaint.  *See* Loc. R. Civ. P. 15(a).

If she does wish to amend her complaint again, Eckert must comply with the

pleading requirements of Federal Rule of Civil Procedure 8.  That rule provides that a

complaint shall "contain . . . *a short and plain* statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  "The statement

should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable [that party] to answer and prepare for trial."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). "The statement should be short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'"  *Id.* (alteration in original) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).

## VI.    CASE DEADLINES

Finally, the Court addresses the outstanding motions related to case deadlines. *See* Docket Items 90 and 115.  After several defendants associated with the City of Buffalo filed a letter seeking to clarify the time to answer for several defendants— including those whose claims had not yet been screened under 28 U.S.C. § 1915(e)(2), *see* Docket Item 89—Eckert filed a "motion in opposition" in response to that letter, *see* Docket Item 90.  More recently, she asked this Court to hold a status conference on the "outstanding service issues" in this case.  Docket Item 115.

The Court now has screened the complaint under section 1915, and several additional claims against defendants associated with the BPD—Morrow, Cullen, DiPasquale, Moriarity, Reese, Redmon, and Wojtanik—have survived screening.  This Court therefore directs the Clerk of the Court to cause the United States Marshals Service to personally serve copies of the summons; this Court's previous orders, Docket Items 4, 57, and 120; the second amended complaint and accompanying RICO Statement, Docket Items 58 and 59; and this order upon the just named defendants at

69

the most recent address provided by Eckert.  It is Eckert's responsibility to inquire of the Marshals at 716-348-5300 as to whether service has been made and, if necessary, to request a further extension of time for service.

Further, in an effort to balance competing priorities—the interest in judicial efficiency in allowing all defendants associated with the same municipal entity to answer as one, on the one hand, and the interest in allowing this case to proceed expeditiously, on the other—the Court orders that the defendants who already have been served must answer **within 60 days of the date of this order**.

In light of those clarifications, the Court deems a status conference to be unnecessary and denies Eckert's motions, Docket Items 90 and 115, as moot.

## CONCLUSION

For the reasons stated above, the Erie County defendants' motion to dismiss, Docket Item 70, is GRANTED IN PART and DENIED IN PART.  More specifically, it is denied as to Eckert's section 1983 claim against Baskin related to the latter's blocking Eckert on Facebook, and it is granted as to all other claims against the Erie County defendants.  The Court GRANTS in part Meadows's motion to dismiss, Docket Item 68, and DENIES it in part.  Eckert's section 1983 claims against Meadows are dismissed, but except for her RICO claim her other claims may proceed.  And the Court GRANTS Walden's motion for judgment on the pleadings, Docket Item 110.  Eckert's motion to join a new defendant, Wojtanik, is GRANTED, and her remaining motions related to case deadlines, Docket Items 90 and 115, are DENIED as moot.

Eckert's section 1988, RICO, FOIA, and Privacy Act claims against all defendants are dismissed under 28 U.S.C. § 1915(e).  Her claims against the Buffalo

Common Council, the Commission on Judicial Conduct, Tembeckjian, the Buffalo Commission on Citizens' Rights and Community Relations, the Buffalo Police Advisory Board, and Dickinson are dismissed under that same section. The Clerk of the Court shall terminate Erie County, Flynn, Garcia, Howard, the Erie County Doe, Walden, the Buffalo Common Council, the Commission on Judicial Conduct, Tembeckjian, the Buffalo Commission on Citizens' Rights and Community Relations, the Buffalo Police Advisory Board, Whitaker, and Dickinson as defendants to this action.

The Clerk of the Court also shall cause the United States Marshals Service to personally serve copies of the summons; this Court's previous orders, Docket Items 4, 57, and 120; the second amended complaint and accompanying RICO Statement, Docket Items 58 and 59; and this order upon Morrow, Cullen, DiPasquale, Moriarity, Reese, Redmon, and Wojtanik at the most recent address provided by Eckert, *see* Docket Item 58. It is Eckert's responsibility to inquire of the Marshals at 716-348-5300 as to whether service has been made and, if necessary, to request a further extension of time for service. All defendants who have been served as of the date of this order but have not yet answered the second amended complaint must answer, move against, or otherwise respond to the complaint **within 60 days of the date of this order**.

SO ORDERED.

Dated:   October 6, 2025
         Buffalo, New York


                                        _/s/ Lawrence J. Vilardo_
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE