UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
AUG 3 1 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

RACHEL ECKERT,

Plaintiff,

v.

CITY OF BUFFALO; CAROLETTE MEADOWS; APRIL BASKIN; BYRON W. BROWN; FRANK BIFARO; JAMES COMERFORD; TIMOTHY CURTIN; SEAN MYERS; BYRON LOCKWOOD; ROBERT JOYCE; MICHAEL FARLEY; JEFF RINALDO; MELISSA KURDZIEL; COREY DIXON; JAMES NIGHTINGALE-GRIFFIN; JACOB SALAZAR; MARK COSTANTINO; WALTER SKRZVNSKI; PATRICK MORROW; CHAD CULLEN; MARC DIPASQUALE; KYLE MORIARITY; JAMES REESE; KEENAN REDMON; MAUREEN WOJTANIK; and JOHN/JANE DOE BPD OFFICERS AND GOVERNMENTAL EMPLOYEES WHOSE IDENTITIES ARE NOT YET KNOWN,

Defendants.

**CASE NO. 1:22CV-00540**

**PROPOSED THIRD VERIFIED AMENDED COMPLAINT**

## PRELIMINARY STATEMENT

1. Plaintiff Rachel Eckert brings this civil-rights action arising from a prolonged series of interactions with City of Buffalo officials, Buffalo Police Department personnel, elected officials, and Defendant Carolette Meadows beginning in March 2020 and continuing thereafter.

2. Plaintiff alleges that what began as a dispute concerning the furnace exhaust and boundary area adjacent to Plaintiff's residence developed into repeated governmental interference with Plaintiff's property rights, unequal police protection and enforcement, criminal charges and prosecutions allegedly undertaken without probable cause, suppression or mishandling of exculpatory evidence, interference with Plaintiff's protected speech and petitioning activity, and other constitutional and state-law injuries.

3. Plaintiff alleges that governmental actors repeatedly treated accusations and property claims made by Meadows as matters warranting immediate police or code-enforcement action, while Plaintiff's complaints concerning assaults, property damage, violations of an Order of Protection, and interference with her residence repeatedly were treated as civil matters or otherwise were not enforced.

4. Plaintiff alleges that this disparity continued over several years and involved multiple governmental employees rather than a single isolated officer or event.

5. Plaintiff alleges that when she attempted to exercise her property rights, repair her residence, criticize public officials, complain about governmental misconduct, seek police protection, and defend herself from criminal accusations, governmental officials repeatedly exercised coercive authority against her or denied her comparable governmental protection.

6. Plaintiff further alleges that an unredacted governmental criminal-history compilation concerning her was disclosed outside ordinary governmental channels and thereafter repeatedly

disseminated publicly, causing substantial reputational, professional, economic, and emotional injury.

7. Plaintiff does not reassert the RICO claims previously dismissed by this Court.

8. Plaintiff incorporates factual events contained in her former RICO Statement only where those events provide additional particularity concerning who acted, what occurred, when it occurred, where it occurred, and how the conduct relates to the causes of action asserted herein.

9. Plaintiff likewise does not reassert claims under the federal Freedom of Information Act, the federal Privacy Act, or 42 U.S.C. § 1988 as an independent cause of action.

10. This pleading is intended to replace Plaintiff's prior Second Amended Complaint while preserving claims that survived prior screening or dispositive rulings and particularizing those claims with additional factual detail.

11. Plaintiff further seeks leave to plead supplemental or amended theories based upon events or evidence discovered after the filing of the Second Amended Complaint, including later First Amendment retaliation, evidence concerning the disclosure and handling of Plaintiff's criminal-history information, and additional facts bearing upon municipal liability.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343.

13. Plaintiff brings federal claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution.

14. This Court has supplemental jurisdiction over Plaintiff's related New York State-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same transactions, occurrences, and course of conduct underlying Plaintiff's federal claims.

15. Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred within the City of Buffalo and Erie County, New York.

16. At all relevant times, the individual governmental Defendants acted under color of state law when exercising or purporting to exercise authority conferred by their governmental employment, public offices, police powers, regulatory powers, governmental database access, or other governmental positions.

**PARTIES**

17. Plaintiff Rachel Eckert is a resident of the State of New York and, at all relevant times, resided within the City of Buffalo.

18. Defendant City of Buffalo is a municipal corporation organized under the laws of the State of New York.

19. The City of Buffalo was responsible for the municipal policies, customs, practices, training, supervision, discipline, evidence-preservation systems, criminal-history systems, and governmental employees described herein.

20. Defendant Carolette Meadows was Plaintiff's neighboring property owner and is alleged to have participated in the events described throughout this Complaint.

21. Defendant April Baskin was, at relevant times, an elected Erie County Legislator.

22. Baskin maintained a social-media page that Plaintiff alleges she used in connection with her governmental office and communications with constituents and members of the public.

23. Defendant Byron W. Brown was, at relevant times, Mayor of the City of Buffalo.

24. Defendant Frank Bifaro was a City of Buffalo Fuel Device Inspector.

25. Defendant James Comerford was Commissioner of Permits and Inspections for the City of Buffalo.

26. Defendant Timothy Curtin was Chief Building Inspector for the City of Buffalo.

27. Defendant Sean Myers was a Building Inspector for the City of Buffalo.

28. Defendant Byron Lockwood was Commissioner of the Buffalo Police Department.

29. Defendant Robert Joyce was a Buffalo Police Department Captain and supervisory official.

30. Defendant Michael Farley was a Buffalo Police Department Lieutenant assigned to Internal Affairs.

31. Defendant Jeff Rinaldo was a Buffalo Police Department official responsible for responding to records or Freedom of Information Law requests.

32. Defendant Melissa Kurdziel was a Buffalo Police Department officer.

33. Defendant Corey Dixon was a Buffalo Police Department officer.

34. Defendant James Nightingale-Griffin was a Buffalo Police Department officer.

35. Defendant Jacob Salazar was a Buffalo Police Department officer.

36. Defendant Mark Costantino was a Buffalo Police Department officer.

37. Defendant Walter Skrzvnski was a Buffalo Police Department officer.

38. Defendant Patrick Morrow was a Buffalo Police Department Lieutenant.

39. Defendant Chad Cullen was a Buffalo Police Department officer.

40. Defendant Marc DiPasquale was a Buffalo Police Department officer.

41. Defendant Kyle Moriarity was a Buffalo Police Department officer.

42. Defendant James Reese was a Buffalo Police Department officer.

43. Defendant Keenan Redmon was a Buffalo Police Department officer.

44. Defendant Maureen Wojtanik was a Buffalo Police Department employee or officer who interacted with Plaintiff in connection with the events alleged herein.

45. Defendants John and Jane Doe are governmental employees, Buffalo Police Department personnel, supervisors, record custodians, database users, or other governmental actors whose identities presently are unknown to Plaintiff.

46. Plaintiff will seek leave to substitute the true identities of the Doe Defendants when those identities are established through discovery or governmental records.

## FACTUAL ALLEGATIONS

### A. March 28–31, 2020 — Furnace Exhaust, Property Access, and Threats of Arrest

47. On March 28, 2020, Meadows cut or otherwise removed the exhaust pipe serving Plaintiff's newly installed furnace.

48. Meadows claimed that the exhaust pipe improperly extended onto her property, although Plaintiff alleged that the pipe protruded only approximately one or two inches from the side of Plaintiff's residence.

49. Defendant Salazar initially filed a police report concerning criminal mischief, trespass, and harassment arising from the damaged pipe.

50. On March 29, 2020, Meadows came to Plaintiff's residence, pounded on Plaintiff's door, and threatened to beat Plaintiff.

51. Defendant Kurdziel responded and directed Meadows to stay off Plaintiff's property and return the pipe.

52. Plaintiff alleges that Meadows made racially derogatory remarks during the confrontation.

53. Plaintiff further alleges that Meadows attempted to strike Plaintiff by whipping the pipe toward her, instead striking Plaintiff's residence.

54. Later that day, Plaintiff attempted to make emergency repairs to her furnace.

55. Plaintiff alleges that Meadows shoved Plaintiff while Plaintiff attempted to make those repairs.

56. A responding BPD officer identified in Plaintiff's prior pleading as Doe No. 1 advised Plaintiff that she could not perform the repair and that doing so would constitute trespass.

57. Doe No. 1 directed Plaintiff to address the matter in civil court.

58. On March 30, 2020, Plaintiff again attempted to reach the damaged exhaust.

59. A second BPD officer identified as Doe No. 2 threatened Plaintiff with arrest for trespass if Plaintiff attempted to make the repair.

60. Doe No. 2 instructed Plaintiff to contact City building inspectors before attempting the repair.

61. Plaintiff contacted Defendant Curtin concerning access to the disputed area.

62. Plaintiff also consulted her real-estate attorney concerning her right to access the area.

63. After consulting counsel, Plaintiff removed a fence from property Plaintiff claimed as her own so that she could reach the damaged furnace exhaust.

64. Meadows contacted police.

65. Defendant Kurdziel responded.

66. Kurdziel threatened Plaintiff with arrest for removing the fence.

67. Kurdziel compelled Plaintiff, under threat of arrest, to reinstall the fence.

68. Plaintiff alleges that this prevented or materially interfered with her ability to access and repair the damaged furnace exhaust.

69. Plaintiff alleges that Meadows recorded the interaction.

70. Meadows thereafter posted the recording on social media.

71. Later that evening, a member of Plaintiff's family contacted BPD and spoke with a lieutenant concerning the disconnected furnace exhaust.

72. Plaintiff's family member warned the lieutenant that failure to repair the exhaust created a danger of carbon-monoxide poisoning.

73. The lieutenant agreed that the repair needed to be made.

74. The lieutenant represented that BPD would send a squad car when Plaintiff was ready to make the repair so that the repair could be completed without further problems.

75. On March 31, 2020, Plaintiff contacted BPD and requested the promised assistance.

76. BPD refused to dispatch a police vehicle to assist Plaintiff.

77. Defendants Curtin and Myers thereafter came to Plaintiff's residence to determine whether Plaintiff could access and repair the area without a court order.

78. Curtin and Myers determined that Plaintiff owned at least approximately 1.5 feet along the north side of Plaintiff's residence.

79. Curtin and Myers further determined that repair of Plaintiff's furnace exhaust was critical.

80. Plaintiff thereafter contacted BPD concerning the inspectors' determination.

81. Defendant Wojtanik advised Plaintiff that Curtin and Myers had confirmed that Plaintiff owned the approximately 1.5-foot area.

82. Wojtanik nevertheless advised Plaintiff that Plaintiff was not permitted to enter the area.

83. Wojtanik further advised Plaintiff that she would be arrested for trespass if she entered the area.

84. Wojtanik also advised Plaintiff that she would be arrested if she again removed the fence from her property.

85. Curtin and Myers further told Plaintiff that she could not erect her own fence to protect her property.

86. Curtin and Myers told Plaintiff that if she erected a fence, they would remove it.

87. Curtin and Myers subsequently apologized for those statements.

88. Plaintiff alleges that City officials therefore simultaneously recognized Plaintiff's ownership of the disputed area while threatening Plaintiff with governmental consequences if she exercised control over that same property.

89. On or about March 31, 2020, Plaintiff and members of her household developed physical symptoms, including vomiting.

90. Plaintiff sought medical evaluation for her children.

91. Plaintiff alleges that blood testing reflected carbon-monoxide poisoning affecting her children.

92. Plaintiff reported the condition to Detective Lauren McDermott.

93. McDermott initially advised Plaintiff that Meadows would be charged with endangering the welfare of minors.

94. Approximately two days later, McDermott advised Plaintiff that her supervisor had directed her not to charge Meadows.

95. McDermott advised Plaintiff that the stated reason was that BPD did not know Meadows's intent.

**B. April 20–May 12, 2020 — Furnace Inspection and Attempted Relocation**

96. On April 20, 2020, Defendant Bifaro inspected Plaintiff's furnace.

97. Bifaro determined that Plaintiff's furnace was up to code.

98. Meadows continued complaining to City officials concerning the location of Plaintiff's furnace exhaust.

99. On May 12, 2020, Bifaro contacted Plaintiff on behalf of Defendant Curtin.

100. Bifaro demanded that Plaintiff relocate the existing furnace exhaust because Meadows was complaining about it.

101. Plaintiff participated in a three-way telephone conversation with Bifaro and Plaintiff's HVAC contractor concerning the demanded relocation.

102. Plaintiff's contractor questioned why the exhaust needed to be relocated when it previously had passed inspection.

103. Plaintiff alleges that Bifaro stated, in substance, that the relocation was being required because Meadows was complaining.

104. Plaintiff advised Bifaro that she would not relocate the exhaust absent a court order establishing that Meadows possessed a legal property right requiring its relocation.

105. Bifaro advised Plaintiff that she could either relocate the exhaust or face court proceedings concerning an alleged permit issue.

106. Plaintiff further alleges that Bifaro threatened Plaintiff's HVAC contractor with enforcement consequences based upon his licensing status if he refused to relocate Plaintiff's exhaust.

107. Plaintiff alleges that the permit issue subsequently was remediated.

108. Approximately one month later, a BPD officer identified as Doe No. 4 threatened to file criminal charges against Plaintiff if she did not relocate the exhaust.

109. Plaintiff again refused to relocate the exhaust without a court order establishing Meadows's claimed legal right to require relocation.

**C. May 20–23, 2020 — Fence Incidents**

110. On May 20, 2020, Plaintiff removed a portion of fence located on property Plaintiff claimed as her own.

111. Meadows contacted BPD.

112. Defendant Salazar responded.

113. Salazar advised Plaintiff that the fence belonged to Meadows notwithstanding Curtin's and Myers's prior determination concerning Plaintiff's property boundary.

114. Salazar further advised Plaintiff that she was required to permit Meadows to enter or use the disputed area to park her vehicle.

115. Plaintiff maintained that no recorded easement existed granting Meadows such a right.

116. Later that day, Meadows covered Plaintiff's security cameras with paper towels.

117. Meadows thereafter pounded on Plaintiff's residence.

118. Plaintiff's son contacted 911.

119. A responding BPD officer identified as Doe No. 5 directed Meadows to leave Plaintiff's cameras alone.

120. Doe No. 5 did not prepare a police report concerning the incident.

121. On May 21, 2020, Meadows again entered Plaintiff's property.

122. Meadows again interfered with Plaintiff's security cameras.

123. Meadows again pounded on Plaintiff's residence.

124. On May 23, 2020, Plaintiff discovered that a panel was missing from her privacy fence.

125. Plaintiff observed the missing panel in Meadows's yard.

126. Plaintiff contacted 911.

127. Defendants Salazar and Cullen responded.

128. Salazar and Cullen retrieved the fence panel from Meadows's property.

129. Salazar and Cullen returned the fence panel to Plaintiff.

130. Salazar and Cullen nevertheless refused to prepare a theft report against Meadows.

131. Plaintiff alleges that Salazar and Cullen instead told her that wind had damaged the fence and that Meadows merely had retrieved the fallen panel.

**D. May 23, 2020 — Physical Confrontation**

132. Later on May 23, 2020, Meadows returned to the area of Plaintiff's property carrying an electric saw.

133. Meadows entered Plaintiff's backyard.

134. Meadows cut the same fence panel that Salazar and Cullen previously had returned to Plaintiff.

135. Plaintiff went outside and directed Meadows to leave Plaintiff's property.

136. Plaintiff alleges that Meadows threatened Plaintiff.

137. Plaintiff alleges that Meadows chased Plaintiff.

138. Plaintiff alleges that Meadows ultimately cornered Plaintiff while holding the electric saw.

139. Plaintiff alleges that Meadows lunged toward her with the saw.

140. Plaintiff defended herself.

141. During the resulting physical confrontation, Plaintiff alleges that Meadows bit Plaintiff on the neck and broke the skin.

142. Plaintiff alleges that Meadows grabbed Plaintiff by the hair.

143. Plaintiff alleges that Meadows repeatedly struck Plaintiff in the head.

144. Plaintiff alleges that Meadows pinched Plaintiff.

145. Plaintiff's son contacted 911.

146. A neighbor also contacted 911.

147. A second neighbor intervened and pulled Meadows off of Plaintiff.

**E. May 23, 2020 — BPD Investigation**

148. Several BPD officers responded to the scene.

149. Defendant Dixon was the first responding officer identified in Plaintiff's prior pleading.

150. Plaintiff alleges that when Dixon arrived, Meadows immediately approached Dixon.

151. Meadows demanded that Plaintiff be arrested.

152. Plaintiff alleges that Meadows referred to Plaintiff in expressly racial terms.

153. Plaintiff alleges that Meadows complained to Dixon that Plaintiff received favorable governmental treatment because Plaintiff was white.

154. Plaintiff further alleges that Meadows invoked Defendant Baskin's governmental position during her discussion with Dixon.

155. Dixon thereafter accused Plaintiff of lying.

156. Dixon accused Plaintiff of fabricating her account of the confrontation.

157. Plaintiff alleges that multiple eyewitnesses were available to provide information concerning what had occurred.

158. Plaintiff alleges that at least three witnesses possessed information favorable to Plaintiff's account of the confrontation.

159. Dixon refused or failed to obtain statements from those witnesses.

160. Plaintiff alleges that one individual questioned Dixon concerning his refusal to obtain the available witness statements.

161. Plaintiff alleges Dixon threatened to tase that individual.

162. Plaintiff alleges that Dixon therefore rejected Plaintiff's account before completing a neutral investigation of the available witnesses and evidence.

163. Plaintiff was visibly injured following the confrontation with Meadows.

164. Plaintiff alleges that responding officers initially attempted to delay or discourage Plaintiff from obtaining medical assistance.

165. Plaintiff ultimately transported herself for medical treatment because of the pain and injuries she sustained.

166. Plaintiff alleges that Defendant Nightingale-Griffin also participated in the investigation arising from the May 23 confrontation.

167. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable eyewitness information.

168. Plaintiff alleges that one witness's legal guardian expressly authorized police to interview the witness.

169. Plaintiff alleges that Dixon and Nightingale-Griffin nevertheless failed to obtain or suppressed that witness's statement.

170. Plaintiff further alleges that one responding officer expressed concern that Plaintiff was being charged even though that officer did not believe Plaintiff had been the aggressor.

171. Plaintiff alleges that information concerning the available eyewitnesses subsequently was inaccurately or incompletely reflected in materials used in connection with Plaintiff's criminal prosecution.

172. Plaintiff later obtained criminal-discovery material that she alleges revealed discrepancies between the eyewitness information actually available and the information transmitted in connection with her prosecution.

173. Plaintiff alleges that Defendant DiPasquale participated in the May 23 investigation and/or handling of evidence arising from the incident.

174. Plaintiff alleges that Defendant Redmon participated in the May 23 investigation and/or handling of evidence arising from the incident.

175. Plaintiff alleges that Defendant Reese subsequently participated in the charging process arising from the May 23 incident.

176. Plaintiff attributes liability to DiPasquale, Redmon, Reese, and other officers only for their own conduct established by the prior pleadings, discovery, and evidence, and does not allege that every responding officer personally committed every act described herein.

**F. May 23, 2020 — Body-Worn-Camera Evidence**

177. Plaintiff alleges that BPD officers responding to the May 23 confrontation were equipped with body-worn cameras.

178. Plaintiff alleges that Dixon's body-worn camera was activated during portions of the investigation.

179. Plaintiff alleges that Dixon asked other responding officers whether their body-worn cameras were turned off before turning off his own camera.

180. Plaintiff alleges that the circumstances surrounding that conversation were material to determining what occurred during the police investigation and charging decision.

181. Shortly after the incident, Plaintiff began seeking preservation of the body-worn-camera evidence.

182. On or about June 1, 2020, Plaintiff sent preservation demands concerning Dixon's AXON body-worn-camera footage to Defendants Joyce and Lockwood.

183. Plaintiff sought preservation because the footage concerned an incident that had resulted or was expected to result in criminal charges against her.

184. Plaintiff thereafter repeatedly sought Dixon's body-worn-camera footage from BPD.

185. Plaintiff made requests through Defendant Rinaldo and other BPD personnel.

186. Plaintiff alleges that her requests included requests made in or about July 2020, November 21, 2020, December 1, 2020, and December 7, 2020.

187. Plaintiff alleges that the complete footage was not produced despite her repeated requests and preservation demands.

188. Plaintiff alleges that she initially was informed, in substance, that responsive body-worn-camera footage did not exist.

189. Plaintiff continued requesting the footage because she believed it contained evidence material to her defense against the criminal accusations arising from May 23.

**G. Complaints to BPD Supervisory and Internal Affairs Personnel**

190. Plaintiff promptly complained to BPD supervisory personnel concerning Dixon's handling of the May 23 investigation.

191. Plaintiff specifically complained concerning Dixon's refusal or failure to obtain available eyewitness statements.

192. Plaintiff complained concerning what she believed to be discriminatory treatment during the investigation.

193. Plaintiff complained concerning the preservation of body-worn-camera evidence.

194. Plaintiff also contacted BPD Internal Affairs concerning the conduct of officers involved in the investigation.

195. By approximately mid-June 2020, Plaintiff alleges that she had contacted Internal Affairs and community-policing personnel more than fifteen times concerning the police conduct at issue.

196. Defendant Farley received or became aware of Plaintiff's complaints through his Internal Affairs role.

197. Defendants Joyce and Lockwood received Plaintiff's preservation demands concerning the AXON evidence.

198. Plaintiff alleges that those complaints and preservation demands placed supervisory BPD personnel on actual notice that Plaintiff disputed the integrity of the May 23 investigation.

199. Plaintiff alleges that supervisory personnel also had actual notice that potentially material body-worn-camera evidence needed to be preserved.

200. Plaintiff continued complaining to BPD and seeking evidence after the criminal proceedings against her began.

**H. Plaintiff's Order of Protection Against Meadows**

201. On October 15, 2020, Plaintiff obtained an Order of Protection against Meadows from Buffalo City Court.

202. Plaintiff thereafter repeatedly contacted BPD concerning conduct by Meadows that Plaintiff believed violated the Order.

203. Plaintiff alleges that BPD officers refused or failed to enforce the Order on October 25, 2020.

204. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on November 7, 2020.

205. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on November 8, 2020.

206. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December 10, 2020.

207. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December 15, 2020.

208. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December 16, 2020.

209. On December 18, 2020, Plaintiff personally communicated with Defendant Morrow concerning BPD's refusal to enforce the Order.

210. Morrow advised Plaintiff, in substance, that BPD would not enforce Plaintiff's Order of Protection unless Meadows physically assaulted Plaintiff.

211. Plaintiff alleges that the Order itself did not condition enforcement upon Meadows first physically assaulting Plaintiff.

212. Plaintiff alleges that Morrow therefore imposed an additional enforcement condition that materially diminished the protection afforded to Plaintiff by the judicial Order.

213. Plaintiff alleges that BPD again refused or failed to enforce the Order on December 27, 2020.

214. Plaintiff alleges further refusals or failures to enforce the Order on September 17, 2021.

215. Plaintiff alleges further refusals or failures to enforce the Order on September 19, 2021.

216. Plaintiff alleges further refusals or failures to enforce the Order on September 20, 2021.

217. Plaintiff alleges further refusals or failures to enforce the Order on September 23, 2021.

218. Plaintiff alleges further refusals or failures to enforce the Order on October 12, 2021.

219. Plaintiff alleges further refusals or failures to enforce the Order on November 15, 2021.

220. Plaintiff alleges further refusals or failures to enforce the Order on December 30, 2021.

221. Plaintiff alleges further refusals or failures to enforce the Order on March 17, 2022.

222. Plaintiff alleges further refusals or failures to enforce the Order on June 23, 2022.

223. Plaintiff alleges that these repeated refusals occurred while BPD personnel readily exercised criminal charging authority when Meadows made accusations against Plaintiff.

**I. December 5, 2020 Charging Instrument**

224. On December 5, 2020, approximately six months after the May 23 confrontation, Defendant Reese signed an Information/Complaint charging Plaintiff with Assault in the Third Degree.

225. Plaintiff alleges that by the time Reese executed the charging instrument, BPD possessed or reasonably should have possessed information concerning Plaintiff's injuries.

226. BPD also possessed or reasonably should have possessed information concerning Plaintiff's claim of self-defense and Meadows prior conviction of assaulting a separate neighbor.

227. BPD possessed or reasonably should have possessed information concerning the available eyewitnesses.

228. Plaintiff alleges that materially favorable eyewitness information was omitted, suppressed, inaccurately transmitted, or otherwise absent from the charging determination.

229. Plaintiff alleges that Reese nevertheless executed the charging instrument based upon a materially incomplete or inaccurate investigative record.

230. Plaintiff was not physically arrested, detained, jailed, or confined in connection with that charge.

231. Plaintiff nevertheless was subjected to criminal process and required to appear in criminal court and defend herself against the charge.

**J. January 18, 2021 — Petit Larceny and Criminal Mischief Appearance Ticket**

232. Before January 18, 2021, Meadows placed objects, structures, or "contraptions" upon property Plaintiff claimed as her own.

233. Plaintiff removed the objects from her property.

234. Meadows thereafter accused Plaintiff of theft and property damage arising from Plaintiff's removal of those objects.

235. Plaintiff alleges that Meadows supplied materially false information to police concerning ownership of the property and circumstances surrounding Plaintiff's removal of the objects.

236. On January 18, 2021, Defendant Salazar charged Plaintiff with Petit Larceny and Criminal Mischief.

237. Salazar issued Plaintiff an appearance ticket requiring Plaintiff to answer the charges in criminal court.

238. Plaintiff was not taken into physical custody.

239. Plaintiff was not jailed or otherwise physically confined.

240. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Petit Larceny.

241. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Criminal Mischief.

242. Plaintiff alleges that the underlying conduct involved Plaintiff's removal of objects that Meadows had placed upon property belonging to Plaintiff.

243. Plaintiff further alleges that BPD personnel already were aware of the longstanding boundary dispute.

244. Plaintiff alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

245. Plaintiff alleges that Defendants Joyce, Farley, and Lockwood participated in or caused the January 18 charging decision.

246. Plaintiff alleges that governmental criminal authority thereby was used to resolve a disputed question of private property ownership in Meadows's favor without a prior judicial determination establishing Meadows's claimed property right.

247. Plaintiff thereafter was required to appear in criminal court and defend herself against the Petit Larceny and Criminal Mischief charges.

248. The Petit Larceny and Criminal Mischief charges ultimately were dismissed.

**K. Continuing Unequal Police Treatment**

249. Following the January 18, 2021 charges, Plaintiff continued reporting alleged violations of her Order of Protection and other conduct by Meadows to BPD.

250. Plaintiff alleges that her requests repeatedly resulted in no report, no enforcement, or an instruction that the matter was civil.

251. By contrast, Plaintiff alleges that accusations made by Meadows repeatedly resulted in the exercise of criminal charging authority against Plaintiff.

252. Plaintiff alleges that this contrast was not confined to one officer.

253. Plaintiff alleges that this contrast was not confined to one complaint.

254. Plaintiff alleges that this contrast was not confined to one isolated event.

255. Plaintiff alleges that multiple BPD officers applied materially different enforcement standards over an extended period.

256. Plaintiff repeatedly complained to supervisory officials concerning what she believed to be discriminatory and unequal police treatment.

257. Plaintiff alleges that the differential treatment nevertheless continued after supervisory personnel received notice of her complaints.

**L. September 20, 2021 — Felony Appearance Ticket**

258. On September 20, 2021, Plaintiff and Meadows were involved in another encounter.

259. Plaintiff's son contacted 911 because Plaintiff alleges that Meadows was threatening Plaintiff.

260. Meadows thereafter accused Plaintiff of intentionally coughing on her despite being in my own backyard with a 6 foot privacy fence.

261. Defendant Moriarity responded.

262. Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

263. Moriarity issued Plaintiff an appearance ticket requiring Plaintiff to answer the felony charge in criminal court.

264. Plaintiff was not taken into physical custody.

265. Plaintiff was not jailed or otherwise physically confined.

266. Plaintiff alleges that she did not possess a chemical or biological weapon.

267. Plaintiff alleges that she did not deploy a chemical or biological weapon.

268. Plaintiff alleges that the factual accusation underlying the felony charge consisted of Meadows's allegation that Plaintiff intentionally coughed on her.

269. Plaintiff alleges that Moriarity lacked probable cause to charge Plaintiff with the felony offense.

270. Plaintiff further alleges that the circumstances known or reasonably available to responding officers included the fact that Plaintiff's son had contacted 911 concerning Meadows's conduct toward Plaintiff.

271. Plaintiff alleges that the September 20 incident further demonstrated the disparity between BPD's response to Plaintiff's requests for protection and its response to accusations made by Meadows.

272. Plaintiff thereafter was required to appear in criminal court and defend herself against the charge.

**M. Absence of Plaintiff's Order of Protection From Governmental Systems**

273. During the period in which Plaintiff repeatedly sought enforcement of her Order of Protection, Plaintiff learned that the Order was not appearing in governmental systems used by responding officers.

274. Defendants Costantino and Skrzvnski advised Plaintiff that the Order was not "in the system."

275. Costantino and Skrzvnski advised Plaintiff that they therefore could not charge Meadows with violating the Order.

276. Plaintiff alleges that the Order was a valid judicial Order of Protection.

277. Plaintiff alleges that the absence of the Order from the governmental system was not caused by Plaintiff.

278. Plaintiff further alleges that on or about September 20, 2021, her Order of Protection was missing from the New York State Registry.

279. Plaintiff alleges that the absence or disappearance of the Order materially interfered with her ability to obtain police enforcement of judicial protection already afforded to her.

280. Plaintiff alleges that during this same period BPD personnel exercised criminal charging authority against Plaintiff when Meadows made accusations against her.

281. Plaintiff alleges that the contrast between the treatment of Plaintiff's requests for enforcement and Meadows's accusations is part of the unequal governmental treatment alleged herein.

**N. Criminal Proceedings and Firearms Deprivation**

282. Plaintiff continued defending herself against the criminal proceedings arising from the events described above.

283. Plaintiff continued seeking evidence concerning the May 23, 2020 incident.

284. Plaintiff alleges that the City of Buffalo and multiple BPD officers possessed or had access to exculpatory evidence, including eyewitness information, AXON body-worn-camera data, and prior convictions of assault by Meadows.

285. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

286. Plaintiff further alleges that Dixon and Nightingale-Griffin failed to obtain or suppressed a statement from a witness even though the witness's legal guardian expressly authorized police to interview the witness.

287. Plaintiff alleges that the resulting criminal prosecution proceeded without the benefit of material evidence favorable to Plaintiff's defense.

288. As a consequence of the criminal proceeding arising from the May 23, 2020 incident, an Order of Protection was issued against Plaintiff.

289. In approximately March 2021, Plaintiff was required to surrender two firearms to her father pursuant to that Order.

290. Plaintiff remained unable to possess the firearms until approximately July 2022.

291. Plaintiff alleges that the firearms restriction was a consequence of the criminal proceeding that she contends resulted from unconstitutional investigative and charging conduct.

292. Plaintiff does not allege that the mere issuance of a judicial Order of Protection independently creates liability against every Defendant.

293. Plaintiff alleges that liability for the firearms deprivation lies only against those Defendants whose independently unconstitutional conduct is proven to have proximately caused the criminal proceeding and resulting restriction.

294. The Petit Larceny and Criminal Mischief charges against Plaintiff ultimately were dismissed.

295. Plaintiff's assault charge arising from the May 23, 2020 incident ultimately was dismissed.

**O. Plaintiff's Continuing Efforts to Obtain AXON Evidence**

296. Plaintiff continued seeking Dixon's complete AXON body-worn-camera footage after the criminal proceedings began.

297. Plaintiff repeatedly requested the footage from Defendant Rinaldo and other BPD personnel.

298. Plaintiff alleges that she sought the footage on multiple occasions beginning in 2020.

299. Plaintiff alleges that the complete footage was not produced despite her repeated requests and prior preservation demands.

300. Plaintiff alleges that she initially was informed that responsive footage did not exist.

301. In approximately March 2023, Plaintiff ultimately received only an approximately three-minute portion of body-worn-camera footage.

302. In approximately June 2023, Plaintiff obtained an AXON audit log.

303. Plaintiff alleges that the audit log indicated that Dixon had in fact been recording during the May 23, 2020 incident.

304. Plaintiff alleges that the audit information demonstrated that additional body-worn-camera evidence had existed.

305. Plaintiff subsequently obtained additional information concerning the handling of the footage.

306. Plaintiff alleges that those records indicated that Dixon had uploaded body-worn-camera footage.

307. Plaintiff further alleges that uploaded footage subsequently was deleted.

308. Plaintiff alleges that the later audit and records information materially contradicted the earlier representation that responsive footage did not exist.

309. Plaintiff alleges that Defendants Joyce, Lockwood, Farley, Rinaldo, and other BPD supervisory or records personnel previously had received notice of Plaintiff's complaints, preservation demands, or repeated attempts to obtain the evidence.

310. Plaintiff alleges that the loss, deletion, nonproduction, or inability to account for the complete footage prejudiced her ability to defend herself and establish what occurred during the May 23 investigation.

**P. Defendant Baskin and Plaintiff's Protected Speech**

311. Plaintiff regularly used social media to criticize elected officials and governmental agencies concerning matters of public concern.

312. Plaintiff's speech included criticism of Defendant Baskin.

313. Plaintiff's criticism concerned Baskin's governmental conduct and other matters of public concern.

314. Plaintiff alleges that Baskin maintained a Facebook page that she used in connection with her governmental office.

315. Plaintiff alleges that Baskin used the page to communicate with constituents and members of the public concerning governmental affairs.

316. Plaintiff alleges that the page functioned as a governmental social-media forum.

317. In or about 2021, Baskin blocked Plaintiff from the Facebook page after Plaintiff criticized Baskin.

318. The blocking prevented Plaintiff from accessing or participating in the forum to the extent restricted by Baskin's block.

319. Plaintiff alleges that Baskin blocked her because of the content and viewpoint of Plaintiff's criticism.

320. Plaintiff further alleges that Baskin thereafter changed or restricted the page in a manner that prevented private citizens from leaving public reviews or comments.

321. Plaintiff continued criticizing Baskin and other governmental officials after she was blocked.

322. In 2025, Plaintiff subsequently sought assistance from the Foundation for Individual Rights and Expression ("FIRE") concerning Baskin's continued blocking of Plaintiff.

323. Plaintiff complained that an elected governmental official had excluded her from a governmental social-media forum because of Plaintiff's protected criticism.

324. Plaintiff alleges that Baskin unblocked Plaintiff the day after Plaintiff made the FIRE complaint.

325. Plaintiff alleges that the timing of the restoration of access is circumstantial evidence that Baskin retained control over Plaintiff's exclusion from the page.

326. Plaintiff further alleges that the later restoration of access supports her contention that the prior exclusion had been deliberately maintained.

327. Plaintiff does not allege that Baskin's act of unblocking Plaintiff itself constituted retaliation.

328. Plaintiff alleges that the later restoration of access is relevant to the nature, duration, and control of the original blocking.

**Q. Defendant Brown and Governmental Social Media**

329. Plaintiff also publicly criticized Defendant Brown while Brown served as Mayor of the City of Buffalo.

330. Plaintiff's criticism concerned governmental conduct and matters of public concern.

331. Plaintiff alleges that Brown maintained a Facebook page that he used in connection with his office as Mayor.

332. Plaintiff alleges that Brown used the page to communicate governmental information and interact with members of the public.

333. In or about 2020, Brown blocked Plaintiff from the Facebook page after Plaintiff criticized him.

334. Plaintiff alleges that the page functioned as an official governmental social-media forum.

335. Plaintiff alleges that Brown excluded Plaintiff because of the content and viewpoint of Plaintiff's criticism.

336. Plaintiff alleges that the blocking interfered with her ability to participate in communications occurring through the governmental page.

337. Plaintiff further alleges that Brown thereafter restricted or made the page private, thereby limiting public participation.

338. Plaintiff seeks relief only for the violation of her own First Amendment rights and does not assert claims on behalf of other persons who may have been blocked.

**R. Continuing Protected First Amendment Activity**

339. Plaintiff continued publicly criticizing City and County officials after the events described above.

340. Plaintiff's speech concerned governmental accountability.

341. Plaintiff's speech concerned police practices and BPD's treatment of her complaints.

342. Plaintiff's speech concerned City property and code-enforcement practices.

343. Plaintiff's speech also concerned elected officials and other matters of public concern.

344. Plaintiff petitioned governmental agencies concerning alleged governmental misconduct.

345. Plaintiff submitted complaints concerning police conduct.

346. Plaintiff requested governmental records.

347. Plaintiff pursued administrative and judicial remedies.

348. Plaintiff also pursued litigation concerning governmental conduct.

349. Plaintiff alleges that these activities constituted protected speech and petitioning activity under the First Amendment.

350. Plaintiff does not allege that every governmental action occurring after her protected speech necessarily constituted retaliation.

351. Plaintiff alleges retaliation only where the responsible Defendant's knowledge, timing, statements, conduct, or other circumstances support an inference that Plaintiff's protected activity was a substantial or motivating factor.

**S. Later Housing-Code Enforcement**

352. In 2025, Plaintiff received summonses requiring her to appear in Buffalo City Court concerning alleged housing-code violations.

353. Plaintiff alleges that at least some of the cited conditions previously had been corrected or marked closed by the City before the resulting court proceedings.

354. Plaintiff had publicly criticized governmental officials during the period preceding the summonses.

355. Plaintiff alleges that certain summonses followed particularly critical public speech concerning governmental officials.

356. Plaintiff alleges that the timing and circumstances caused her to suspect that the housing enforcement was retaliatory.

357. Plaintiff does not allege that temporal proximity alone establishes First Amendment retaliation.

358. Plaintiff alleges that the housing proceedings support a retaliation claim only to the extent evidence establishes that a Defendant responsible for the adverse action knew of Plaintiff's protected speech and acted because of that speech.

359. Plaintiff does not attribute the housing-code proceedings to Defendant Baskin merely because they occurred after Plaintiff criticized Baskin.

360. Plaintiff asserts liability only against persons whose personal involvement and retaliatory causation can be established.

**T. August 22, 2025 — Defendant Wojtanik**

361. Plaintiff previously interacted directly with Defendant Wojtanik in Wojtanik's capacity as a BPD employee.

362. During the March 2020 property dispute, Wojtanik communicated to Plaintiff that Plaintiff would be arrested for trespass if she entered the disputed area or again removed the fence.

363. Plaintiff thereafter became a frequent public critic of BPD and other City officials.

364. Plaintiff publicly discussed her complaints concerning BPD conduct.

365. Plaintiff alleges that Wojtanik became aware of Plaintiff's public criticism and governmental complaints.

366. Plaintiff alleges that Wojtanik subsequently joined a community Facebook group in which Plaintiff and Plaintiff's governmental complaints were discussed.

367. Plaintiff alleges that Wojtanik publicly characterized Plaintiff as unstable and otherwise disparaged Plaintiff in connection with those discussions.

368. Plaintiff alleges that Wojtanik laughed at, reacted to, or otherwise interacted with posts or comments ridiculing Plaintiff and her governmental complaints.

369. Plaintiff further alleges that Wojtanik subsequently interacted in a similar manner with multiple posts appearing on Plaintiff's personal social-media page.

370. Plaintiff alleges that Wojtanik's conduct was particularly significant because Wojtanik was a BPD employee who previously had personally communicated governmental threats of arrest to Plaintiff.

371. Plaintiff alleges that Wojtanik's later conduct demonstrated hostility toward Plaintiff because of Plaintiff's protected criticism and complaints concerning BPD and other governmental officials.

372. On August 22, 2025, Plaintiff moved in this action to join Wojtanik as a Defendant based upon the later conduct.

373. The Court granted Plaintiff's request to add Wojtanik as a Defendant.

374. The Court deemed Plaintiff's Second Amended Complaint to incorporate the allegations contained in Plaintiff's joinder motion.

375. Plaintiff alleges that Wojtanik's conduct would deter a person of ordinary firmness from continuing to complain about and criticize governmental actors.

**U. Governmental Criminal-History Record Concerning Plaintiff**

376. In July of 2022, an unredacted governmental criminal-history compilation concerning Plaintiff was disclosed outside ordinary governmental channels to Meadows.

377. The document contained Plaintiff's photograph.

378. The document contained Plaintiff's full name and other personally identifying information.

379. The document contained governmental identifiers.

380. The document contained Plaintiff's arrest-history information.

381. The document included arrests or accusations that did not result in criminal convictions.

382. Plaintiff subsequently obtained an official Criminal History Record Search reflecting that Plaintiff had no criminal convictions.

383. Plaintiff alleges that Meadows nevertheless obtained or possessed the governmental criminal-history document.

384. Plaintiff presently does not know the identity of the governmental employee who originally accessed, furnished, transmitted, copied, or released the governmental record.

385. Plaintiff therefore identifies the responsible governmental employee as a John/Jane Doe Defendant pending discovery.

386. Plaintiff alleges upon information and belief that the Doe Defendant obtained access to the record through governmental employment, governmental database credentials, governmental custody, or governmental authority unavailable to an ordinary private citizen.

387. Plaintiff alleges that the Doe Defendant therefore was able to access or obtain the governmental compilation by virtue of governmental authority.

388. Plaintiff later obtained documentary information concerning the procedure for requesting a BPD criminal-history record.

389. Plaintiff alleges that the procedure required an individual seeking his or her criminal-history record to appear personally and present government-issued photographic identification.

390. Plaintiff alleges that this procedure is circumstantial evidence that the governmental compilation at issue was maintained under controlled governmental access.

391. Plaintiff does not allege that an arrest itself was secret.

392. Plaintiff does not allege that ordinary public court records could never disclose information concerning an arrest.

393. Plaintiff instead alleges that the particular government-generated compilation containing assembled law-enforcement information and personal identifiers reached a private adversary through governmental access outside ordinary procedures.

V. Continuing Dissemination of Plaintiff's Criminal-History Record

394. After the governmental record left governmental custody, copies of the document circulated among private individuals.

395. Plaintiff alleges that the document also circulated on social media.

396. Plaintiff alleges that the document was republished on multiple occasions over a period of years.

397. Plaintiff alleges that the record was used to portray her as a convicted criminal or as a person engaged in repeated criminal conduct.

398. Plaintiff repeatedly attempted to correct that implication.

399. Plaintiff produced official criminal-history information reflecting that she had no criminal convictions.

400. Plaintiff alleges that the governmental record nevertheless continued to circulate.

401. Plaintiff alleges that its continuing dissemination caused reputational injury.

402. Plaintiff alleges that its continuing dissemination caused professional injury.

403. Plaintiff alleges that its continuing dissemination caused emotional distress.

404. Plaintiff further alleges that the electronic nature of the document made continuing republication foreseeable once the unredacted governmental record was released outside governmental custody.

**W. Differential Handling of Meadows's Criminal History**

405. Plaintiff possesses governmental criminal-history information concerning Meadows.

406. Plaintiff alleges that Meadows previously sustained an assault conviction.

407. Plaintiff alleges that Meadows was sentenced to a period of probation in connection with that conviction.

408. Plaintiff also possesses a separate governmental record obtained during criminal discovery concerning Meadows.

409. Plaintiff alleges that the later governmental record states that Meadows had no criminal record.

410. Plaintiff alleges that the records therefore materially conflict concerning Meadows's criminal history.

411. Plaintiff is unaware of a lawful sealing, vacatur, expungement, or other statutory disposition explaining the absence of the prior conviction from the later governmental record.

412. Plaintiff does not presently know why the records conflict.

413. Plaintiff alleges that discovery is necessary to determine the reason for the discrepancy.

414. Plaintiff alleges that her own non-conviction arrest information was assembled and disseminated outside governmental channels.

415. By contrast, Plaintiff alleges that Meadows's prior conviction was absent from a later governmental criminal-history record.

416. Plaintiff alleges that both women were participants in the same longstanding dispute and repeatedly interacted with the same local governmental institutions.

417. Plaintiff alleges that the materially different handling of their criminal-history information is additional evidence of the unequal governmental treatment alleged herein.

418. Plaintiff alleges that this disparity must be considered together with the repeated differences in police enforcement described above.

**X. Continuing Notice to the City of Buffalo**

419. Beginning in 2020 and continuing thereafter, Plaintiff repeatedly notified City officials and BPD supervisory personnel concerning the conduct described throughout this Complaint.

420. Plaintiff complained to BPD Internal Affairs.

421. Plaintiff complained to supervisory BPD personnel.

422. Plaintiff complained to City officials.

423. Plaintiff communicated with City inspectors and other governmental offices concerning the property-related conduct.

424. Plaintiff repeatedly sought governmental records concerning the police investigation and body-worn-camera evidence.

425. Plaintiff's complaints included allegations of unequal police enforcement.

426. Plaintiff's complaints included threats of arrest concerning Plaintiff's property.

427. Plaintiff's complaints included concerns about inadequate police investigation.

428. Plaintiff's complaints included concerns regarding favorable eyewitness evidence.

429. Plaintiff's complaints included concerns regarding body-worn-camera preservation.

430. Plaintiff sent specific preservation demands concerning body-worn-camera evidence shortly after the May 23, 2020 incident.

431. Plaintiff alleges that despite repeated notice, materially similar conduct continued.

432. Plaintiff alleges that subsequent events included continued refusals to enforce her Order of Protection.

433. Plaintiff alleges that subsequent events included additional criminal charges initiated against her.

434. Plaintiff alleges that subsequent events included continuing interference with her property rights.

435. Plaintiff alleges that she remained unable to obtain the complete body-worn-camera evidence despite her prior preservation demands.

436. Plaintiff further alleges later retaliatory conduct by a BPD employee.

437. Plaintiff alleges that the duration and repetition of the conduct, involvement of multiple City employees and departments, and repeated notice to supervisory personnel support her municipal-liability allegations.

**Y. Emotional and Psychological Injuries**

438. The events described herein occurred over a period of several years.

439. Plaintiff alleges that the repeated criminal proceedings caused substantial emotional distress.

440. Plaintiff alleges that the repeated denial of police protection caused substantial emotional distress.

441. Plaintiff alleges that threats of arrest concerning her own property and her ability to access and repair her residence caused substantial emotional distress.

442. Plaintiff alleges that the prolonged property dispute and governmental interference with her ability to safely maintain and repair her residence caused fear and disruption within her own home.

443. Plaintiff alleges that the dissemination and repeated republication of her governmental criminal-history information caused humiliation, reputational injury, and substantial emotional distress.

444. Plaintiff further alleges that the prolonged course of conduct attributed to Meadows caused severe emotional and psychological distress.

445. Plaintiff experienced anxiety.

446. Plaintiff experienced depression.

447. Plaintiff experienced fear and humiliation.

448. Plaintiff experienced loss of enjoyment of life.

449. Plaintiff experienced substantial disruption of her sense of security within her own residence.

450. Plaintiff alleges that the prolonged events also substantially interfered with her personal and professional life.

451. Plaintiff ultimately sought professional mental-health treatment.

452. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder ("GAD").

453. Plaintiff subsequently was diagnosed with Major Depressive Disorder ("MDD").

454. Plaintiff alleges that the prolonged conduct described herein, including the conduct of Meadows, was a substantial cause of or substantially contributed to Plaintiff's emotional and psychological injuries.

455. Plaintiff will rely upon her medical and mental-health records and other admissible evidence concerning diagnosis, treatment, causation, severity, duration, and prognosis to the extent supported by those records.

456. Plaintiff alleges that her psychological injuries are continuing.

**Z. Continuing Reputational, Professional, and Economic Injury**

457. Plaintiff alleges that certain injuries caused by the conduct described herein remain ongoing.

458. Copies of Plaintiff's governmental criminal-history record remain outside governmental custody.

459. Plaintiff alleges that those copies remain capable of continued electronic copying, dissemination, and republication.

460. Plaintiff alleges that the record has been used publicly to portray her through arrests and criminal accusations notwithstanding her official criminal-history search reflecting no criminal convictions.

461. Plaintiff alleges that the continuing circulation of the governmental record has damaged her reputation within the community.

462. Plaintiff provides tax-preparation, bookkeeping, and related financial services.

463. Plaintiff alleges that professional trust, honesty, competence, reputation, referrals, and community relationships are important to her ability to obtain and retain clients.

464. Plaintiff alleges that public circulation of governmental criminal-history information portraying her through repeated arrests and criminal accusations foreseeably impaired her professional reputation.

465. Plaintiff alleges that the continuing dissemination caused or contributed to loss of professional standing, business opportunities, and public confidence.

466. Plaintiff seeks recovery only for economic losses that she can establish through admissible evidence and causally attribute to actionable conduct by the Defendants.

467. Plaintiff further alleges continuing property-related expenses and losses resulting from governmental interference with her ability to access, maintain, protect, and repair her residence.

468. Plaintiff alleges that she suffered loss of the use and possession of her firearms during the period in which she was required to surrender them.

469. Plaintiff alleges that the cumulative constitutional, reputational, professional, property-related, and psychological injuries described herein have caused substantial damages.

## CAUSES OF ACTION

## COUNT I

## 42 U.S.C. § 1983 — FIRST AMENDMENT

### Viewpoint Discrimination Against Defendant April Baskin

470. Plaintiff repeats and realleges paragraphs 1 through 469 as though fully incorporated and set forth herein.

471. At all relevant times, Defendant Baskin was an elected governmental official.

472. Plaintiff alleges that Baskin acted under color of state law when administering and controlling the governmental Facebook page described herein.

473. Baskin maintained and used the Facebook page in connection with her governmental office and communications with constituents and members of the public.

474. Plaintiff used Facebook to criticize Baskin concerning governmental conduct and matters of public concern.

475. Plaintiff's criticism of an elected governmental official constituted speech protected by the First Amendment.

476. Plaintiff alleges that the Facebook page functioned as a governmental social-media forum.

477. Baskin blocked Plaintiff from the page after Plaintiff criticized her.

478. Plaintiff alleges that Baskin blocked Plaintiff because of the content and viewpoint of Plaintiff's criticism.

479. The blocking prevented Plaintiff from accessing or participating in the governmental forum to the extent restricted by Baskin's block.

480. Plaintiff alleges that Baskin thereafter restricted the page in a manner that further limited public participation.

481. Plaintiff later sought assistance from FIRE concerning her continued exclusion.

482. Plaintiff alleges that Baskin restored Plaintiff's access the following day.

483. Plaintiff alleges that the timing of the restoration supports her contention that Baskin retained control over the exclusion and that the blocking had been deliberately maintained.

484. The later restoration of access did not eliminate the constitutional injury allegedly sustained during the period of viewpoint-based exclusion.

485. Plaintiff alleges that Baskin's conduct constituted viewpoint discrimination in violation of the First Amendment.

486. As a direct and proximate result, Plaintiff suffered constitutional injury and the other damages alleged herein.

**COUNT II**

**42 U.S.C. § 1983 — FIRST AMENDMENT**

**Viewpoint Discrimination Against Defendant Byron W. Brown**

487. Plaintiff repeats and realleges paragraphs 1 through 486 as though fully incorporated and set forth herein.

488. At all relevant times, Defendant Brown served as Mayor of the City of Buffalo.

489. Plaintiff alleges that Brown acted under color of state law when administering and controlling the governmental Facebook page described herein.

490. Brown maintained and used the Facebook page in connection with his office as Mayor and communications with members of the public.

491. Plaintiff publicly criticized Brown concerning governmental conduct and matters of public concern.

492. Plaintiff's criticism constituted protected First Amendment activity.

493. Plaintiff alleges that Brown's Facebook page functioned as an official governmental social-media forum.

494. Plaintiff alleges that Brown blocked Plaintiff from the page after Plaintiff criticized him.

495. Plaintiff alleges that Brown blocked Plaintiff because of the content and viewpoint of Plaintiff's criticism.

496. The blocking prevented Plaintiff from participating in the governmental forum to the extent restricted by Brown's block.

497. Plaintiff further alleges that Brown thereafter restricted or made the page private, limiting public participation.

498. Plaintiff alleges that Brown's conduct constituted viewpoint discrimination in violation of the First Amendment.

499. Plaintiff seeks relief only for the violation of her own First Amendment rights.

500. Plaintiff suffered constitutional injury and other damages as a direct and proximate result of the alleged exclusion.

## COUNT III

## 42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION

### Against Defendant Maureen Wojtanik

501. Plaintiff repeats and realleges paragraphs 1 through 500 as though fully incorporated and set forth herein.

502. Plaintiff engaged in activity protected by the First Amendment.

503. That activity included publicly criticizing BPD and City officials.

504. That activity included submitting complaints concerning governmental misconduct.

505. That activity included petitioning governmental entities for redress.

506. That activity included pursuing litigation concerning governmental conduct.

507. Defendant Wojtanik previously interacted directly with Plaintiff in Wojtanik's capacity as a BPD employee.

508. Plaintiff alleges that Wojtanik knew of Plaintiff's complaints and public criticism concerning BPD and governmental officials.

509. Plaintiff alleges that Wojtanik thereafter participated in social-media discussions concerning Plaintiff and Plaintiff's governmental complaints.

510. Plaintiff alleges that Wojtanik publicly characterized Plaintiff as unstable or otherwise disparaged Plaintiff.

511. Plaintiff alleges that Wojtanik laughed at, reacted to, or otherwise interacted with posts or comments ridiculing Plaintiff and her complaints.

512. Plaintiff alleges that Wojtanik subsequently engaged in similar conduct concerning multiple posts on Plaintiff's personal social-media page.

513. Plaintiff alleges that Wojtanik's conduct was motivated by Plaintiff's protected criticism, complaints, and petitioning activity.

514. Plaintiff alleges that retaliatory conduct by a BPD employee who previously had communicated governmental threats of arrest to Plaintiff would deter a person of ordinary firmness from continuing to criticize or complain about that governmental agency.

515. Plaintiff alleges that Wojtanik's conduct caused emotional distress, humiliation, chilling of protected activity, and other damages.

516. Plaintiff therefore alleges that Wojtanik retaliated against her for protected First Amendment activity in violation of 42 U.S.C. § 1983.

## COUNT IV

## 42 U.S.C. § 1983 — FOURTH AMENDMENT

### Malicious Prosecution Arising From the May 23, 2020 Incident

### Against Defendants Dixon, Nightingale-Griffin, Reese, and Other Personally Involved Defendants

517. Plaintiff repeats and realleges paragraphs 1 through 516 as though fully incorporated and set forth herein.

518. Plaintiff alleges that Defendants Dixon, Nightingale-Griffin, Reese, and other personally involved Defendants caused, initiated, or continued criminal proceedings against Plaintiff arising from the May 23, 2020 confrontation.

519. Plaintiff alleges that Dixon arrived at the scene after Plaintiff had sustained visible physical injuries during the confrontation with Meadows.

520. Multiple eyewitnesses were available to provide information concerning the confrontation.

521. Plaintiff alleges that at least three witnesses possessed information favorable to Plaintiff's account.

522. Plaintiff alleges that Dixon refused or failed to obtain statements from those witnesses.

523. Plaintiff alleges that Dixon accused Plaintiff of lying and fabricating her account before completing a neutral investigation of the available evidence.

524. Plaintiff further alleges that Dixon threatened to tase an individual who questioned his refusal to obtain available witness statements.

525. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable eyewitness information.

526. Plaintiff alleges that one witness's legal guardian expressly authorized police to interview the witness.

527. Plaintiff alleges that Dixon and Nightingale-Griffin nevertheless failed to obtain or suppressed that witness's statement.

528. Plaintiff further alleges that one responding officer expressed concern that Plaintiff was being charged even though that officer did not believe Plaintiff had been the aggressor.

529. Plaintiff alleges that subsequent criminal discovery revealed discrepancies between available eyewitness information and information transmitted in connection with Plaintiff's prosecution.

530. Plaintiff further alleges that material body-worn-camera evidence existed concerning the May 23 investigation.

531. Plaintiff alleges that Dixon asked other responding officers whether their body-worn cameras were turned off before turning off his own camera.

532. Plaintiff alleges that despite preservation demands beginning shortly after the incident, the complete body-worn-camera evidence was not produced.

533. Plaintiff later obtained AXON audit information indicating that Dixon had in fact been recording during the incident.

534. Plaintiff alleges that subsequent records indicated that additional uploaded footage had existed and later was deleted.

535. On December 5, 2020, Defendant Reese signed an Information/Complaint charging Plaintiff with Assault in the Third Degree.

536. Plaintiff alleges that when Reese executed the charging instrument, the investigative record contained or reasonably should have contained Plaintiff's injuries, her claim of self-defense, and materially favorable eyewitness information.

537. Plaintiff alleges that the responsible Defendants lacked probable cause to initiate or continue the criminal proceeding after consideration of the materially favorable information available to BPD.

538. Plaintiff alleges that the responsible Defendants acted maliciously or with reckless disregard for Plaintiff's rights by initiating or continuing the proceeding on a materially incomplete or distorted factual record.

539. Plaintiff was not physically arrested, detained, jailed, or confined in connection with the charge.

540. Plaintiff nevertheless was subjected to compulsory criminal process and was required to appear in criminal court and defend herself.

541. The criminal proceeding also resulted in an Order of Protection against Plaintiff.

542. As a consequence of that Order, Plaintiff was required to surrender two firearms in approximately March 2021.

543. Plaintiff remained unable to possess those firearms until approximately July 2022.

544. The assault proceeding ultimately terminated in Plaintiff's favor through dismissal.

545. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, restrictions resulting from the criminal proceeding, and other damages.

**COUNT V**

**42 U.S.C. § 1983 — FOURTH AMENDMENT**

**Malicious Prosecution Arising From the January 18, 2021 Charges**

**Against Defendant Jacob Salazar and Other Personally Involved Defendants**

546. Plaintiff repeats and realleges paragraphs 1 through 545 as though fully incorporated and set forth herein.

547. Before January 18, 2021, Meadows placed objects or structures upon property Plaintiff claimed as her own.

548. Plaintiff removed those objects from her property.

549. Meadows thereafter accused Plaintiff of theft and property damage.

550. Plaintiff alleges that Meadows supplied materially false information concerning ownership of the property and the circumstances surrounding Plaintiff's removal of the objects.

551. On January 18, 2021, Defendant Salazar charged Plaintiff with Petit Larceny and Criminal Mischief.

552. Salazar issued Plaintiff an appearance ticket requiring Plaintiff to answer the charges in criminal court.

553. Plaintiff was not physically arrested, detained, jailed, or confined.

554. Plaintiff alleges that BPD personnel already were aware of the longstanding property-boundary dispute.

555. Plaintiff further alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

556. Plaintiff alleges that the underlying conduct involved Plaintiff's removal of objects Meadows had placed upon property belonging to Plaintiff.

557. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Petit Larceny.

558. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Criminal Mischief.

559. Plaintiff alleges that Defendants Joyce, Farley, and Lockwood participated in, caused, directed, or agreed to the charging decision only to the extent established by Plaintiff's prior operative pleading and discovery.

560. Plaintiff alleges that the responsible Defendants caused Plaintiff to be subjected to criminal process without probable cause.

561. Plaintiff was required to appear in criminal court and defend herself against the charges.

562. The Petit Larceny and Criminal Mischief proceedings ultimately terminated in Plaintiff's favor through dismissal.

563. Plaintiff alleges malice based upon the circumstances surrounding the charges, including the known property dispute and alleged materially false information concerning ownership.

564. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, and other damages.

**COUNT VI**

**42 U.S.C. § 1983 — FOURTH AMENDMENT**

**Malicious Prosecution Arising From the September 20, 2021 Charge**

**Against Defendant Kyle Moriarity and Other Personally Involved Defendants**

565. Plaintiff repeats and realleges paragraphs 1 through 564 as though fully incorporated and set forth herein.

566. On September 20, 2021, Plaintiff's son contacted 911 because Plaintiff alleges that Meadows was threatening Plaintiff.

567. Meadows thereafter accused Plaintiff of intentionally coughing in her direction.

568. Defendant Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

569. Moriarity issued Plaintiff an appearance ticket requiring Plaintiff to answer the felony charge in criminal court.

570. Plaintiff was not physically arrested, detained, jailed, or confined.

571. Plaintiff alleges that she did not possess a chemical or biological weapon.

572. Plaintiff alleges that she did not deploy a chemical or biological weapon.

573. Plaintiff alleges that the factual accusation underlying the felony charge consisted of Meadows's allegation that Plaintiff intentionally coughed in her direction.

574. Plaintiff alleges that the circumstances known or reasonably available to Moriarity included or should have included the fact that Plaintiff's son had contacted 911 concerning Meadows's conduct toward Plaintiff.

575. Plaintiff alleges that Moriarity lacked probable cause to charge Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

576. Plaintiff alleges that the proceeding was initiated maliciously or with reckless disregard for the absence of probable cause.

577. Plaintiff was required to appear in criminal court and defend herself against the felony charge.

578. Plaintiff alleges that the criminal proceeding ultimately terminated without a conviction.

579. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, and other damages.

## COUNT VII

## 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT

### Denial of Equal Protection in Police Protection and Enforcement

### Against Morrow, Costantino, Skrzvnski, Salazar, Cullen, Dixon, Moriarity, and Other Personally Involved Defendants

580. Plaintiff repeats and realleges paragraphs 1 through 579 as though fully incorporated and set forth herein.

581. Plaintiff does not claim a constitutional entitlement to have every complaint investigated.

582. Plaintiff does not claim a constitutional entitlement to have every person she accused arrested or prosecuted.

583. Plaintiff instead alleges that Defendants intentionally administered governmental police protection and enforcement according to materially different standards depending upon whether Plaintiff or Meadows sought governmental intervention.

584. Plaintiff obtained a judicial Order of Protection against Meadows on October 15, 2020.

585. Plaintiff thereafter repeatedly sought BPD enforcement of that Order.

586. Plaintiff alleges that BPD personnel repeatedly refused or failed to enforce the Order over an extended period.

587. Defendant Morrow expressly advised Plaintiff that BPD would not enforce the Order unless Meadows physically assaulted Plaintiff.

588. Plaintiff alleges that the Order itself contained no such requirement.

589. Defendants Costantino and Skrzvnski separately advised Plaintiff that they could not enforce the Order because it was not present in the governmental system.

590. Plaintiff alleges that her valid Order subsequently was missing from the New York State Registry through no action of Plaintiff.

591. Plaintiff alleges that the absence of the Order materially interfered with her ability to obtain governmental enforcement of judicial protection already afforded to her.

592. Plaintiff further alleges materially different treatment concerning her complaints of property crimes.

593. On May 23, 2020, Plaintiff discovered her missing fence panel in Meadows's yard.

594. Salazar and Cullen retrieved the panel and returned it to Plaintiff.

595. Salazar and Cullen nevertheless refused to prepare a theft report against Meadows.

596. Later that same day, Meadows allegedly returned with an electric saw and cut the same fence panel.

597. Plaintiff alleges that Meadows thereafter physically attacked Plaintiff during the resulting confrontation.

598. Plaintiff alleges that when Meadows accused Plaintiff of criminal conduct, BPD personnel repeatedly exercised coercive criminal authority against Plaintiff.

599. Those actions included the prosecution arising from the May 23, 2020 incident.

600. Those actions included the January 18, 2021 Petit Larceny and Criminal Mischief charges.

601. Those actions included the September 20, 2021 felony charge.

602. Plaintiff alleges that the contrasting treatment occurred repeatedly.

603. Plaintiff alleges that the contrasting treatment involved multiple BPD personnel.

604. Plaintiff alleges that the contrasting treatment continued after Plaintiff repeatedly complained to supervisory personnel.

605. Plaintiff further alleges that racial considerations expressly entered the May 23 investigation when Meadows referred to Plaintiff in racial terms and asserted that Plaintiff received favorable governmental treatment because Plaintiff was white.

606. Plaintiff alleges that the differential treatment was intentional.

607. Plaintiff alleges that there was no rational governmental basis for applying materially different standards of police protection and enforcement to Plaintiff and Meadows.

608. Plaintiff alleges that the unequal administration of governmental protection deprived her of equal protection of the laws.

609. Plaintiff suffered loss of governmental protection, compulsory criminal proceedings, reputational injury, emotional distress, financial loss, and other damages.

**COUNT VIII**

**42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**

**Deprivation of Property and Arbitrary Governmental Interference**

**Against Kurdziel, Wojtanik, Curtin, Myers, Bifaro, Salazar, Doe Officers, and Other Personally Involved Defendants**

610. Plaintiff repeats and realleges paragraphs 1 through 609 as though fully incorporated and set forth herein.

611. Plaintiff possessed protected property interests in the ownership, possession, use, maintenance, repair, and control of her real property.

612. In March 2020, Plaintiff's furnace exhaust was damaged or disconnected and required repair.

613. Plaintiff attempted to access the north side of her residence to make the necessary repair.

614. BPD Doe officers threatened Plaintiff with arrest for trespass if she entered the disputed area.

615. Plaintiff removed a fence from property she claimed as her own to gain access to the damaged exhaust.

616. Defendant Kurdziel threatened Plaintiff with arrest and compelled her to reinstall the fence.

617. Plaintiff alleges that this materially interfered with her ability to repair the dangerous furnace condition.

618. Curtin and Myers subsequently inspected the property.

619. Curtin and Myers determined that Plaintiff owned at least approximately 1.5 feet along the north side of Plaintiff's residence.

620. Curtin and Myers further determined that repair of the furnace exhaust was critical.

621. Defendant Wojtanik nevertheless advised Plaintiff that she would be arrested for trespass if she entered the same area.

622. Wojtanik further advised Plaintiff that she would be arrested if she again removed the fence.

623. Curtin and Myers told Plaintiff that she could not erect her own fence to protect the property.

624. Curtin and Myers told Plaintiff that they would remove the fence if Plaintiff erected one.

625. Curtin and Myers subsequently apologized for those statements.

626. Defendant Bifaro inspected Plaintiff's furnace on April 20, 2020, and determined that it was up to code.

627. On May 12, 2020, Bifaro nevertheless demanded that Plaintiff relocate the existing exhaust because Meadows was complaining.

628. Plaintiff refused absent a court order establishing Meadows's legal right to require relocation.

629. Bifaro advised Plaintiff that she could relocate the exhaust or face court proceedings concerning an alleged permit issue.

630. Plaintiff further alleges that Bifaro threatened Plaintiff's HVAC contractor with enforcement consequences based upon his licensing status if he refused to relocate the exhaust.

631. A BPD Doe officer subsequently threatened Plaintiff with criminal charges if she did not relocate the exhaust.

632. Defendant Salazar subsequently advised Plaintiff concerning the fence and disputed property area in a manner Plaintiff alleges treated Meadows's asserted property rights as enforceable despite the absence of a judicial determination establishing those rights.

633. Plaintiff alleges that Defendants thereby used or threatened police, inspection, code-enforcement, and other governmental authority to restrict Plaintiff's use and control of property that City inspectors themselves had determined belonged to Plaintiff.

634. Plaintiff alleges that no judicial determination had established Meadows's claimed property rights before the governmental restrictions and threats were imposed.

635. Plaintiff alleges that the governmental conduct was arbitrary because officials simultaneously recognized Plaintiff's ownership and the necessity of repairs while threatening governmental sanctions if Plaintiff exercised those ownership rights.

636. Plaintiff alleges that she was deprived of meaningful use, access, control, maintenance, and enjoyment of her property.

637. Plaintiff suffered repair delays, financial loss, emotional distress, loss of use and enjoyment, and other damages.

**COUNT IX**

**42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**

**Equal Protection — Unequal Treatment of Criminal-History Information**

**Against John/Jane Doe Governmental Discloser and Other Personally Involved Defendants**

638. Plaintiff repeats and realleges paragraphs 1 through 637 as though fully incorporated and set forth herein.

639. Plaintiff does not assert under this Count a general constitutional right to confidentiality in every arrest record or criminal-history record.

640. Plaintiff instead alleges that governmental actors intentionally administered access to, use of, maintenance of, and dissemination of criminal-history information concerning Plaintiff under materially different standards from those applied to Meadows.

641. An unredacted governmental criminal-history compilation concerning Plaintiff was disclosed outside ordinary governmental channels.

642. The governmental compilation contained Plaintiff's photograph.

643. The governmental compilation contained Plaintiff's name, date of birth, address, and other personally identifying information.

644. The governmental compilation contained governmental identifiers and assembled arrest-history information.

645. The document included arrests and accusations that did not result in criminal convictions.

646. Plaintiff subsequently obtained an official Criminal History Record Search reflecting that Plaintiff had no criminal convictions.

647. Plaintiff alleges that Meadows nevertheless obtained or possessed the governmental criminal-history compilation.

648. Plaintiff presently does not know the identity of the governmental employee who originally accessed, retrieved, printed, copied, furnished, transmitted, or otherwise released the record.

649. Plaintiff therefore identifies the responsible governmental employee as John/Jane Doe pending discovery.

650. Plaintiff alleges upon information and belief that the Doe Defendant obtained access to Plaintiff's criminal-history information by virtue of governmental employment, governmental database credentials, governmental custody of records, or other governmental authority unavailable to an ordinary private citizen.

651. Plaintiff alleges that the Doe Defendant therefore acted under color of state law when using governmental access in connection with the disclosure, even if the disclosure itself was unauthorized by official policy.

652. Plaintiff later obtained documentary information concerning the procedure for requesting a BPD criminal-history record.

653. Plaintiff alleges that the procedure required an individual seeking his or her own criminal-history record to appear in person.

654. Plaintiff alleges that the procedure also required presentation of government-issued photographic identification.

655. Plaintiff alleges that these requirements constitute circumstantial evidence that the governmental compilation at issue was maintained under controlled governmental access.

656. Plaintiff does not allege merely that the underlying fact of an arrest was confidential.

657. Plaintiff alleges that the specific government-generated compilation containing assembled law-enforcement information and personal identifiers reached a private adversary through governmental access outside ordinary procedures.

658. Plaintiff alleges that once the record left governmental custody, it was repeatedly copied and disseminated among private individuals and through social media.

659. Plaintiff alleges that the document repeatedly was used to portray Plaintiff as a convicted criminal or as a person engaged in repeated criminal conduct.

660. Plaintiff repeatedly attempted to correct that implication by producing official criminal-history information reflecting that she had no criminal convictions.

661. Plaintiff further possesses governmental criminal-history information concerning Meadows.

662. Plaintiff alleges that Meadows previously sustained an assault conviction.

663. Plaintiff alleges that Meadows received a period of probation in connection with that conviction.

664. Plaintiff possesses a separate governmental record obtained during criminal discovery stating that Meadows had no criminal record.

665. Plaintiff alleges that the governmental records concerning Meadows materially conflict.

666. Plaintiff is unaware of any lawful sealing, vacatur, expungement, or other statutory disposition explaining the absence of the prior conviction from the later governmental record.

667. Plaintiff does not presently know why the records conflict and seeks discovery concerning the discrepancy.

668. Plaintiff alleges that her own non-conviction arrest history was assembled and disseminated outside governmental channels while Meadows's prior conviction was absent from a later governmental criminal-history record.

669. Plaintiff alleges that both Plaintiff and Meadows were participants in the same longstanding dispute and repeatedly interacted with the same local governmental institutions.

670. Plaintiff alleges that the differential handling of their criminal-history information must be considered together with the unequal police enforcement alleged throughout this Complaint.

671. Plaintiff alleges that the differential treatment was intentional.

672. Plaintiff alleges that the differential treatment lacked a rational governmental basis.

673. Plaintiff suffered continuing reputational, professional, economic, and emotional injury as a result of the disclosure and subsequent dissemination.

## COUNT X

## 42 U.S.C. § 1983 — SECOND AMENDMENT

## Against Dixon, Nightingale-Griffin, Reese, and Other Defendants Whose Unconstitutional Conduct Proximately Caused the Deprivation

674. Plaintiff repeats and realleges paragraphs 1 through 673 as though fully incorporated and set forth herein.

675. Before the criminal proceeding arising from the May 23, 2020 incident, Plaintiff lawfully possessed two firearms.

676. Plaintiff alleges that Dixon and Nightingale-Griffin participated in an investigation that failed to obtain, preserve, disclose, or accurately transmit materially favorable eyewitness information.

677. Plaintiff alleges that materially favorable body-worn-camera evidence also existed concerning the investigation.

678. Defendant Reese subsequently executed the December 5, 2020 charging instrument arising from that investigation.

679. Plaintiff alleges that the resulting criminal proceeding was initiated or continued through unconstitutional investigative or charging conduct.

680. As a consequence of that criminal proceeding, an Order of Protection was issued against Plaintiff.

681. In approximately March 2021, Plaintiff was required to surrender two firearms to her father.

682. Plaintiff remained unable to possess those firearms until approximately July 2022.

683. Plaintiff alleges that the firearms deprivation was a foreseeable consequence of the criminal proceeding.

684. Plaintiff does not allege that the mere issuance of a judicial Order of Protection automatically creates constitutional liability against every Defendant.

685. Plaintiff seeks liability under this Count only against those Defendants whose independently unconstitutional conduct is proven to have proximately caused the criminal proceeding and resulting firearms deprivation.

686. Plaintiff alleges that she was deprived of the possession and use of her firearms during the period described above.

687. Plaintiff suffered constitutional and other damages as a result.

**COUNT XI**

**42 U.S.C. § 1985**

**Conspiracy to Interfere With Civil Rights**

**Against Meadows, Dixon, and Other Defendants Proven to Have Knowingly Joined the Alleged Agreement**

688. Plaintiff repeats and realleges paragraphs 1 through 687 as though fully incorporated and set forth herein.

689. On May 23, 2020, Meadows and Dixon communicated during an active police investigation concerning Plaintiff.

690. Meadows demanded that Plaintiff be subjected to criminal charges.

691. Plaintiff alleges that Meadows referred to Plaintiff in expressly racial terms.

692. Plaintiff alleges that Meadows represented to Dixon that Plaintiff received favorable governmental treatment because Plaintiff was white.

693. Plaintiff further alleges that Meadows invoked Defendant Baskin's governmental position during that conversation.

694. Dixon thereafter accused Plaintiff of lying and fabricating her account.

695. Plaintiff alleges that Dixon refused or failed to obtain statements from multiple witnesses possessing information favorable to Plaintiff.

696. Plaintiff alleges that Dixon threatened to tase an individual who questioned his refusal to obtain available witness statements.

697. Plaintiff further alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

698. Plaintiff alleges that subsequent criminal discovery revealed discrepancies concerning eyewitness information and the charging process.

699. Plaintiff further alleges that body-worn-camera and AXON audit information revealed circumstances concerning the investigation that were not disclosed or available to Plaintiff when the prosecution began.

700. Plaintiff alleges that the communications between Meadows and Dixon, the introduction of racial considerations into the investigation, the subsequent handling of favorable evidence, and the resulting prosecution support an inference of concerted action.

701. Plaintiff alleges that the object of the alleged agreement included subjecting Plaintiff to unequal governmental treatment and criminal process.

702. Plaintiff alleges that the conspiracy was motivated, at least in part, by discriminatory animus expressly introduced into the May 23 investigation.

703. Plaintiff alleges that overt acts in furtherance of the alleged agreement included rejection of Plaintiff's account before completion of a neutral investigation.

704. Plaintiff alleges that overt acts included failure to obtain or accurately transmit favorable eyewitness information.

705. Plaintiff alleges that overt acts included initiation or continuation of criminal proceedings against Plaintiff.

706. Plaintiff alleges that overt acts included the related evidence-handling conduct described herein.

707. Plaintiff asserts this Count against additional Defendants only to the extent evidence establishes that a particular Defendant knowingly joined the alleged agreement.

708. Plaintiff does not allege that an individual joined a conspiracy merely because that individual performed ordinary governmental duties or participated at a different stage of an investigation.

709. Plaintiff suffered compulsory criminal proceedings, reputational injury, emotional distress, financial injury, and other damages.

**COUNT XII**

**42 U.S.C. § 1986**

**Neglect to Prevent Civil-Rights Conspiracy**

**Against Defendants With Actual Knowledge and the Ability to Prevent the Violation**

710. Plaintiff repeats and realleges paragraphs 1 through 709 as though fully incorporated and set forth herein.

711. Plaintiff pleads this claim only to the extent she establishes an actionable conspiracy under 42 U.S.C. § 1985.

712. Plaintiff alleges that certain governmental Defendants obtained actual knowledge of the actionable conspiracy while possessing authority or a reasonable ability to prevent or mitigate the resulting deprivation.

713. Shortly after the May 23, 2020 incident, Plaintiff repeatedly complained to BPD supervisory and Internal Affairs personnel concerning Dixon's conduct.

714. Plaintiff complained concerning the failure to obtain favorable eyewitness information.

715. Plaintiff complained concerning what she believed to be discriminatory treatment during the investigation.

716. Plaintiff sent preservation demands concerning Dixon's AXON body-worn-camera evidence to Defendants Joyce and Lockwood.

717. Plaintiff repeatedly complained to Internal Affairs, including Defendant Farley, concerning the May 23 investigation and related police conduct.

718. Plaintiff alleges that supervisory personnel therefore possessed actual notice of the alleged conduct while evidence remained capable of preservation and while the criminal proceeding remained ongoing.

719. Plaintiff alleges that despite that notice, the alleged constitutional injuries were not prevented or adequately mitigated.

720. Plaintiff further alleges that complete body-worn-camera evidence subsequently became unavailable.

721. Plaintiff later obtained records indicating that additional footage previously had existed.

722. Plaintiff asserts liability under §1986 only against a Defendant proven to have possessed actual knowledge of an actionable §1985 conspiracy.

723. Plaintiff further must establish that the Defendant possessed the power to prevent or aid in preventing the conspiracy and wrongfully failed to exercise that power.

724. Plaintiff suffered the injuries and damages described throughout this Complaint.

**COUNT XIII**

## 42 U.S.C. § 1983 — MUNICIPAL LIABILITY UNDER *MONELL*

### Against Defendant City of Buffalo

725. Plaintiff repeats and realleges paragraphs 1 through 724 as though fully incorporated and set forth herein.

726. Plaintiff does not seek to hold the City of Buffalo liable under §1983 merely because it employed one or more individual Defendants.

727. Plaintiff alleges that the constitutional deprivations described herein resulted from persistent municipal customs or practices, failures of supervision or discipline, inadequate evidence-preservation safeguards, and deliberate indifference after repeated notice.

**A. Unequal Administration of Police Protection**

728. Plaintiff alleges that multiple BPD personnel repeatedly applied materially different standards depending upon whether Plaintiff or Meadows sought governmental intervention.

729. Plaintiff obtained a judicial Order of Protection against Meadows.

730. Plaintiff thereafter repeatedly sought enforcement of that Order.

731. Plaintiff alleges that BPD personnel repeatedly refused or failed to enforce the Order.

732. Defendant Morrow expressly advised Plaintiff that BPD would not enforce the Order unless Meadows physically assaulted Plaintiff.

733. Defendants Costantino and Skrzvnski separately advised Plaintiff that the Order could not be enforced because it was not present in the governmental system.

734. Plaintiff alleges that her valid Order later was missing from the New York State Registry.

735. During the same period, BPD personnel repeatedly exercised criminal charging authority against Plaintiff based upon accusations made by Meadows.

736. Plaintiff alleges that the repetition of this differential treatment by different BPD personnel over an extended period supports an inference that the conduct was not merely one officer's isolated discretionary error.

**B. Investigation and Handling of Favorable Evidence**

737. Plaintiff alleges recurring deficiencies concerning the investigation, preservation, and transmission of materially favorable evidence.

738. During the May 23, 2020 investigation, multiple eyewitnesses were available to provide information favorable to Plaintiff.

739. Plaintiff alleges that Dixon refused or failed to obtain favorable witness statements.

740. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

741. Plaintiff alleges that subsequent criminal discovery revealed discrepancies between available eyewitness information and information transmitted in connection with Plaintiff's prosecution.

742. Plaintiff alleges that those deficiencies materially contributed to the criminal proceeding against her.

**C. Body-Worn-Camera Preservation and Accountability**

743. Plaintiff began demanding preservation of Dixon's AXON footage shortly after the May 23 incident.

744. Defendants Joyce and Lockwood received preservation demands concerning the footage.

745. Plaintiff repeatedly sought the footage through Defendant Rinaldo and other BPD personnel.

746. Plaintiff alleges that she initially was informed that responsive footage did not exist.

747. Plaintiff subsequently received only a brief portion of footage.

748. Plaintiff later obtained audit information indicating that additional footage had existed.

749. Plaintiff alleges that later records indicated uploaded footage subsequently was deleted.

750. Plaintiff alleges that the inability to preserve, locate, account for, and produce complete body-worn-camera evidence despite repeated preservation demands reflects inadequate municipal safeguards, supervision, or accountability.

**D. Actual Notice to Supervisory Personnel**

751. Plaintiff repeatedly complained to BPD supervisory personnel and Internal Affairs concerning the conduct described herein.

752. By approximately mid-June 2020, Plaintiff alleges that she already had contacted Internal Affairs and community-policing personnel more than fifteen times.

753. Plaintiff continued submitting complaints thereafter.

754. Plaintiff's complaints included concerns regarding unequal police treatment.

755. Plaintiff's complaints included concerns regarding the May 23 investigation.

756. Plaintiff's complaints included concerns regarding favorable witness evidence.

757. Plaintiff's complaints included concerns regarding body-worn-camera preservation.

758. Plaintiff alleges that despite repeated notice to supervisory personnel, materially similar conduct continued.

759. Plaintiff alleges that subsequent conduct included repeated non-enforcement of her Order of Protection and additional criminal charges against Plaintiff.

**E. Municipal Authority in the Property Dispute**

760. Plaintiff further alleges repeated use or threatened use of municipal police and regulatory authority concerning her property dispute with Meadows.

761. City inspectors determined that Plaintiff owned the disputed boundary area and that repair of Plaintiff's furnace exhaust was critical.

762. Plaintiff nevertheless was threatened with arrest if she entered the same area.

763. Plaintiff was threatened with arrest if she again removed the fence.

764. Plaintiff alleges that Bifaro later used or threatened code-enforcement authority to require relocation of an exhaust pipe that previously had been found to be up to code.

765. Plaintiff alleges that a BPD Doe officer thereafter threatened criminal charges if Plaintiff did not relocate the exhaust.

766. Plaintiff alleges that involvement by police personnel, inspectors, code personnel, and supervisory officials supports her contention that the challenged governmental treatment was not confined to one municipal employee.

**F. Criminal-History Access and Accountability**

767. Plaintiff alleges that the City maintained or controlled BPD criminal-history information concerning Plaintiff.

768. Plaintiff later obtained documentation indicating that an individual seeking a BPD criminal-history record was required to appear personally and present government-issued photographic identification.

769. Nevertheless, Plaintiff's unredacted governmental criminal-history compilation reached a private adversary and thereafter circulated publicly.

770. Plaintiff presently does not know the identity of the governmental employee responsible for the original disclosure.

771. Plaintiff alleges that governmental database-access records, audit logs, personnel records, communications, or record-request information may identify the person responsible.

772. Plaintiff alleges that the City received notice of Plaintiff's contention that governmental criminal-history information had been improperly disclosed.

773. Plaintiff alleges that the responsible employee was not identified to Plaintiff and that the disclosed record continued circulating publicly.

**G. Causation**

774. Plaintiff alleges that the municipal practices, failures, and deliberate indifference described above were moving forces behind constitutional injuries alleged herein.

775. Plaintiff alleges that deficiencies concerning police investigation and evidence handling contributed to the criminal proceedings against her.

776. Plaintiff alleges that unequal police-protection practices contributed to repeated denial of enforcement of her Order of Protection.

777. Plaintiff alleges that municipal treatment of her property rights caused interference with her access to and repair of her residence through governmental threats and enforcement.

778. Plaintiff alleges that deficiencies concerning safeguarding and accountability for governmental criminal-history information enabled or failed to prevent the disclosure alleged herein.

779. Plaintiff therefore seeks relief against the City of Buffalo under §1983 for constitutional injuries proven to have resulted from a municipal policy, custom, practice, deliberate indifference, or actionable failure of supervision or discipline.

## COUNT XIV

## NEW YORK STATE LAW — MALICIOUS PROSECUTION

**Against the Individual Defendants Who Initiated or Continued the Criminal Proceedings**

780. Plaintiff repeats and realleges paragraphs 1 through 779 as though fully incorporated and set forth herein.

781. Plaintiff alleges that the responsible individual Defendants initiated, caused, or actively continued criminal proceedings against Plaintiff.

782. Those proceedings included the prosecution arising from the May 23, 2020 incident.

783. Those proceedings included the January 18, 2021 Petit Larceny and Criminal Mischief charges.

784. Those proceedings included the September 20, 2021 felony charge described above.

785. Plaintiff was not physically arrested, detained, jailed, or confined in connection with the criminal charges alleged herein.

786. Plaintiff instead was issued appearance tickets or otherwise subjected to criminal process requiring her to appear in criminal court and answer the charges.

787. With respect to the May 23, 2020 proceeding, Plaintiff alleges that the responsible Defendants initiated or continued the proceeding despite materially favorable eyewitness information.

788. Plaintiff alleges that multiple eyewitnesses were available to provide information favorable to Plaintiff.

789. Plaintiff alleges that Dixon refused or failed to obtain statements from witnesses possessing information favorable to Plaintiff.

790. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

791. Plaintiff further alleges that materially favorable body-worn-camera evidence existed concerning the investigation.

792. Defendant Reese subsequently executed the December 5, 2020 charging instrument.

793. Plaintiff alleges that the responsible Defendants lacked probable cause to initiate or continue the May 23 proceeding.

794. With respect to the January 18, 2021 proceeding, Plaintiff alleges that Salazar charged Plaintiff with Petit Larceny and Criminal Mischief based upon Plaintiff's removal of objects Meadows had placed upon property belonging to Plaintiff.

795. Plaintiff alleges that BPD personnel already were aware of the underlying property dispute.

796. Plaintiff further alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

797. Plaintiff alleges that Salazar lacked probable cause to initiate the Petit Larceny and Criminal Mischief proceedings.

798. With respect to the September 20, 2021 proceeding, Plaintiff alleges that Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree based upon Meadows's accusation that Plaintiff intentionally coughed in her direction.

799. Plaintiff alleges that she possessed and deployed no chemical or biological weapon.

800. Plaintiff alleges that Moriarity lacked probable cause to initiate the felony proceeding.

801. Plaintiff alleges malice based upon the knowing or reckless disregard of materially favorable evidence, materially false or incomplete information used in the charging process, and the circumstances specifically alleged concerning each prosecution.

802. Plaintiff alleges that the responsible Defendants initiated or continued the proceedings for purposes other than the fair administration of justice.

803. The Petit Larceny and Criminal Mischief proceedings ultimately terminated in Plaintiff's favor through dismissal.

804. The assault proceeding arising from the May 23 incident ultimately terminated in Plaintiff's favor through dismissal.

805. Plaintiff alleges that the September 20, 2021 criminal proceeding ultimately terminated without a conviction.

806. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, restrictions imposed through the criminal proceedings, and other damages.

## COUNT XV

## NEW YORK STATE LAW — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Against Defendant Carolette Meadows**

807. Plaintiff repeats and realleges paragraphs 1 through 806 as though fully incorporated and set forth herein.

808. Plaintiff alleges that Meadows engaged in a prolonged and escalating course of conduct specifically directed toward Plaintiff over a period of years.

809. Plaintiff does not base this cause of action upon ordinary insults, disagreements, criticism, or the ordinary incidents of a contentious neighbor dispute.

810. Plaintiff instead relies upon the cumulative course of conduct specifically alleged throughout this Complaint.

811. Plaintiff alleges that Meadows intentionally damaged or interfered with the furnace exhaust serving Plaintiff's residence.

812. Plaintiff alleges that the interference created a dangerous condition affecting Plaintiff and members of Plaintiff's household.

813. Plaintiff alleges that Meadows continued interfering with Plaintiff's ability to access, use, maintain, and repair portions of Plaintiff's residence.

814. Plaintiff alleges that Meadows repeatedly entered or interfered with Plaintiff's property.

815. Plaintiff alleges that Meadows repeatedly damaged or interfered with Plaintiff's property.

816. Plaintiff alleges that Meadows repeatedly interfered with Plaintiff's security cameras.

817. Plaintiff alleges that Meadows repeatedly engaged in physical confrontations with Plaintiff.

818. On May 23, 2020, Plaintiff alleges that Meadows entered Plaintiff's backyard carrying an electric saw.

819. Plaintiff alleges that Meadows threatened and chased Plaintiff.

820. Plaintiff alleges that Meadows cornered Plaintiff while holding the saw.

821. Plaintiff alleges that Meadows lunged toward Plaintiff with the saw.

822. Plaintiff alleges that Meadows thereafter bit Plaintiff on the neck, breaking the skin.

823. Plaintiff alleges that Meadows grabbed Plaintiff by the hair.

824. Plaintiff alleges that Meadows repeatedly struck Plaintiff in the head and pinched Plaintiff.

825. Plaintiff further alleges that Meadows repeatedly made accusations to governmental authorities that subjected Plaintiff to criminal process.

826. Plaintiff alleges that Meadows supplied materially false information concerning the property dispute that resulted in the January 18, 2021 charges.

827. Plaintiff alleges that Meadows's accusation concerning an alleged cough resulted in the September 20, 2021 felony charge.

828. Plaintiff further alleges that Meadows obtained, possessed, used, and/or disseminated Plaintiff's governmental criminal-history information.

829. Plaintiff alleges that copies of that governmental record thereafter continued circulating publicly for years.

830. Plaintiff alleges that Meadows knew that her prolonged conduct was causing Plaintiff substantial fear, humiliation, distress, disruption, and injury.

831. Plaintiff alleges that Meadows intended to cause Plaintiff severe emotional distress or acted with reckless disregard of the substantial probability that severe emotional distress would result.

832. Plaintiff alleges that the cumulative and prolonged course of conduct exceeded the bounds of conduct reasonably tolerated in a civilized society.

833. Plaintiff alleges that the cumulative course of conduct was extreme and outrageous.

834. Plaintiff experienced severe and continuing emotional and psychological distress.

835. Plaintiff ultimately sought professional mental-health treatment.

836. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

837. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

838. Plaintiff alleges that Meadows's prolonged conduct was a substantial cause of or substantially contributed to Plaintiff's emotional and psychological injuries.

839. Plaintiff will rely upon medical and mental-health records and other admissible evidence concerning diagnosis, treatment, causation, severity, duration, and prognosis.

840. Plaintiff suffered severe anxiety, depression, fear, humiliation, loss of enjoyment of life, and disruption of her ability to feel secure within her own residence.

841. Plaintiff suffered substantial interference with her personal and professional life.

842. Plaintiff seeks compensatory damages against Meadows.

843. Plaintiff further seeks punitive damages against Meadows to the extent permitted by law and supported by the evidence.

## COUNT XVI

## NEW YORK STATE LAW — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### Against Defendant Carolette Meadows — Pleaded in the Alternative

844. Plaintiff repeats and realleges paragraphs 1 through 843 as though fully incorporated and set forth herein.

845. Plaintiff pleads this cause of action in the alternative to her intentional-tort claims to the extent particular conduct by Meadows is determined to have been negligent or reckless rather than intentional.

846. Meadows owed Plaintiff a duty to exercise reasonable care so as not to create an unreasonable and foreseeable risk of physical injury to Plaintiff.

847. Plaintiff alleges that Meadows interfered with the furnace exhaust serving Plaintiff's residence.

848. Plaintiff alleges that interference with the furnace exhaust created an immediate and foreseeable danger of exposure to combustion gases.

849. Plaintiff alleges that the condition created a foreseeable risk of serious physical injury.

850. Plaintiff alleges that members of Plaintiff's household actually experienced physical symptoms.

851. Plaintiff alleges that Plaintiff and members of her household sought medical evaluation or treatment following the dangerous condition.

852. Plaintiff alleges that blood testing reflected carbon-monoxide poisoning affecting her children.

853. Plaintiff further alleges that Meadows's repeated physical confrontations and conduct affecting the safety of Plaintiff's residence caused Plaintiff reasonably to fear for her own physical safety.

854. Plaintiff alleges that her emotional injuries arose directly from circumstances involving actual or threatened physical danger and not merely from economic or property loss.

855. Plaintiff subsequently sought professional mental-health treatment.

856. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

857. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

858. Plaintiff alleges that Meadows's prolonged conduct was a substantial cause of or substantially contributed to Plaintiff's emotional and psychological injuries.

859. Plaintiff alleges that the actual physical danger, medical consequences, prolonged course of events, and diagnosed psychological conditions provide objective circumstances supporting the genuineness and severity of Plaintiff's emotional harm.

860. Plaintiff seeks compensatory damages against Meadows to the extent the conduct at issue is determined to have been negligent or reckless rather than intentional.

## DAMAGES AND INJURIES

861. As a direct and proximate result of the actionable conduct alleged herein, Plaintiff has sustained constitutional, reputational, professional, economic, emotional, psychological, property-related, and other compensable injuries.

862. Plaintiff was not physically arrested, jailed, detained, or confined in connection with the criminal charges described herein.

863. Plaintiff instead was issued appearance tickets or otherwise subjected to criminal process requiring her to appear in criminal court and defend herself against the charges.

864. Plaintiff alleges that the criminal proceedings required repeated court appearances.

865. Plaintiff alleges that the proceedings consumed substantial time and resources.

866. Plaintiff alleges that the proceedings caused reputational injury.

867. Plaintiff alleges that the proceedings caused severe emotional distress.

868. Plaintiff further alleges that the criminal proceedings resulted in restrictions affecting her constitutional rights.

869. In approximately March 2021, Plaintiff was required to surrender two firearms to her father pursuant to an Order of Protection arising from the criminal proceeding.

870. Plaintiff remained unable to possess those firearms until approximately July 2022.

871. Plaintiff alleges loss of the possession and use of those firearms during that period.

872. Plaintiff alleges that governmental interference with access to and control of her property delayed or obstructed necessary repairs.

873. Plaintiff alleges that the property-related governmental conduct caused financial expense.

874. Plaintiff alleges that the property-related governmental conduct caused disruption and loss of use and enjoyment of her residence.

875. Plaintiff alleges substantial reputational injury resulting from dissemination and continuing republication of her governmental criminal-history information.

876. Plaintiff alleges that the governmental record included arrest information concerning matters that did not result in convictions.

877. Plaintiff subsequently obtained official criminal-history information reflecting no criminal convictions.

878. Plaintiff alleges that copies of the governmental record nevertheless continued to circulate.

879. Plaintiff alleges that continuing circulation of the record caused humiliation and damage to her reputation within the community.

880. Plaintiff provides tax-preparation, bookkeeping, and related financial services.

881. Plaintiff relies upon professional trust, honesty, competence, reputation, referrals, and community relationships in obtaining and retaining clientele.

882. Plaintiff alleges that public circulation of governmental criminal-history information portraying her through repeated arrests and criminal accusations foreseeably impaired her professional reputation.

883. Plaintiff alleges that the continuing dissemination caused or contributed to loss of professional standing, loss of business opportunities, difficulty maintaining public confidence, and other economic injury.

884. Plaintiff seeks recovery only for economic losses that she can establish through admissible evidence and causally attribute to actionable conduct by Defendants.

885. Plaintiff further alleges severe and prolonged emotional and psychological injury resulting from the cumulative events described herein.

886. Plaintiff experienced anxiety.

887. Plaintiff experienced depression.

888. Plaintiff experienced fear and humiliation.

889. Plaintiff experienced loss of enjoyment of life.

890. Plaintiff experienced substantial disruption of her sense of security within her own residence.

891. Plaintiff experienced substantial interference with her personal and professional life.

892. Plaintiff ultimately sought professional mental-health treatment.

893. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

894. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

895. Plaintiff alleges that the conduct described herein, including the prolonged conduct of Meadows, was a substantial cause of or substantially contributed to those injuries.

896. Plaintiff will rely upon medical records, treating-provider testimony, and other admissible evidence concerning diagnosis, treatment, causation, severity, prognosis, and duration to the extent supported by such evidence.

897. Plaintiff alleges continuing reputational injury because copies of the disclosed governmental criminal-history document remain outside governmental custody.

898. Plaintiff alleges that those copies remain capable of further electronic dissemination.

899. Plaintiff alleges continuing psychological and emotional consequences arising from the events described herein.

900. Plaintiff seeks past and future compensatory damages to the extent established by admissible evidence.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered in her favor and against the appropriate Defendants as follows:

901. Awarding compensatory damages in an amount to be determined at trial for Plaintiff's constitutional injuries, compulsory criminal proceedings, emotional and psychological injuries, reputational harm, proven economic loss, property-related injury, loss of use of firearms, and other proven consequential damages;

902. Awarding nominal damages for constitutional violations for which Plaintiff establishes a violation but cannot establish measurable compensatory damages;

903. Awarding punitive damages against those individual Defendants whose conduct is proven to have been malicious, oppressive, reckless, or undertaken with callous indifference to Plaintiff's federally protected rights, to the extent permitted by law;

905. Entering appropriate declaratory relief concerning constitutional violations established by Plaintiff;

904. Granting appropriate prospective or injunctive relief concerning continuing unconstitutional governmental practices to the extent Plaintiff establishes standing and entitlement to such relief;

905. Awarding Plaintiff recoverable costs to the extent permitted by law;

906. Awarding pre-judgment and post-judgment interest to the extent permitted by law; and

907. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

908. Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 31, 2026

I affirm this 31st day of August, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

Rachel Zekert
277 Barnard St.
Buffalo, NY 14206

8/31/2026