UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RACHEL ECKERT,

Plaintiff,

v.

CITY OF BUFFALO, et al.,

Defendants. No.

Index No. 1:22-cv-00540

UNITED STATES DISTRICT COURT
FILED
NOV 6 . 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

## MOTION FOR LEAVE TO FILE CORRECTED THIRD AMENDED COMPLAINT

Plaintiff Rachel Eckert, proceeding pro se, moves under Federal Rule of Civil Procedure 15(a)(2) and Local Rule 15(a) for leave to file and serve the complete proposed corrected Third Amended Complaint attached as Exhibit A. Plaintiff requests that the Court accept Exhibit A in place of the version submitted at ECF No. 142 upon filing and clarify which pleading governs pending disposition of this motion.

ECF No. 123 at 68 directed Plaintiff to move for leave and attach a proposed amended complaint. Plaintiff submitted ECF No. 142 without first filing that motion. The present motion supplies the request and the complete proposed pleading. The proposed changes also describe the City's response concerning access to Plaintiff's RAP sheet and the professional harm alleged to have followed its disclosure. The proposed changes restore the May 23 Meadows–Dixon exchange, particularize the allegations about DiPasquale and Wojtanik, and set out the dates, recipients, and subjects of the notices supporting the existing municipal-liability theory against Buffalo. The proposed pleading removes the standalone Second Amendment count and preserves temporary firearm loss of use as an alleged consequence of the prosecution in Count IV.

These changes concern incidents and communications already at issue and clarify the basis for the claims and relief sought. Plaintiff respectfully requests leave in the interest of justice and a direction to file and serve the approved pleading within the time set by the Court.

Dated: Buffalo, NY 14206
November 06, 2026

Rachel Eckert
277 Barnard St.
Buffalo, NY 14206

## SUPPORTING DECLARATION OF RACHEL ECKERT

1. I am the Plaintiff. I submit this declaration in support of my motion for leave to file the corrected pleading.

2. On August 31, 2026, I submitted ECF No. 142 without first filing a motion for leave. I was trying to comply with the Court's direction to present a shorter, clearer complaint. I condensed a lengthy chronology and tried to keep the allegations that supported each claim.

3. I submitted ECF No. 142 on August 31, 2026, the last day I had to submit it. I was working under the deadline and trying to condense my earlier pleadings. My neurological difficulties made it harder to check the shortened draft against the earlier rulings. When I submitted it, I did not recall the Court's prior disposition of my Second Amendment claim against Erie County and included a standalone Second Amendment count in error. After reviewing the earlier rulings, I removed that count from the proposed corrected complaint. I retained the temporary loss of use of my firearms as an injury I allege resulted from the prosecution.

4. I experience short-term memory and attention difficulties following a verified medically autonomic neurological condition. I also experience chronic dizziness, fatigue, and brain fog. I further suffer from anxiety which can intensify my symptoms. To check names, dates, and sequences reliably, I have to compare the draft with my earlier filings and records. During the time I was preparing ECF No. 142, I was working under time pressure. Those limitations made it harder for me to review the shortened version against the earlier pleadings and check the separate filing steps before submitting it. I did not act in bad faith.

5. In reviewing the filings again, I identified details that had been lost or generalized. For example, ECF No. 142 kept the allegation that Meadows told Officer Dixon that I received favorable treatment because I was white, but omitted that the exchange concerned the George Floyd movement. My earlier pleadings described that exchange at ECF No. 3 at 66 and ECF No. 58 at 159–160.

6. The attached proposed pleading restores that exchange, adds details from the earlier pleadings concerning the May 23 response, and sets out the substance and timing of my communications with the Commissioner's office and Internal Affairs. It also places my temporary loss of use of two firearms in the allegations concerning injury from the prosecution.

7. The proposed complaint also describes the officers' holster gestures during two separate fence incidents and clarifies the facts supporting my allegation of unequal treatment concerning access to my RAP sheet.

8. I ask the Court to grant leave to file and serve the corrected pleading attached as Exhibit A.

declare under penalty of perjury that the foregoing is true and correct.

Dated: Buffalo, NY
November 6, 2026

Rachel Eckert
Plaintiff, Pro-Se
277 Barnard St.
Buffalo NY 14206

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RACHEL ECKERT,

Plaintiff,

v. CITY OF BUFFALO; CAROLETTE MEADOWS; APRIL BASKIN; BYRON W. BROWN; FRANK BIFARO; JAMES COMERFORD; TIMOTHY CURTIN; SEAN MYERS; BYRON LOCKWOOD; ROBERT JOYCE; MICHAEL FARLEY; JEFF RINALDO; MELISSA KURDZIEL; COREY DIXON; JAMES NIGHTINGALE-GRIFFIN; JACOB SALAZAR; MARK COSTANTINO; WALTER SKRZVNSKI; PATRICK MORROW; CHAD CULLEN; MARC DIPASQUALE; KYLE MORIARITY; JAMES REESE; KEENAN REDMON; MAUREEN WOJTANIK; and JOHN/JANE DOE BPD OFFICERS AND GOVERNMENTAL EMPLOYEES WHOSE IDENTITIES ARE NOT YET KNOWN,

Defendants.

CASE NO. 1:22CV-00540

PROPOSED CORRECTED THIRD AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiff Rachel Eckert, a white female, brings this civil-rights action arising from a prolonged series of interactions with City of Buffalo officials, Buffalo Police Department personnel, elected officials, and Defendant Carolette Meadows, a black female, beginning in March 2020 and continuing thereafter.

2. Plaintiff alleges that what began as a dispute concerning the furnace exhaust and boundary area adjacent to Plaintiff's residence developed into repeated governmental interference with Plaintiff's property rights, unequal police protection and enforcement, criminal charges and prosecutions allegedly undertaken without probable cause, suppression or mishandling of exculpatory evidence, interference with Plaintiff's protected speech and petitioning activity, and other constitutional and state-law injuries.

3. Plaintiff alleges that governmental actors repeatedly treated accusations and property claims made by Meadows as matters warranting immediate police or code-enforcement action, while Plaintiff's complaints concerning assaults, property damage, violations of an Order of Protection, and interference with her residence repeatedly were treated as civil matters or otherwise were not enforced.

4. Plaintiff alleges that this disparity continued over several years and involved multiple governmental employees rather than a single isolated officer or event.

5. Plaintiff alleges that when she attempted to exercise her property rights, repair her residence, criticize public officials, complain about governmental misconduct, seek police protection, and defend herself from criminal accusations, governmental officials repeatedly exercised coercive authority against her or denied her comparable governmental protection.

6. Plaintiff further alleges that an unredacted governmental criminal-history compilation concerning her was disclosed outside ordinary governmental channels and thereafter repeatedly disseminated publicly, causing substantial reputational, professional, economic, and emotional distress.

7. Plaintiff **does not** reassert the RICO claims previously dismissed by this Court.

8. Plaintiff incorporates factual events contained in her former RICO Statement only where those events provide additional particularity concerning who acted, what occurred, when it occurred, where it occurred, and how the conduct relates to the causes of action asserted herein.

9. Plaintiff likewise **does not** reassert claims under the federal Freedom of Information Act, the federal Privacy Act, or 42 U.S.C. § 1988 as an independent cause of action.

10. This pleading is intended to replace Plaintiff's prior Second Amended Complaint while preserving claims that survived prior screening or dispositive rulings and particularizing those claims with additional factual detail.

11. Plaintiff further seeks leave to plead supplemental or amended theories based upon evidence concerning the disclosure and handling of Plaintiff's criminal- history information and it's continuing detriment and effect and additional facts bearing upon municipal liability against the City of Buffalo.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343.

13. Plaintiff brings federal claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

14. This Court has supplemental jurisdiction over Plaintiff's related New York State-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same transactions, occurrences, and course of conduct underlying Plaintiff's federal claims.

15. Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred within the City of Buffalo and Erie County, New York.

16. At all relevant times, the individual governmental Defendants acted under color of state law when exercising or purporting to exercise authority conferred by their governmental employment, public offices, police powers, regulatory powers, governmental database access, or other governmental positions.

**PARTIES**

17. Plaintiff Rachel Eckert is a resident of the State of New York and, at all relevant times, resided within the City of Buffalo.

18. Defendant City of Buffalo is a municipal corporation organized under the laws of the State of New York.

19. The City of Buffalo was responsible for the municipal policies, customs, practices, training, supervision, discipline, evidence-preservation systems, criminal-history systems, and governmental employees described herein.

20. Defendant Carolette Meadows was Plaintiff's neighboring property owner and is alleged to have participated in the events described throughout this Complaint.

21. Defendant April Baskin was, at relevant times, an elected Erie County Legislator.

22. Baskin maintained a social-media page that Plaintiff alleges she used in connection with her governmental office and communications with constituents and members of the public.

23. Defendant Byron W. Brown was, at relevant times, Mayor of the City of Buffalo.

24. Defendant Frank Bifaro was a City of Buffalo Fuel Device Inspector.

25. Defendant James Comerford was Commissioner of Permits and Inspections for the City of Buffalo.

26. Defendant Timothy Curtin was Chief Building Inspector for the City of Buffalo.

27. Defendant Sean Myers was a Building Inspector for the City of Buffalo.

28. Defendant Byron Lockwood was Commissioner of the Buffalo Police Department.

29. Defendant Robert Joyce was a Buffalo Police Department Captain and supervisory official.

30. Defendant Michael Farley was a Buffalo Police Department Lieutenant assigned to Internal Affairs.

31. Defendant Jeff Rinaldo was a Buffalo Police Department official responsible for responding to records or Freedom of Information Law requests.

32. Defendant Melissa Kurdziel was a Buffalo Police Department officer.

33. Defendant Corey Dixon was a Buffalo Police Department officer.

34, Defendant James Nightingale-Griffin was a Buffalo Police Department officer.

35. Defendant Jacob Salazar was a Buffalo Police Department officer.

36. Defendant Mark Costantino was a Buffalo Police Department officer.

37. Defendant Walter Skrzvnski was a Buffalo Police Department officer.

38. Defendant Patrick Morrow was a Buffalo Police Department Lieutenant.

39. Defendant Chad Cullen was a Buffalo Police Department officer.

40. Defendant Marc DiPasquale was a Buffalo Police Department officer.

41. Defendant Kyle Moriarity was a Buffalo Police Department officer.

42. Defendant James Reese was a Buffalo Police Department officer.

43. Defendant Keenan Redmon was a Buffalo Police Department officer.

44. Defendant Maureen Wojtanik was a Buffalo Police Department employee or officer who interacted with Plaintiff in connection with the events alleged herein.

45. Defendants John and Jane Doe are governmental employees, Buffalo Police Department personnel, supervisors, record custodians, database users, or other governmental actors whose identities presently are unknown to Plaintiff.

## FACTUAL ALLEGATIONS

**A. March 28-31, 2020 — Furnace Exhaust, Property Access, and Threats of Arrest**

46. On or about March 28, 2020, Meadows cut or otherwise removed the exhaust pipe serving Plaintiff's newly installed furnace.

47. Meadows claimed that the exhaust pipe improperly extended onto her property, although Plaintiff alleged that the pipe protruded only approximately one or two inches from the side of Plaintiff's residence.

48. Defendant Salazar initially filed a police report concerning criminal mischief, trespass, and harassment arising from the damaged pipe.

49. On or about March 29, 2020, Meadows came to Plaintiff's residence, pounded on Plaintiff's door, and threatened to assault Plaintiff.

50. Defendant Kurdziel responded and directed Meadows to stay off Plaintiff's property and return the pipe.

51. Plaintiff alleges that Meadows made racially derogatory remarks during the confrontation.

52. Plaintiff further alleges that Meadows attempted to strike Plaintiff by whipping the pipe toward her, instead striking Plaintiff's residence.

53. Later that day, Plaintiff attempted to make emergency repairs to her furnace.

54. Plaintiff alleges that Meadows shoved Plaintiff while Plaintiff attempted to make those repairs.

55. A responding BPD officer identified in Plaintiff's prior pleading as Doe No. 1 advised Plaintiff that she could not perform the repair and that doing so would constitute trespass.

56. Doe No. 1 directed Plaintiff to address the matter in civil court.

57. On or about March 30, 2020, Plaintiff again attempted to reach the damaged exhaust.

58. A second BPD officer identified as Doe No. 2 threatened Plaintiff with arrest for trespass if Plaintiff attempted to make the repair.

59. Doe No. 2 instructed Plaintiff to contact City building inspectors before attempting the repair.

60. Plaintiff contacted Defendant Curtin concerning access to the disputed area.

61. Plaintiff also consulted her real-estate attorney, Todd Potter, concerning her right to access the area.

62. After consulting counsel, Plaintiff removed a fence from property Plaintiff claimed as her own so that she could reach the damaged furnace exhaust.

63. Defendant Meadows contacted the Buffalo police.

64. On or about March 30, 2020, Officer Melissa Kurdziel responded after Plaintiff removed a fence from her property to reach the damaged furnace exhaust pipe.

65. Plaintiff advised Defendant Kurdziel that the fence was on her property.

66. With show of authority, Defendant Kurdziel responded "I don't care……you were told to call the housing inspector….until he comes, do not touch anything…..get this fence put back up, if I get a call back here today, you're going to get locked up."

67. Plaintiff reinstalled the fence because she feared arrest if she did not comply. Defendant Kurdziel remained at Plaintiff's residence for at least 15 minutes and watched her reinstall it.

68. Reinstalling the fence interfered with Plaintiff's access to the damaged exhaust pipe, her ability to repair it, the right of possession, and the right of control over her home.

69. Plaintiff alleges that Defendant Meadows recorded the interaction.

70. Defendant Meadows thereafter posted the recording on social media in an attempt to humiliate the Plaintiff.

71. Later that evening, a member of Plaintiff's family contacted BPD and spoke with a lieutenant concerning the disconnected furnace exhaust.

72. Plaintiff's family member warned the lieutenant that failure to repair the exhaust created a danger of carbon-monoxide poisoning.

73. The lieutenant agreed that the repair needed to be made.

74. The lieutenant represented that BPD would send a squad car when Plaintiff was ready to make the repair so that the repair could be completed without further problems.

75. On or about March 31, 2020, Plaintiff contacted BPD and requested the promised assistance.

76. BPD refused to dispatch a police vehicle to assist Plaintiff.

77. Defendants Curtin and Myers thereafter came to Plaintiff's residence to determine whether Plaintiff could access and repair the area without a court order.

78. Defendants Curtin and Myers determined that Plaintiff owned at least approximately 1.5 feet along the north side of Plaintiff's residence.

79. Defendants Curtin and Myers further determined that repair of Plaintiff's furnace exhaust was critical and communicated the same to BPD.

80. Plaintiff thereafter contacted BPD concerning the inspectors' determination.

81. Defendant Wojtanik advised Plaintiff that Defendants Curtin and Myers had confirmed that Plaintiff owned the approximately 1.5-foot area.

82. Defendant Wojtanik nevertheless advised Plaintiff that Plaintiff was not permitted to enter the area.

83. Defendant Wojtanik further advised Plaintiff that she would be arrested for trespass if she entered the area.

84. Defendant Wojtanik also advised Plaintiff that she would be arrested if she again removed the fence from her property.

85. Defendants Curtin and Myers further told Plaintiff that she could not erect her own fence to protect her property in front of Defendant Meadows.

86. Defendants Curtin and Myers told Plaintiff that if she erected a fence, they would remove it in front of Defendant Meadows.

87. On or around May 30, 2020, Defendants Curtin and Myers apologized for those statements and acknowledged that if it is on my property, and acknowledged my right to control my property in front of Meadows.

88. Plaintiff alleges that City officials therefore simultaneously recognized Plaintiff's ownership of the disputed area while threatening Plaintiff with governmental consequences if she exercised control over that same property.

89. On or about March 31, 2020, Plaintiff and members of her household developed physical symptoms, including vomiting.

90. Plaintiff sought medical evaluation for her children.

91. Plaintiff alleges that blood testing reflected carbon-monoxide poisoning affecting her children.

92. Plaintiff reported the condition to Detective Lauren McDermott with A-District BPD.

93. McDermott initially advised Plaintiff that Defendant Meadows would be charged with endangering the welfare of minors.

94. Approximately two days later, McDermott advised Plaintiff that her supervisor had directed her not to charge Defendant Meadows.

95. McDermott advised Plaintiff that the stated reason was that BPD did not know Meadows's intent.

**B. April 02, 2026- Plaintiff's Non-Spoliation Notice**

96. On April 02, 2026, Plaintiff sent a non-spoliation notice to Corporate Counsel Timothy Ball and Defendants Joyce and Lockwood. Defendant Wojtanik acknowledged the copy to Joyce on April 03, 2026.

97. The non-spoliation notice was detailed to cover specific interactions with BPD responding to the dispute between Plaintiff and Defendant Meadows from March 29, 2020 thru March 31, 2020.

**C. April 20—-May 12, 2020 — Furnace Inspection and Attempted Relocation**

98. On or about April 20, 2020, Defendant Bifaro inspected Plaintiff's furnace.

99. Defendant Bifaro determined that Plaintiff's furnace was up to code.

100. Defendant Meadows continued complaining to City officials concerning the location of Plaintiff's furnace exhaust.

101. On or about May 12, 2020, Defendant Bifaro contacted Plaintiff on behalf of Defendant Curtin.

102. Defendant Bifaro demanded that Plaintiff relocate the existing furnace exhaust because Defendant Meadows was complaining about it.

103. Plaintiff participated in a three-way telephone conversation with Defendant Bifaro and Plaintiff's HVAC contractor concerning the demanded relocation.

104. Plaintiff's contractor questioned why the exhaust needed to be relocated when it previously had passed inspection.

105. Plaintiff alleges that Defendant Bifaro stated, in substance, that the relocation was being required because Defendant Meadows was complaining.

106. Plaintiff advised Defendant Bifaro that she would not relocate the exhaust absent a court order establishing that Defendant Meadows possessed a legal property right requiring its relocation.

107. Defendant Bifaro advised Plaintiff that she could either relocate the exhaust or face court proceedings concerning an alleged permit issue.

108. Plaintiff further alleges that Defendant Bifaro threatened Plaintiff's HVAC contractor with enforcement consequences based upon his licensing status if he refused to relocate Plaintiff's exhaust.

109. Plaintiff alleges that the permit issue subsequently was remediated.

110. Approximately one month later, a BPD officer identified as Doe No. 4 threatened to file criminal charges against Plaintiff if she did not relocate the exhaust.

111. Plaintiff again refused to relocate the exhaust without a court order establishing Defendant Meadows's claimed legal right to require relocation.

**C. May 20-23, 2020 — Fence Incidents**

112. On or around May 20, 2020, Plaintiff removed the portion of fence Defendant Kurdziel threatened arrest over.

113. Defendant Meadows contacted BPD.

114. Defendant Salazar responded.

115. Defendant Salazar advised Plaintiff that the fence belonged to Meadows notwithstanding Defendant Curtin's and Myers's prior determination concerning Plaintiff's property boundary.

116. Defendant Salazar further advised Plaintiff that she was required to permit Defendant Meadows to enter or use the disputed area to park her vehicle.

117. Plaintiff maintained that no recorded easement existed granting Defendant Meadows such a right and that the fence extended onto Plaintiff's property, attached to a pole on Plaintiff's property.

118. Defendant Salazar ultimately told Plaintiff he was going to charge her with harassment.

119. Later that day, Defendant Meadows covered Plaintiff's security cameras with paper towels.

120. Defendant Meadows thereafter pounded on Plaintiff's residence.

121. Plaintiff's son contacted 911.

122, A responding BPD officer identified as Doe No.5 directed Defendant Meadows to leave Plaintiff's cameras alone.

123. Upon information and belief, Doe No. 5 did not prepare a police report concerning the incident.

124, On or about May 21, 2020, Defendant Meadows again entered Plaintiff's property and interfered with Plaintiff's security cameras.

125. Meadows again pounded on Plaintiff's residence.

126. On or about May 23, 2020, Plaintiff discovered that a panel was missing from her privacy fence.

127. Plaintiff observed the missing panel in Meadows's yard and captured photos.

128. Plaintiff contacted 911.

129. Defendants Salazar and Cullen responded.

130. Defendants Salazar and Cullen retrieved the fence panel from Meadows's property and returned the fence panel to Plaintiff.

131. Defendants Salazar and Cullen nevertheless refused to prepare a theft report against Meadows (despite Plaintiff later being charged with theft for removing items off her own property).

132. Defendants Salazar and Cullen told Plaintiff that the wind had blown the fence panel down and Meadows had picked it up. They told Plaintiff there was no theft because the panel was only two feet from her property. While the officers were telling Plaintiff they would not file a theft

report, Plaintiff saw one of them place his hand on his holster. Plaintiff felt intimidated by that gesture.

133. Upon information and belief, Defendants Salazar nor Cullen filed a police report concerning that incident.

**D. May 23, 2020 — Physical Confrontation**

134. Later in the evening of May. 23, 2020, Defendant Meadows returned to Plaintiff's property carrying an electric saw.

135. Defendant Meadows entered Plaintiff's backyard.

136. Defendant Meadows cut the same fence panel that Salazar and Cullen previously had returned to Plaintiff.

137. Plaintiff went outside and directed Defendant Meadows to leave Plaintiff's property.

138. Plaintiff alleges that Defendant Meadows threatened Plaintiff.

139. Plaintiff alleges that Defendant Meadows chased Plaintiff with the electric saw.

140. Plaintiff alleges that Defendant Meadows ultimately cornered Plaintiff while holding the electric saw.

141. Plaintiff alleges that Defendant Meadows lunged toward her with the saw.

142. Plaintiff defended herself.

143. During the resulting physical confrontation, Plaintiff alleges that Meadows bit Plaintiff on the neck and broke the skin.

144. Plaintiff alleges that Defendant Meadows grabbed Plaintiff by the hair.

145. Plaintiff alleges that Defendant Meadows repeatedly struck Plaintiff.

146, Plaintiff alleges that Defendant Meadows pinched Plaintiff.

147. Plaintiff's son contacted 911.

148. A neighbor also contacted 911.

149. A second neighbor intervened and pulled Defendant Meadows off of Plaintiff.

**E. May 23, 2020 — BPD Investigation**

150. Several BPD officers responded to the scene.

151. Defendant Dixon, a black male, was one of the first responding officer identified in Plaintiff's prior pleading.

152. Plaintiff alleges that when Dixon arrived, Meadows immediately approached Dixon.

153. Meadows demanded that Plaintiff be arrested.

154. During the May 23, 2020 response, Defendants Meadows and Dixon discussed the George Floyd movement. Meadows told Dixon that she was receiving unfavorable treatment because she was Black and Plaintiff was white. Plaintiff alleges that assertion was false.

155. During the same response, Defendant Dixon accused Plaintiff of lying and told other officers she had changed her account. Plaintiff alleges she had not changed her account.

156. Plaintiff further alleges that Defendant Meadows invoked Defendant Baskin's governmental position during her discussion with Dixon.

157. Defendant Dixon thereafter accused Plaintiff of lying.

158. Defendant Dixon accused Plaintiff of fabricating her account of the confrontation.

159. Plaintiff alleges that multiple eyewitnesses were available to provide information concerning what had occurred,

160. Plaintiff alleges that at least three witnesses possessed information favorable to Plaintiff's account of the confrontation.

161. Dixon refused or failed to obtain statements from two (2) witnesses.

162. Plaintiff alleges that one individual questioned Defendant Dixon concerning his refusal to obtain the available witness statements.

163. Plaintiff alleges Defendant Dixon threatened to tase that individual.

164. Plaintiff alleges that Defendant Dixon therefore rejected Plaintiff's account before completing a neutral investigation of the available witnesses and evidence.

165. Plaintiff was visibly injured following the confrontation with Defendant Meadows.

166. Plaintiff alleges that responding officers initially attempted to delay or discourage Plaintiff from obtaining medical assistance.

167. Plaintiff ultimately transported herself for medical treatment because of the pain and injuries she sustained.

168. Plaintiff alleges that Defendants Nightingale-Griffin, Marc DiPasquale, James Reese, and Keenan Redmon also participated in the investigation arising from the May 23 confrontation.

169. Plaintiff alleges that Defendants Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain, preserve, disclose, or accurately transmit materially favorable eyewitness information.

170. Plaintiff alleges that one witness's legal guardian expressly authorized police to interview the witness.

171, Plaintiff alleges that Defendants Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon nevertheless failed to obtain or suppressed that witness's statement.

172. Plaintiff alleges BPD spoke with the witness who intervened in Defendant Meadows assaulting me.

173. Plaintiff alleges that by the time that witnesses information made it to the Erie County District Attorney's office, that the name, address, and contact number was changed from what the witness initially provided the officers on scene.

174. Plaintiff alleges that Defendant Nightingale-Griffin intimidated Plaintiff by stating Plaintiff could only file charges against Defendant Meadows if Plaintiff agreed to allow Meadows to file charges against her. Plaintiff was not told what she would be charged with.

175. Plaintiff further alleges that one responding officer expressed concern that Plaintiff was being charged even though that officer did not believe Plaintiff had been the aggressor per AXON body camera footage Plaintiff reviewed.

176. Plaintiff alleges Defendant Morrow ultimately decided to charge Plaintiff with assault despite eyewitness accounts of what happened.

177. Plaintiff alleges that information concerning the available eyewitnesses subsequently was inaccurately or incompletely reflected in materials used in connection with Plaintiff's criminal prosecution.

178. Plaintiff later obtained criminal-discovery material that she alleges revealed discrepancies between the eyewitness information actually available and the information transmitted in connection with her prosecution.

179. Officer Marc DiPasquale discussed with Dixon how to handle the May 23 incident. Dixon told DiPasquale, Reese, and Nightingale-Griffin that Plaintiff had accused Meadows of attacking her with a chainsaw. Plaintiff alleges she never said Meadows used a chainsaw. DiPasquale turned off his body-worn camera before the call ended and expressed discomfort with signing off on Lieutenant Morrow's decision to arrest Plaintiff.

180. Plaintiff alleges that Defendants gave Meadows a warrant card concerning the felony assault accusation. Meadows later displayed the card, which contained Plaintiff's unlisted telephone number, on Facebook.

181. Plaintiff alleges that Defendant Reese subsequently participated in the charging process arising from the May 23 incident.

182. Plaintiff seeks to hold each officer liable for that officer's own conduct alleged in this pleading.

**F. May 23, 2020 — Body-Worn-Camera Evidence**

183. Plaintiff alleges that BPD officers responding to the May 23 confrontation were equipped with body-worn cameras.

184. Plaintiff alleges that Dixon's body-worn camera was activated during the investigation.

185. Plaintiff alleges that Dixon asked other responding officers whether their body-worn cameras were turned off before turning off his own camera and stating "what if we."

186. Plaintiff alleges Defendant's Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon therefore violated City of Buffalo AXON worn body camera policies.

187. Plaintiff alleges that the circumstances surrounding that conversation were material to determining what occurred during the police investigation and charging decision.

188. Shortly after the incident, Plaintiff began seeking preservation of the body-worn-camera evidence.

189. On or about June 1, 2020, Plaintiff sent preservation demands concerning Dixon's AXON body-worn-camera footage to Defendants Joyce and Lockwood.

190. Plaintiff sought preservation because the footage concerned an incident that had resulted or was expected to result in criminal charges against her.

191. Plaintiff thereafter repeatedly sought Dixon's body-worn-camera footage from BPD.

192. Plaintiff made requests through Defendant Rinaldo and other BPD personnel.

193. Plaintiff alleges that her requests included requests made in or about July 2020, November 21, 2020, December 1, 2020, and December 7, 2020.

194. Plaintiff alleges that the complete footage was not produced despite her repeated requests and preservation demands.

195. Plaintiff alleges that she initially was informed, in substance, that responsive body-worn-camera footage did not exist.

196. Plaintiff continued requesting the footage because she believed it contained evidence material to her defense against the criminal accusations arising from May 23.

197. Plaintiff ultimately received audit records from the City of Buffalo that Defendant Dixon did have his body worn camera on, it was later uploaded to the AXON body camera dock at the station, and then subsequently deleted from the system.

**G. Complaints to BPD Supervisory and Internal Affairs Personnel**

198. Plaintiff promptly complained to BPD supervisory personnel concerning Defendant Dixon's handling of the May 23 investigation.

199. Plaintiff specifically complained concerning Defendant Dixon's refusal or failure to obtain available eyewitness statements.

200. Plaintiff complained concerning what she believed to be discriminatory treatment during the investigation.

201. Plaintiff complained concerning the preservation of body-worn-camera evidence.

202. Plaintiff also contacted BPD Internal Affairs concerning the conduct of officers involved in the investigation.

203. By approximately mid-June 2020, Plaintiff alleges that she had contacted Internal Affairs and community-policing personnel more than fifteen times concerning the police conduct at issue.

204. Defendant Farley received or became aware of Plaintiff's complaints through his Internal Affairs role.

205. Defendants Joyce and Lockwood received Plaintiff's preservation demands concerning the AXON evidence.

206. Plaintiff alleges that those complaints and preservation demands placed supervisory BPD personnel on actual notice that Plaintiff disputed the integrity of the May 23 investigation.

207. Plaintiff alleges that supervisory personnel also had actual notice that potentially material body-worn-camera evidence needed to be preserved.

208. Plaintiff continued complaining to BPD and seeking evidence after the criminal proceedings against her began.

**H. Plaintiff's Order of Protection Against Meadows**

209. On or about October 15, 2020, Plaintiff obtained an Order of Protection against Meadows from Buffalo City Court.

210. Plaintiff thereafter repeatedly contacted BPD concerning conduct by Defendant Meadows that Plaintiff believed violated the Order.

211. Plaintiff alleges that BPD officers refused or failed to enforce the Order on October 25, 2020.

212. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on November 7, 2020.

213. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on November 8, 2020.

214. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December

10, 2020.

215. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December 15, 2020.

216. Plaintiff alleges that BPD officers again refused or failed to enforce the Order on December 16, 2020.

217. On December 18, 2020, Plaintiff personally communicated with Defendant Morrow concerning BPD's refusal to enforce the Order.

218. Defendant Morrow advised Plaintiff, in substance, that BPD would not enforce Plaintiffs Order of Protection unless Defendant Meadows physically assaulted Plaintiff.

219. Plaintiff alleges that the Order itself did not condition enforcement upon Defendant Meadows first physically assaulting Plaintiff.

220. Plaintiff alleges that Defendant Morrow therefore imposed an additional enforcement condition that materially diminished the protection afforded to Plaintiff by the judicial Order.

221. Plaintiff alleges that BPD again refused or failed to enforce the Order on December 27, 2020.

222. Plaintiff alleges further refusals or failures to enforce the Order on September 17, 2021.

223. Plaintiff alleges further refusals or failures to enforce the Order on September 19, 2021.

224. Plaintiff alleges further refusals or failures to enforce the Order on September 20, 2021.

225. Plaintiff alleges further refusals or failures to enforce the Order on September 23, 2021.

226. Plaintiff alleges further refusals or failures to enforce the Order on October 12, 2021.

227. Plaintiff alleges further refusals or failures to enforce the Order on November 15, 2021.

228. Plaintiff alleges further refusals or failures to enforce the Order on December 30, 2021.

229. Plaintiff alleges further refusals or failures to enforce the Order on March 17, 2022.

230. Plaintiff alleges further refusals or failures to enforce the Order on June 23, 2022.

231. Plaintiff alleges that these repeated refusals occurred while BPD personnel readily exercised criminal charging authority when Defendant Meadows made accusations against Plaintiff.

**I. December 5, 2020 Charging Instrument**

232. On December 5, 2020, approximately six months after the May 23 confrontation, Defendant Reese signed an Information/Complaint charging Plaintiff with Assault in the Third Degree.

233. Plaintiff alleges that by the time Reese executed the charging instrument, BPD possessed or reasonably should have possessed information concerning Plaintiff's injuries.

234. BPD also possessed or reasonably should have possessed information concerning Plaintiff's claim of self-defense and Meadows prior conviction of assaulting a separate neighbor, Jody Wolfson.

235. BPD possessed or reasonably should have possessed information concerning the available eyewitnesses.

236. BPD possessed the 911 calls where two (2) witnesses called 911 over the assault.

237. Plaintiff alleges that materially favorable eyewitness information was omitted, suppressed, inaccurately transmitted, or otherwise absent from the charging determination.

238. Plaintiff alleges that Defendant Reese nevertheless executed the charging instrument based upon a materially incomplete or inaccurate investigative record.

239. Plaintiff was not physically arrested, detained, jailed, or confined in connection with that charge.

240. Plaintiff nevertheless was subjected to criminal process and required to appear in criminal court and defend herself against the charge.

**J. January 18, 2021 — Petit Larceny and Criminal Mischief Appearance Ticket**

241. Before January 18, 2021, Meadows placed objects, structures, or "contraptions" upon property Defendants Curtin and Meyers earlier confirmed was Plaintiff's.

242. Plaintiff removed the objects from her property.

243. Defendant Meadows thereafter accused Plaintiff of theft and property damage arising from Plaintiff's removal of those objects.

244. Plaintiff alleges that Defendant Meadows supplied materially false information to police concerning ownership of the property and circumstances surrounding Plaintiff's removal of the objects.

245. On or about January 18, 2021, Defendant Salazar charged Plaintiff with Petit Larceny and Criminal Mischief.

246. Defendant Salazar issued Plaintiff an appearance ticket requiring Plaintiff to answer the charges in criminal court.

247. Plaintiff was not taken into physical custody.

248. Plaintiff was not jailed or otherwise physically confined.

249. Plaintiff alleges that Defendant Salazar lacked probable cause to charge Plaintiff with Petit Larceny.

250. Plaintiff alleges that Defendant Salazar lacked probable cause to charge Plaintiff with Criminal Mischief.

251. Plaintiff alleges that the underlying conduct involved Plaintiff's removal of objects that Defendant Meadows had placed upon property belonging to Plaintiff.

252. Plaintiff further alleges that BPD personnel already were aware of the longstanding boundary dispute.

253. Plaintiff alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

254. Plaintiff alleges that Defendants Joyce, Farley, and Lockwood participated in or caused the January 18 charging decision.

255. Plaintiff alleges that governmental criminal authority thereby was used to resolve a disputed question of private property ownership in Defendant Meadows's favor without a prior judicial determination establishing Meadows's claimed property right.

256. Plaintiff thereafter was required to appear in criminal court and defend herself against the Petit Larceny and Criminal Mischief charges.

257. The Petit Larceny and Criminal Mischief charges ultimately were dismissed in Plaintiff's favor.

**K. Continuing Unequal Police Treatment**

258. Following the January 18, 2021 charges, Plaintiff continued reporting alleged violations of her Order of Protection and other conduct by Defendant Meadows to BPD.

259. Plaintiff alleges that her requests repeatedly resulted in no report, no enforcement, or an instruction that the matter was civil.

260. By contrast, Plaintiff alleges that accusations made by Defendant Meadows repeatedly resulted in the exercise of criminal charging authority against Plaintiff.

261. Plaintiff alleges that this contrast was not confined to one officer.

262. Plaintiff alleges that this contrast was not confined to one complaint.

263. Plaintiff alleges that this contrast was not confined to one isolated event.

264. Plaintiff alleges that multiple BPD officers applied materially different enforcement standards over an extended period.

265. Plaintiff repeatedly complained to supervisory officials concerning what she believed to be discriminatory and unequal police treatment.

266. Plaintiff alleges that the differential treatment nevertheless continued after supervisory personnel received notice of her complaints.

**L. September 20, 2021 — Felony Appearance Ticket**

267. On September 20, 2021, Plaintiff and Defendant Meadows were involved in another encounter.

268. Plaintiff's son contacted 911 because Plaintiff alleges that Defendant Meadows was threatening Plaintiff.

269. Defendant Meadows thereafter accused Plaintiff of intentionally coughing on her despite being in my own backyard with a 6 foot privacy fence.

270. Defendant Moriarity responded.

271. Defendant Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

272. Defendant Moriarity issued Plaintiff an appearance ticket requiring Plaintiff to answer the felony charge in criminal court.

273. Plaintiff was not taken into physical custody.

274. Plaintiff was not jailed or otherwise physically confined.

275. Plaintiff alleges that she did not possess a chemical or biological weapon.

276. Plaintiff alleges that she did not deploy a chemical or biological weapon.

277. Plaintiff alleges that the factual accusation underlying the felony charge consisted of Defendant Meadows's allegation that Plaintiff intentionally coughed on her.

278. Plaintiff alleges that Defendant Moriarity lacked probable cause to charge Plaintiff with the felony offense.

279. Plaintiff further alleges that the circumstances known or reasonably available to responding officers included the fact that Plaintiff's son had contacted 911 concerning Defendant Meadows's conduct toward Plaintiff.

280. Plaintiff alleges that the September 20 incident further demonstrated the disparity between BPD's response to Plaintiff's requests for protection and its response to accusations made by Defendant Meadows.

281. Plaintiff thereafter was required to appear in criminal court and defend herself against the charge.

282. The Chemical or Biological Weapon charges ultimately were dismissed in Plaintiff's favor by a grand jury.

**M. Absence of Plaintiff's Order of Protection From Governmental Systems**

283. During the period in which Plaintiff repeatedly sought enforcement of her Order of Protection, Plaintiff learned that the Order was not appearing in governmental systems used by responding officers.

284. Defendants Costantino and Skrzvnski advised Plaintiff that the Order was not "in the system."

285. Defendants Costantino and Skrzvnski advised Plaintiff that they therefore could not charge Defendant Meadows with violating the Order.

286. Plaintiff alleges that the Order was a valid judicial Order of Protection.

287. Plaintiff alleges that the absence of the Order from the governmental system was not caused by Plaintiff.

288. Plaintiff further alleges that on or about September 20, 2021, her Order of Protection was missing from the New York State Registry.

289. Plaintiff alleges that the absence or disappearance of the Order materially interfered with her ability to obtain police enforcement of judicial protection already afforded to her.

290. Plaintiff alleges that during this same period BPD personnel exercised criminal charging authority against Plaintiff when Defendant Meadows made accusations against her.

291. Plaintiff alleges that the contrast between the treatment of Plaintiff's requests for enforcement and Defendant Meadows's accusations is part of the unequal governmental treatment alleged herein.

**N. Criminal Proceedings and Firearms Deprivation**

292. Plaintiff continued defending herself against the criminal proceedings arising from the events described above.

293. Plaintiff continued seeking evidence concerning the May 23, 2020 incident.

294. Plaintiff alleges that the City of Buffalo and multiple BPD officers possessed or had access to exculpatory evidence, including eyewitness information, AXON body-worn-camera data, and prior convictions of assault by Defendant Meadows.

295. Plaintiff alleges that Defendants Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

296. Plaintiff further alleges that Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain or suppressed a statement from a witness even though the witness's legal guardian expressly authorized police to interview the witness.

297. Plaintiff alleges that the resulting criminal prosecution proceeded without the benefit of material evidence favorable to Plaintiff's defense.

298. As a consequence of the criminal proceeding arising from the May 23, 2020 incident, an Order of Protection was issued against Plaintiff.

299. In approximately March 2021, Plaintiff was required to surrender two firearms to her father pursuant to that Order.

300. Plaintiff remained unable to possess the firearms until approximately July 2022.

301. Plaintiff alleges that the firearms restriction was a consequence of the criminal proceeding that she contends resulted from unconstitutional investigative and charging conduct.

302. Plaintiff does not allege that the mere issuance of a judicial Order of Protection independently creates liability against every Defendant.

303. Plaintiff alleges that liability for the firearms deprivation lies only against those Defendants whose independently unconstitutional conduct is proven to have proximately caused the criminal proceeding and resulting restriction.

304. The Petit Larceny and Criminal Mischief charges against Plaintiff ultimately were dismissed.

305. Plaintiff's assault charge arising from the May 23, 2020 incident ultimately was dismissed.

306. The felony Biological or Chemical Weapon charges against Plaintiff were ultimately dismissed by a grand jury for lack of probable cause.

**O. Plaintiff's Continuing Efforts to Obtain AXON Evidence**

307. Plaintiff continued seeking Dixon's complete AXON body-worn-camera footage after the criminal proceedings began.

308. Plaintiff repeatedly requested the footage from Defendant Rinaldo and other BPD personnel.

309. Plaintiff alleges that she sought the footage on multiple occasions beginning in 2020.

310. Plaintiff alleges that the complete footage was not produced despite her repeated requests and prior preservation demands.

311. Plaintiff alleges that she initially was informed that responsive footage did not exist.

312. In approximately March 2023, Plaintiff ultimately received only an approximately three-minute portion of body-worn-camera footage.

313. In approximately June 2023, Plaintiff obtained an AXON audit log.

314. Plaintiff alleges that the audit log indicated that Defendant Dixon had in fact been recording during the May 23, 2020 incident.

315. Plaintiff alleges that the audit information demonstrated that additional body-worn-camera evidence had existed.

316. Plaintiff subsequently obtained additional information concerning the handling of the footage.

317. Plaintiff alleges that those records indicated that Defendant Dixon had uploaded body-worn-camera footage.

318. Plaintiff further alleges that uploaded footage subsequently was deleted.

319. Plaintiff alleges that the later audit and records information materially contradicted the earlier representation that responsive footage did not exist.

320. Plaintiff alleges that Defendants Joyce, Lockwood, Farley, Rinaldo, and other BPD supervisory or records personnel previously had received notice of Plaintiff's complaints, preservation demands, or repeated attempts to obtain the evidence.

321. Plaintiff alleges that the loss, deletion, nonproduction, or inability to account for the complete footage prejudiced her ability to defend herself and establish what occurred during the May 23 investigation.

**P. Defendant Baskin and Plaintiff's Protected Speech**

322. Plaintiff regularly used social media to criticize elected officials and governmental agencies concerning matters of public concern.

323. Plaintiff's speech included criticism of Baskin.

324. Plaintiff's criticism concerned Baskin's governmental conduct and other matters of public concern.

325. Plaintiff alleges that Baskin maintained a Facebook page that she used in connection with her governmental office.

326. Plaintiff alleges that Baskin used the page to communicate with constituents and members of the public concerning governmental affairs.

327. Plaintiff alleges that the page functioned as a governmental social-media forum.

328. In or about 2021, Baskin blocked Plaintiff from the Facebook page after Plaintiff criticized Baskin.

329. The blocking prevented Plaintiff from accessing or participating in the forum to the extent restricted by Baskin's block.

330. Plaintiff alleges that Baskin blocked her because of the content and viewpoint of Plaintiff's criticism.

331. Plaintiff further alleges that Baskin thereafter changed or restricted the page in a manner that prevented private citizens from leaving public reviews or comments.

332. Plaintiff continued criticizing Baskin and other governmental officials after she was blocked.

333. In 2025, Plaintiff subsequently sought assistance from the Foundation for Individual Rights and Expression ("FIRE") concerning Baskin's continued blocking of Plaintiff.

334. Plaintiff complained that an elected governmental official had excluded her from a governmental social-media forum because of Plaintiff's protected criticism.

335. Plaintiff alleges that Baskin unblocked Plaintiff the day after Plaintiff made the FIRE complaint.

336. Plaintiff alleges that the timing of the restoration of access is circumstantial evidence that Baskin retained control over Plaintiff's exclusion from the page.

337. Plaintiff further alleges that the later restoration of access supports her contention that the prior exclusion had been deliberately maintained.

338. Plaintiff alleges that the later restoration of access is relevant to the nature, duration, and control of the original blocking.

**Q. Defendant Brown and Governmental Social Media**

339. Plaintiff also publicly criticized Defendant Brown while Brown served as Mayor of the City of Buffalo.

340. Plaintiff's criticism concerned governmental conduct and matters of public concern.

341. Plaintiff alleges that Brown maintained a Facebook page that he used in connection with his office as Mayor.

342. Plaintiff alleges that Brown used the page to communicate governmental information and interact with members of the public.

343. In or about 2020, Brown blocked Plaintiff from the Facebook page after Plaintiff criticized him.

344, Plaintiff alleges that the page functioned as an official governmental social-media forum.

345. Plaintiff alleges that Brown excluded Plaintiff because of the content and viewpoint of Plaintiff's criticism.

346. Plaintiff alleges that the blocking interfered with her ability to participate in communications occurring through the governmental page.

347. Plaintiff further alleges that Brown thereafter restricted or made the page private, thereby

limiting public participation.

348. Plaintiff seeks relief only for the violation of her own First Amendment rights and does not assert claims on behalf of other persons who may have been blocked.

**R. Continuing Protected First Amendment Activity**

349. Plaintiff continued publicly criticizing City and County officials after the events described above.

350. Plaintiff's speech concerned governmental accountability.

351. Plaintiff's speech concerned police practices and BPD's treatment of her complaints.

352. Plaintiff's speech concerned City property and code-enforcement practices.

353. Plaintiff's speech also concerned elected officials and other matters of public concem.

354. Plaintiff petitioned governmental agencies concerning alleged governmental misconduct.

355. Plaintiff submitted complaints concerning police conduct.

356. Plaintiff requested governmental records.

357. Plaintiff pursued administrative and judicial remedies.

358. Plaintiff also pursued litigation concerning governmental conduct.

359. Plaintiff alleges that these activities constituted protected speech and petitioning activity under the First Amendment.

360. Plaintiff does not allege that every governmental action occurring after her protected speech necessarily constituted retaliation.

361. Plaintiff alleges retaliation only where the responsible Defendant's knowledge, timing, statements, conduct, or other circumstances support an inference that Plaintiff's protected activity was a substantial or motivating factor.

**S. August 22, 2025 — Defendant Wojtanik**

362. Plaintiff previously interacted directly with Wojtanik in Wojtanik's capacity as a BPD employee.

363. During the March 2020 property dispute, Wojtanik communicated to Plaintiff that Plaintiff would be arrested for trespass if she entered the disputed area or again removed the fence.

363(a). On April 3, 2020, Wojtanik acknowledged Plaintiff's request to preserve footage from the March 29–31 responses and directed her to Buffalo's FOIL department. In June 2020, Wojtanik declined to identify the responding officer Plaintiff later learned was Dixon and told Plaintiff to seek his name through FOIL.

364. Plaintiff thereafter became a frequent public critic of BPD and other City officials.

365. Plaintiff publicly discussed her complaints concerning BPD conduct.

366. On or about August 22, 2025, Plaintiff alleges that Wojtanik became aware of Plaintiff's public criticism and governmental complaints.

367. Plaintiff alleges that Wojtanik subsequently joined a community Facebook group in which Plaintiff and Plaintiff's governmental complaints were discussed.

368. Plaintiff alleges that Wojtanik publicly characterized Plaintiff as unstable and otherwise disparaged Plaintiff in connection with those discussions.

369. Plaintiff alleges that Wojtanik laughed at, reacted to, or otherwise interacted with posts or comments ridiculing Plaintiff and her governmental complaints.

370. Plaintiff further alleges that Wojtanik subsequently interacted in a similar manner with multiple posts appearing on Plaintiff's personal social-media page.

371. Plaintiff alleges that Wojtanik's conduct was particularly significant because Wojtanik was a BPD employee who previously had personally communicated governmental threats of arrest to Plaintiff.

372. Plaintiff alleges that Wojtanik's later conduct demonstrated hostility toward Plaintiff because of Plaintiff's protected criticism and complaints concerning BPD and other governmental officials.

373. On August 22, 2025, Plaintiff moved in this action to join Wojtanik as a Defendant based upon the later conduct.

374. The Court granted Plaintiff's request to add Wojtanik as a Defendant.

375. The Court deemed Plaintiff's Second Amended Complaint to incorporate the allegations contained in Plaintiff's joinder motion.

376. Plaintiff alleges that Wojtanik's conduct would deter a person of ordinary firmness from continuing to complain about and criticize governmental actors.

**T. Governmental Criminal-History Record Concerning Plaintiff**

377. In July of 2022, an unredacted governmental criminal-history compilation concerning Plaintiff was disclosed outside ordinary governmental channels to Meadows.

378. The document contained Plaintiffs photograph.

379. The document contained Plaintiff's full name and other personally identifying information.

380. The document contained governmental identifiers.

381. The document contact a FBI and RICI number.

382. The document contained Plaintiff's sealed arrest-history information.

383. The document included arrests or accusations that did not result in criminal convictions.

384. Plaintiff subsequently obtained an official Criminal History Record Search reflecting that Plaintiff had no criminal convictions.

385. Plaintiff alleges that Defendant Meadows nevertheless obtained or possessed the governmental criminal-history document.

386. Plaintiff presently does not know the identity of the governmental employee who originally accessed, furnished, transmitted, copied, or released the governmental record.

387. Plaintiff therefore identifies the responsible governmental employee as a John/Jane Doe Defendant pending discovery.

388. Plaintiff alleges upon information and belief that the Doe Defendant obtained access to the record through governmental employment, governmental database credentials, governmental custody, or governmental authority unavailable to an ordinary private citizen.

389. Plaintiff alleges that the Doe Defendant therefore was able to access or obtain the governmental compilation by virtue of governmental authority.

390. Plaintiff later obtained documentary information concerning the procedure for requesting a BPD criminal-history record.

391. Plaintiff alleges that the procedure required an individual seeking his or her criminal-history record to appear personally and present government-issued photographic identification.

392. Plaintiff alleges that this procedure is circumstantial evidence that the governmental compilation at issue was maintained under controlled governmental access.

393. Plaintiff does not allege that an arrest itself was secret.

394. Plaintiff does not allege that ordinary public court records could never disclose information concerning an arrest.

395. Plaintiff instead alleges that the particular government-generated compilation containing assembled law-enforcement information and personal identifiers reached a private adversary through governmental access outside ordinary procedures.

**U. Continuing Dissemination of Plaintiffs Criminal-History Record**

396. After the governmental record left governmental custody, copies of the document circulated among private individuals.

397. Plaintiff alleges that the document also circulated on social media.

398. Plaintiff alleges that the document was republished on multiple occasions over a period of four (4) years.

399. Plaintiff alleges that the record was used to portray her as a convicted criminal or as a person engaged in repeated criminal conduct.

400. Plaintiff repeatedly attempted to correct that implication.

401. Plaintiff produced official criminal-history information reflecting that she had no criminal convictions.

402. Plaintiff alleges that the governmental record nevertheless continued to circulate.

403. Plaintiff alleges that its continuing dissemination caused reputational injury.

404. Plaintiff alleges that its continuing dissemination caused professional injury.

405. Plaintiff alleges that its continuing dissemination caused emotional distress.

406. Plaintiff further alleges that the electronic nature of the document made continuing republication foreseeable once the unredacted governmental record was released outside governmental custody.

**V. Differential Handling of Meadows's Criminal History**

407. Plaintiff possesses governmental criminal-history information concerning Meadows.

408. Plaintiff alleges that Meadows previously sustained an assault conviction.

409. Plaintiff alleges that Meadows was sentenced to a period of probation in connection with that conviction.

410. Plaintiff also possesses a separate governmental record obtained during criminal discovery concerning Meadows.

411. Plaintiff alleges that the later governmental record states that Meadows had no criminal record.

412. Plaintiff alleges that the records therefore materially conflict concerning Meadows's criminal history.

413. Plaintiff is unaware of a lawful sealing, vacatur, expungement, or other statutory disposition explaining the absence of the prior conviction from the later governmental record.

414. Plaintiff does not presently know why the records conflict.

415. Plaintiff alleges that discovery is necessary to determine the reason for the discrepancy.

416. Plaintiff alleges that her own non-conviction arrest information was assembled and disseminated outside governmental channels.

417. By contrast, Plaintiff alleges that Defendant Meadows's prior conviction was absent from a later governmental criminal-history record.

418. Plaintiff alleges that both women were participants in the same longstanding dispute and repeatedly interacted with the same local governmental institutions.

419. Plaintiff alleges that the materially different handling of their criminal-history information is additional evidence of the unequal governmental treatment alleged herein.

420. Plaintiff alleges that this disparity must be considered together with the repeated differences in police enforcement described above and racial discrimination.

**W. Continuing Notice to the City of Buffalo**

421. Beginning in 2020 and continuing thereafter, Plaintiff repeatedly notified City officials and BPD supervisory personnel concerning the conduct described throughout this Complaint.

422. Plaintiff complained to BPD Internal Affairs.

423. Plaintiff complained to supervisory BPD personnel.

424. Plaintiff complained to City officials.

425. Plaintiff communicated with City inspectors and other governmental offices concerning the property-related conduct.

426. Plaintiff repeatedly sought governmental records concerning the police investigation and body-worn-camera evidence.

427. Plaintiff's complaints included allegations of unequal police enforcement.

428. Plaintiffs complaints included threats of arrest concerning Plaintiff's property.

429. Plaintiff's complaints included concerns about inadequate police investigation.

430. Plaintiff's complaints included concerns regarding favorable eyewitness evidence.

431. Plaintiff's complaints included concerns regarding body-worn-camera preservation.

432. Plaintiff sent specific preservation demands concerning body-worn-camera evidence shortly after the May 23, 2020 incident.

433. Plaintiff alleges that despite repeated notice, materially similar conduct continued.

434. Plaintiff alleges that subsequent events included continued refusals to enforce her Order of Protection.

435. Plaintiff alleges that subsequent events included additional criminal charges initiated against her.

436. Plaintiff alleges that subsequent events included continuing interference with her property rights.

437. Plaintiff alleges that she remained unable to obtain the complete body-worn-camera evidence despite her prior preservation demands.

438. Plaintiff further alleges later retaliatory conduct by a BPD employee.

439. Plaintiff alleges that the duration and repetition of the conduct, involvement of multiple City employees and departments, and repeated notice to supervisory personnel support her municipal-liability allegations.

**X. Emotional and Psychological Injuries**

440. The events described herein occurred over a period of several years.

441. Plaintiff alleges that the repeated criminal proceedings caused substantial emotional distress.

442. Plaintiff alleges that the repeated denial of police protection caused substantial emotional distress.

443. Plaintiff alleges that threats of arrest concerning her own property and her ability to access and repair her residence caused substantial emotional distress.

444. Plaintiff alleges that the prolonged property dispute and governmental interference with her ability to safely maintain and repair her residence caused fear and disruption within her own home.

445. Plaintiff alleges that the dissemination and repeated republication of her governmental criminal-history information caused humiliation, reputational injury, and substantial emotional distress.

446. Plaintiff further alleges that the prolonged course of conduct attributed to Defendant Meadows caused severe emotional and psychological distress.

447. Plaintiff experienced anxiety.

448. Plaintiff experienced depression.

449. Plaintiff experienced fear and humiliation.

450. Plaintiff experienced loss of enjoyment of life.

451. Plaintiff experienced substantial disruption of her sense of security within her own residence.

452. Plaintiff alleges that the prolonged events also substantially interfered with her personal and professional life.

453. Plaintiff ultimately sought professional mental-health treatment.

454. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder ("GAD").

455. Plaintiff subsequently was diagnosed with Major Depressive Disorder ("MDD").

456. Plaintiff alleges that the prolonged conduct described herein, including the conduct of Meadows, was a substantial cause of or substantially contributed to Plaintiff's emotional and psychological injuries.

457. Plaintiff will rely upon her medical and mental-health records and other admissible evidence concerning diagnosis, treatment, causation, severity, duration, and prognosis to the extent supported by those records.

458. Plaintiff alleges that her psychological injuries are continuing.

**Y. Continuing Reputational, Professional, and Economic Injury**

459. Plaintiff alleges that certain injuries caused by the conduct described herein remain ongoing.

460. Copies of Plaintiff's governmental criminal-history record remain outside governmental custody.

461. Plaintiff alleges that those copies remain capable of continued electronic copying, dissemination, and republication.

462. Plaintiff alleges that the record has been used publicly to portray her through arrests and criminal accusations notwithstanding her official criminal-history search reflecting no criminal convictions.

463. Plaintiff alleges that the continuing circulation of the governmental record has damaged her reputation within the community.

464. Plaintiff provides tax-preparation, bookkeeping, and related financial services.

465. Plaintiff alleges that professional trust, honesty, competence, reputation, referrals, and community relationships are important to her ability to obtain and retain clients.

466. Plaintiff alleges that public circulation of governmental criminal-history information portraying her through repeated arrests and criminal accusations foreseeably impaired her professional reputation.

467. Plaintiff alleges that the continuing dissemination caused or contributed to loss of professional standing, business opportunities, and public confidence.

468. Plaintiff seeks recovery only for economic losses that she can establish through admissible evidence and causally attribute to actionable conduct by the Defendants.

469. Plaintiff further alleges continuing property-related expenses and losses resulting from governmental interference with her ability to access, maintain, protect, and repair her residence.

470. Plaintiff alleges that she suffered loss of the use and possession of her firearms during the period in which she was required to surrender them.

471. Plaintiff alleges that the cumulative constitutional, reputational, professional, property-related, and psychological injuries described herein have caused substantial damages.

## CAUSES OF ACTION

## COUNT I 42 U.S.C. § 1983 — FIRST AMENDMENT

### Viewpoint Discrimination Against Defendant April Baskin

472. Plaintiff repeats and realleges paragraphs 1 through 471 as though fully incorporated and set forth herein.

473. At all relevant times, Defendant Baskin was an elected governmental official.

473. Plaintiff alleges that Baskin acted under color of state law when administering and controlling the governmental Facebook page described herein.

475. Baskin maintained and used the Facebook page in connection with her governmental office and communications with constituents and members of the public.

476. Plaintiff used Facebook to criticize Baskin concerning governmental conduct and matters of public concern.

477. Plaintiff's criticism of an elected governmental official constituted speech protected by the First Amendment.

478. Plaintiff alleges that the Facebook page functioned as a governmental social-media forum.

479. Baskin blocked Plaintiff from the page after Plaintiff criticized her.

480. Plaintiff alleges that Baskin blocked Plaintiff because of the content and viewpoint of Plaintiff's criticism.

481. The blocking prevented Plaintiff from accessing or participating in the governmental forum to the extent restricted by Baskin's block.

482. Plaintiff alleges that Baskin thereafter restricted the page in a manner that further limited public participation.

483. Plaintiff later sought assistance from FIRE concerning her continued exclusion.

484. Plaintiff alleges that Baskin restored Plaintiff's access the following day.

485. Plaintiff alleges that the timing of the restoration supports her contention that Baskin retained control over the exclusion and that the blocking had been deliberately maintained.

486. The later restoration of access did not eliminate the constitutional injury allegedly sustained during the period of viewpoint-based exclusion.

487. Plaintiff alleges that Baskin's conduct constituted viewpoint discrimination in violation of the First Amendment.

488. As a direct and proximate result, Plaintiff suffered constitutional injury and the other damages alleged herein.

**COUNT II 42 U.S.C. § 1983 — FIRST AMENDMENT**

**Viewpoint Discrimination Against Defendant Byron W. Brown**

489. Plaintiff repeats and realleges paragraphs 1 through 488 as though fully incorporated and set forth herein.

490. At all relevant times, Defendant Brown served as Mayor of the City of Buffalo.

491. Plaintiff alleges that Brown acted under color of state law when administering and controlling the governmental Facebook page described herein.

492. Brown maintained and used the Facebook page in connection with his office as Mayor and communications with members of the public.

493. Plaintiff publicly criticized Brown concerning governmental conduct and matters of public concern.

494. Plaintiff's criticism constituted protected First Amendment activity.

495. Plaintiff alleges that Brown's Facebook page functioned as an official governmental social-media forum.

496. Plaintiff alleges that Brown blocked Plaintiff from the page after Plaintiff criticized him.

497. Plaintiff alleges that Brown blocked Plaintiff because of the content and viewpoint of Plaintiff's criticism.

498. The blocking prevented Plaintiff from participating in the governmental forum to the extent restricted by Brown's block.

499. Plaintiff further alleges that Brown thereafter restricted or made the page private, limiting public participation.

500. Plaintiff alleges that Brown's conduct constituted viewpoint discrimination in violation of the First Amendment.

501. Plaintiff secks relief only for the violation of her own First Amendment rights.

502. Plaintiff suffered constitutional injury and other damages as a direct and proximate result of the alleged exclusion.

**COUNT III 42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION**

**Against Defendant Maureen Wojtanik**

503. Plaintiff repeats and realleges paragraphs 1 through 502 as though fully incorporated and set forth herein.

504. Plaintiff engaged in activity protected by the First Amendment.

505. That activity included publicly criticizing BPD and City officials.

506. That activity included submitting complaints concerning governmental misconduct.

507. That activity included petitioning governmental entities for redress.

508. That activity included pursuing litigation concerning governmental conduct.

509. Defendant Wojtanik previously interacted directly with Plaintiff in Wojtanik's capacity asa BPD employee.

510. Plaintiff alleges that Wojtanik knew of Plaintiff's complaints and public criticism conceming BPD and governmental officials.

511. Plaintiff alleges that Wojtanik thereafter participated in social-media discussions concerning Plaintiff and Plaintiff's governmental complaints.

512. Plaintiff alleges that Wojtanik publicly characterized Plaintiff as unstable or otherwise disparaged Plaintiff.

513. Plaintiff alleges that Wojtanik laughed at, reacted to, or otherwise interacted with posts or comments ridiculing Plaintiff and her complaints.

514. Plaintiff alleges that Wojtanik subsequently engaged in similar conduct concerning multiple posts on Plaintiff's personal social-media page.

515. Plaintiff alleges that Wojtanik's conduct was motivated by Plaintiff's protected criticism, complaints, and petitioning activity.

516. Plaintiff alleges that retaliatory conduct by a BPD employee who previously had communicated governmental threats of arrest to Plaintiff would deter a person of ordinary firmness from continuing to criticize or complain about that governmental agency.

517. Plaintiff alleges that Wojtanik's conduct caused emotional distress, humiliation, chilling of protected activity, and other damages.

518. Plaintiff therefore alleges that Wojtanik retaliated against her for protected First Amendment activity in violation of 42 U.S.C. § 1983.

## COUNT IV 42 U.S.C. § 1983 — FOURTH AMENDMENT

## Malicious Prosecution Arising From the May 23, 2020 Incident Against Defendants Dixon, Nightingale-Griffin, DiPasquale, Reese, Redmon and Other Personally Involved Defendants

519. Plaintiff repeats and realleges paragraphs 1 through 518 as though fully incorporated and set forth herein.

520. Plaintiff alleges that Defendants Dixon, Nightingale-Griffin, DiPasquale, Reese, Redmon and other personally involved Defendants caused, initiated, or continued criminal proceedings against Plaintiff arising from the May 23, 2020 confrontation.

521. Plaintiff alleges that Dixon arrived at the scene after Plaintiff had sustained visible physical injuries during the confrontation with Meadows.

522. Multiple eyewitnesses were available to provide information concerning the confrontation.

523. Plaintiff alleges that at least three witnesses possessed information favorable to Plaintiff's account.

524. Plaintiff alleges that Dixon refused or failed to obtain statements from those witnesses.

525. Plaintiff alleges that Dixon accused Plaintiff of lying and fabricating her account before completing a neutral investigation of the available evidence.

526. Plaintiff further alleges that Dixon threatened to tase an individual who questioned his refusal to obtain available witness statements.

527. Plaintiff alleges that Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain, preserve, disclose, or accurately transmit materially favorable eyewitness information.

528. Plaintiff alleges that one witness's legal guardian expressly authorized police to interview the witness.

529. Plaintiff alleges that Defendants nevertheless failed to obtain or suppressed that witness's statement.

530. Plaintiff further alleges that one responding officer expressed concern that Plaintiff was being charged even though that officer did not believe Plaintiff had been the aggressor.

531. Plaintiff alleges that subsequent criminal discovery revealed discrepancies between available eyewitness information and information transmitted in connection with Plaintiff's prosecution.

532. Plaintiff further alleges that material body-worn-camera evidence existed concerning the May 23 investigation.

533. Plaintiff alleges that Dixon asked other responding officers whether their body-worn cameras were turned off before turning off his own camera.

534. Plaintiff alleges that despite preservation demands beginning shortly after the incident, the complete body-worn-camera evidence was not produced.

535. Plaintiff later obtained AXON audit information indicating that Dixon had in fact been recording during the incident.

536. Plaintiff alleges that subsequent records indicated that additional uploaded footage had existed and later was deleted.

537. On December 5, 2020, Defendant Reese signed an Information/Complaint charging Plaintiff with Assault in the Third Degree.

538. Plaintiff alleges that when Reese executed the charging instrument, the investigative record contained or reasonably should have contained Plaintiff's injuries, her claim of self-defense, and materially favorable eyewitness information.

539. Plaintiff alleges that the responsible Defendants lacked probable cause to initiate or continue the criminal proceeding after consideration of the materially favorable information available to BPD.

540. Plaintiff alleges that the responsible Defendants acted maliciously or with reckless disregard for Plaintiff's rights by initiating or continuing the proceeding on a materially incomplete or distorted factual record.

541. Plaintiff was not physically arrested, detained, jailed, or confined in connection with the charge.

542. Plaintiff nevertheless was subjected to compulsory criminal process and was required to appear in criminal court and defend herself.

543. The initial felony assault accusation was reduced to a misdemeanor before the criminal court issued an order of protection requiring Plaintiff to surrender all firearms.

544. Pursuant to the order, Plaintiff surrendered two firearms in approximately March 2021.

545. Plaintiff could not possess or use those firearms until approximately July 2022. Plaintiff alleges that this temporary loss of use resulted from the prosecution and seeks compensatory damages for the loss to the extent proven.

546. The assault proceeding ultimately terminated in Plaintiff's favor through dismissal.

547. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, restrictions resulting from the criminal proceeding, and other damages.

## COUNT V 42 U.S.C. § 1983 — FOURTH AMENDMENT

### Malicious Prosecution Arising From the January 18, 2021 Charges Against Defendant Jacob Salazar and Other Personally Involved Defendants

548. Plaintiff repeats and realleges paragraphs 1 through 547 as though fully incorporated and set forth herein.

549. Before January 18, 2021, Meadows placed objects or structures upon property Plaintiff claimed as her own.

550. Plaintiff removed those objects from her property.

551. Meadows thereafter accused Plaintiff of theft and property damage.

552. Plaintiff alleges that Meadows supplied materially false information concerning ownership of the property and the circumstances surrounding Plaintiff's removal of the objects.

553. On January 18, 2021, Defendant Salazar charged Plaintiff with Petit Larceny and Criminal Mischief.

554. Salazar issued Plaintiff an appearance ticket requiring Plaintiff to answer the charges in criminal court.

555. Plaintiff was not physically arrested, detained, jailed, or confined.

556. Plaintiff alleges that BPD personnel already were aware of the longstanding property-boundary dispute.

557. Plaintiff further alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

558. Plaintiff alleges that the underlying conduct involved Plaintiff's removal of objects Meadows had placed upon property belonging to Plaintiff.

559. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Petit Larceny.

560. Plaintiff alleges that Salazar lacked probable cause to charge Plaintiff with Criminal Mischief.

561. Plaintiff alleges that Defendants Joyce, Farley, and Lockwood participated in, caused, directed, or agreed to the charging decision only to the extent established by Plaintiff's prior operative pleading and discovery.

562. Plaintiff alleges that the responsible Defendants caused Plaintiff to be subjected to criminal process without probable cause.

563. Plaintiff was required to appear in criminal court and defend herself against the charges.

564. The Petit Larceny and Criminal Mischief proceedings ultimately terminated in Plaintiff's favor through dismissal.

565. Plaintiff alleges malice based upon the circumstances surrounding the charges, including the known property dispute and alleged materially false information concerning ownership.

566. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, and other damages.

## COUNT VI 42 U.S.C. § 1983 — FOURTH AMENDMENT

### Malicious Prosecution Arising From the September 20, 2021 Charge Against Defendant Kyle Moriarity and Other Personally Involved Defendants

567. Plaintiff repeats and realleges paragraphs 1 through 566 as though fully incorporated and set forth herein.

568. On or about September 20, 2021, Plaintiff's son contacted 911 because Plaintiff alleges that Defendant Meadows was threatening Plaintiff.

569. Defendant Meadows thereafter accused Plaintiff of intentionally coughing in her direction from behind a 6-foot privacy fence.

570. Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

571. Moriarity issued Plaintiff an appearance ticket requiring Plaintiff to answer the felony charge in criminal court.

572. Plaintiff was not physically arrested, detained, jailed, or confined.

573. Plaintiff alleges that she did not possess a chemical or biological weapon.

574. Plaintiff alleges that she did not deploy a chemical or biological weapon.

575. Plaintiff alleges that the factual accusation underlying the felony charge consisted of Defendant Meadows's allegation that Plaintiff intentionally coughed in her direction and a purported video of the incident.

576. Plaintiff alleges that the circumstances known or reasonably available to Moriarity included or should have included the fact that Plaintiff's son had contacted 911 concerning Defendant Meadows's conduct toward Plaintiff.

577. Plaintiff alleges that Moriarity lacked probable cause to charge Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree.

578. Plaintiff alleges that the proceeding was initiated maliciously or with reckless disregard for the absence of probable cause.

579. Plaintiff alleges that the criminal proceeding ultimately terminated without a conviction by a Grand Jury for lack of probable cause.

## COUNT VII 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT

### Denial of Equal Protection in Police Protection and Enforcement Against Morrow, Costantino, Skrzvnski, Salazar, Cullen, Dixon, Moriarity, and Other Personally Involved Defendants

580. Plaintiff repeats and realleges paragraphs 1 through 579 as though fully incorporated and set forth herein.

581. Plaintiff does not claim a constitutional entitlement to have every complaint investigated.

582. Plaintiff does not claim a constitutional entitlement to have every person she accused arrested or prosecuted.

583. Plaintiff instead alleges that Defendants intentionally administered governmental police protection and enforcement according to materially different standards depending upon whether Plaintiff or Defendant Meadows sought governmental intervention.

584. Plaintiff obtained a judicial Order of Protection against Meadows on October 15, 2020.

585. Plaintiff thereafter repeatedly sought BPD enforcement of that Order.

586. Plaintiff alleges that BPD personnel repeatedly refused or failed to enforce the Order over an extended period.

587. Defendant Morrow expressly advised Plaintiff that BPD would not enforce the Order unless Meadows physically assaulted Plaintiff.

588. Plaintiff alleges that the Order itself contained no such requirement.

589. Defendants Costantino and Skrzvnski separately advised Plaintiff that they could not enforce the Order because it was not present in the governmental system.

590. Plaintiff alleges that her valid Order subsequently was missing from the New York State Registry through no action of Plaintiff.

591. Plaintiff alleges that the absence of the Order materially interfered with her ability to obtain governmental enforcement of judicial protection already afforded to her.

592. Plaintiff further alleges materially different treatment concerning her complaints of property crimes.

593. On May 23, 2020, Plaintiff discovered her missing fence panel in Meadows's yard.

594. Salazar and Cullen retrieved the panel and returned it to Plaintiff.

595. Salazar and Cullen nevertheless refused to prepare a theft report against Meadows despite charging Plaintiff with Petit Larceny in January of 2018.

596. Later that same day, Meadows allegedly returned with an electric saw and cut the same fence panel.

597. Plaintiff alleges that Meadows thereafter physically attacked Plaintiff during the resulting confrontation.

598. Plaintiff alleges that when Meadows accused Plaintiff of criminal conduct, BPD personnel repeatedly exercised coercive criminal authority against Plaintiff.

599. Those actions included the prosecution arising from the May 23, 2020 incident.

600. Those actions included the January 18, 2021 Petit Larceny and Criminal Mischief charges.

601. Those actions included the September 20, 2021 felony charge.

602. Plaintiff alleges that the contrasting treatment occurred repeatedly.

603. Plaintiff alleges that the contrasting treatment involved multiple BPD personnel.

604. Plaintiff alleges that the contrasting treatment continued after Plaintiff repeatedly complained to supervisory personnel.

605. Plaintiff further alleges that racial considerations expressly entered the May 23 investigation when Meadows referred to Plaintiff in racial terms and asserted that Plaintiff received favorable governmental treatment because Plaintiff was white.

606. Plaintiff alleges that the differential treatment was intentional.

607. Plaintiff alleges that there was no rational governmental basis for applying materially different standards of police protection and enforcement to Plaintiff and Meadows.

608. Plaintiff alleges that the unequal administration of governmental protection deprived her of equal protection of the laws.

609. Plaintiff suffered loss of governmental protection, compulsory criminal proceedings, reputational injury, emotional distress, financial loss, and other damages.

**COUNT VIII 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**

**Deprivation of Property and Arbitrary Governmental Interference Against Kurdziel, Wojtanik, Curtin, Myers, Bifaro, Salazar, Doe Officers, and Other Personally Involved Defendants**

610. Plaintiff repeats and realleges paragraphs 1 through 609 as though fully incorporated and set forth herein.

611. Plaintiff possessed protected property interests in the ownership, possession, use, maintenance, repair, and control of her real property.

612. In March 2020, Plaintiff's furnace exhaust was damaged or disconnected and required repair.

613. Plaintiff attempted to access the north side of her residence to make the necessary repair.

614. BPD Doe officers threatened Plaintiff with arrest for trespass if she entered the disputed area.

615. Plaintiff removed a fence from property she claimed as her own to gain access to the damaged exhaust.

616. Defendant Kurdziel threatened Plaintiff with arrest and compelled her to reinstall the fence.

617. Plaintiff alleges that this materially interfered with her ability to repair the dangerous furnace condition.

618. Curtin and Myers subsequently inspected the property.

619. Curtin and Myers determined that Plaintiff owned at least approximately 1.5 feet along the north side of Plaintiff's residence.

620. Curtin and Myers further determined that repair of the furnace exhaust was critical.

621. Defendant Wojtanik nevertheless advised Plaintiff that she would be arrested for trespass if she entered the same area.

622. Wojtanik further advised Plaintiff that she would be arrested if she again removed the fence.

623. Curtin and Myers told Plaintiff that she could not erect her own fence to protect the property.

624. Curtin and Myers told Plaintiff that they would remove the fence if Plaintiff erected one.

625. Curtin and Myers subsequently apologized for those statements.

626. Defendant Bifaro inspected Plaintiff's furnace on April 20, 2020, and determined that it was up to code.

627. On May 12, 2020, Bifaro nevertheless demanded that Plaintiff relocate the existing exhaust because Meadows was complaining.

628. Plaintiff refused absent a court order establishing Meadows's legal right to require relocation.

629. Bifaro advised Plaintiff that she could relocate the exhaust or face court proceedings concerning an alleged permit issue.

630. Plaintiff further alleges that Bifaro threatened Plaintiff's HVAC contractor with enforcement consequences based upon his licensing status if he refused to relocate the exhaust.

631. A BPD Doe officer subsequently threatened Plaintiff with criminal charges if she did not relocate the exhaust.

632. Defendant Salazar subsequently advised Plaintiff concerning the fence and disputed property area in a manner Plaintiff alleges treated Meadows's asserted property rights as enforceable despite the absence of a judicial determination establishing those rights.

633. Plaintiff alleges that Defendants thereby used or threatened police, inspection, code-enforcement, and other governmental authority to restrict Plaintiff's use and control of property that City inspectors themselves had determined belonged to Plaintiff.

634. Plaintiff alleges that no judicial determination had established Meadows's claimed property rights before the governmental restrictions and threats were imposed.

635. Plaintiff alleges that the governmental conduct was arbitrary because officials simultaneously recognized Plaintiff's ownership and the necessity of repairs while threatening governmental sanctions if Plaintiff exercised those ownership rights.

636. Plaintiff alleges that she was deprived of meaningful use, access, control, maintenance, and enjoyment of her property.

637. Plaintiff suffered repair delays, financial loss, emotional distress, loss of use and enjoyment, and other damages.

## COUNT IX 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT

**Equal Protection — Unequal Treatment of Criminal-History Information Against John/Jane Doe Governmental Discloser and Other Personally Involved Defendants**

638. Plaintiff repeats and realleges paragraphs 1 through 637 as though fully incorporated and set forth herein.

639. In May 2022, Plaintiff reported to police that Defendant Meadows had assaulted her.

640. By July 2022, Meadows had obtained a Buffalo Police generated rap sheet bearing identifying information of the Plaintiff. The record was publicly posted that month.

641. The posted document identifies the Buffalo Police Department as the agency that generated it. It contains Plaintiff's photograph, identifying information, and entries about arrests and charges that did not result in convictions.

642. In a sworn affidavit filed in her federal action, Meadows stated that she requested Plaintiff's record through FOIL and obtained it. *See Meadows v. Buffalo Police Department, et al. 1:21-cv-00449.*

643. Based on Meadows's sworn account and the document's identifying information, Plaintiff alleges on information and belief that the record came from Buffalo. Plaintiff does not know the date of its release or the identity of the employee who processed or authorized it.

644. When Plaintiff requested her own RAP sheet under FOIL, BPD responded that it could not send the record through FOIL because identity had to be verified. BPD instructed Plaintiff to appear at 68 Court Street with photo identification and $10. It also described a mail option requiring notarized documents, a money order, and a self-addressed envelope.

645. Plaintiff subsequently requested from Buffalo any FOIL request Meadows submitted for Plaintiff's RAP sheet. Buffalo did not produce a request from Meadows in response.

646. In its written response describing its identity-verification procedures, BPD directed criminal-history audit requests to Erie County because the County maintains the systems used by BPD and other agencies.

647. Plaintiff relies on the differing accounts of how access to the same BPD-generated record was handled to support her allegation of unequal treatment. Plaintiff alleges on information and belief that a government employee used access available through official duties to release the record. Plaintiff does not know whether Meadows submitted identification or authorization or whether another procedure was used.

648. Plaintiff alleges that officials intentionally applied materially different standards to requests for access to the same record without a rational basis. Plaintiff bases that inference on BPD's

stated identity-verification requirement, Meadows's sworn account of obtaining the record through FOIL, and Buffalo's failure to produce a request by Meadows.

649. Plaintiff is an accountant and tax preparer whose work depends on clients and referral sources trusting her with sensitive financial information. Plaintiff alleges that the public circulation of the record damaged her reputation for honesty and reliability and harmed her professional standing.

650. Plaintiff alleges that the record was used to portray her as a convicted criminal. Plaintiff sought to correct that implication by producing official criminal-history information reflecting that she had no criminal convictions.

651. Plaintiff seeks compensatory damages for reputational and professional injury and for resulting economic loss to the extent proven.

## COUNT X 42 U.S.C. § 1985

### Conspiracy to Interfere With Civil Rights Against Meadows, Dixon, Nightingale-Griffin, DiPasquale, Reese, Redmon, Morrow and Other Defendants Proven to Have Knowingly Joined the Alleged Agreement

652. Plaintiff repeats and realleges paragraphs 1 through 651 as though fully incorporated and set forth herein.

653. On May 23, 2020, Meadows and Dixon privately communicated during an active police investigation concerning Plaintiff.

654. Meadows demanded that Plaintiff be subjected to criminal charges.

655. During the May 23, 2020 response, Meadows and Dixon discussed the George Floyd movement. Meadows told Dixon that she was receiving unfavorable treatment because she was Black and Plaintiff was white. Plaintiff alleges that assertion was false.

656. Plaintiff further alleges Meadows invoked Defendant Baskin's name, as she did din New York State Supreme Court and referred to Baskin as her "good friend".

657. During the same response, Dixon accused Plaintiff of lying and told other officers she had changed her account. Plaintiff alleges she had not changed her account.

658. Plaintiff alleges that Dixon refused or failed to obtain statements from multiple witnesses possessing information favorable to Plaintiff.

659. Plaintiff alleges that Dixon threatened to tase an individual who questioned his refusal to obtain available witness statements.

660. Plaintiff further alleges that Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

661. Plaintiff alleges that subsequent criminal discovery revealed discrepancies concerning eyewitness information and the charging process.

662. Plaintiff further alleges that body-worn-camera and AXON audit information revealed circumstances concerning the investigation that were not disclosed or available to Plaintiff when the prosecution began.

663. Plaintiff alleges that the communications between Meadows and Dixon, the introduction of racial considerations into the investigation, the subsequent handling of favorable evidence, and the resulting prosecution support an inference of concerted action.

664. Plaintiff alleges that the object of the alleged agreement included subjecting Plaintiff to unequal governmental treatment and criminal process.

665. Plaintiff alleges that the conspiracy was motivated, at least in part, by discriminatory animus expressly introduced into the May 23 investigation.

666. Plaintiff alleges that overt acts in furtherance of the alleged agreement included rejection of Plaintiff's account before completion of a neutral investigation.

667. Plaintiff alleges that overt acts included failure to obtain or accurately transmit favorable eyewitness information.

668. Plaintiff alleges that overt acts included initiation or continuation of criminal proceedings against Plaintiff.

669. Plaintiff alleges that overt acts included the related evidence-handling conduct described herein.

670. Plaintiff asserts this Count against additional Defendants only to the extent evidence establishes that a particular Defendant knowingly joined the alleged agreement.

671. Defendants City of Buffalo and Meadows reached a meeting of the minds to violate Plaintiff's constitutional rights. Specifically, a state actor with the City of Buffalo agreed to abuse their official position and authority under color of law to access, retrieve, and unlawfully hand over Plaintiff's private, sealed, and inaccurate Buffalo City rap sheet and sensitive identifiers directly to Meadows.

672. This agreement was executed with the joint intent to inflict constitutional injury upon the Plaintiff, specifically violating Plaintiff's Fourteenth Amendment right to informational privacy regarding highly sensitive, unredacted data, and to perpetuate First Amendment retaliation by creating a smear campaign to destroy Plaintiff's public credibility and undermine Plaintiff's ongoing official complaints against municipal misconduct.

673. John/Jane Doe with the City of Buffalo utilized state law enforcement databases under color of law to pull the confidential file without a legitimate law enforcement purpose.

674. The state actor transmitted the inaccurate and unredacted file to Defendant Meadows.

675. Defendant Meadows, acting in concert with and as a joint state-actor under section 1983, executed her role in the conspiracy by actively weaponizing the leaked government document and publicly posting it on social media and sharing with other third-parties.

676. Plaintiff does not allege that an individual joined a conspiracy merely because that individual performed ordinary governmental duties or participated at a different stage of an investigation.

677. As a direct and proximate result of this conspiratorial state-private action under color of law, Plaintiff suffered compulsory criminal proceedings, reputational injury, emotional distress, financial injury, and other damages.

**COUNT XI 42 U.S.C. § 1986**

**Neglect to Prevent Civil-Rights Conspiracy**

**Against Defendants With Actual Knowledge and the Ability to Prevent the Violation**

678. Plaintiff repeats and realleges paragraphs 1 through 677 as though fully incorporated and set forth herein.

679. Plaintiff pleads this claim only to the extent she establishes an actionable conspiracy under 42 U.S.C. § 1985.

680. Plaintiff alleges that certain governmental Defendants obtained actual knowledge of the actionable conspiracy while possessing authority or a reasonable ability to prevent or mitigate the resulting deprivation.

681. Shortly after the May 23, 2020 incident, Plaintiff repeatedly complained to BPD supervisory and Internal Affairs personnel concerning Dixon's conduct.

682. Plaintiff complained concerning the failure to obtain favorable eyewitness information.

683. Plaintiff complained concerning what she believed to be discriminatory treatment during the investigation.

684. Plaintiff sent preservation demands concerning Dixon's AXON body-worn-camera evidence to Defendants Joyce and Lockwood.

685. Plaintiff repeatedly complained to Internal Affairs, including Defendant Farley, concerning the May 23 investigation and related police conduct.

686. Plaintiff alleges that supervisory personnel therefore possessed actual notice of the alleged conduct while evidence remained capable of preservation and while the criminal proceeding remained ongoing.

687. Plaintiff alleges that despite that notice, the alleged constitutional injuries were not prevented or adequately mitigated.

688. Plaintiff further alleges that complete body-worn-camera evidence subsequently became unavailable.

689. Plaintiff later obtained records indicating that additional footage previously had existed.

690. Plaintiff asserts liability under §1986 only against a Defendant proven to have possessed actual knowledge of an actionable §1985 conspiracy.

691. Plaintiff further must establish that the Defendant possessed the power to prevent or aid in preventing the conspiracy and wrongfully failed to exercise that power.

692. Plaintiff suffered the injuries and damages described throughout this Complaint.

**COUNT XII 42 U.S.C. § 1983 — MUNICIPAL LIABILITY UNDER MONELL**

**Against Defendant City of Buffalo**

693. Plaintiff repeats and realleges paragraphs 1 through 692 as though fully incorporated and set forth herein.

694. Plaintiff does not seek to hold the City of Buffalo liable under §1983 merely because it employed one or more individual Defendants.

695. Plaintiff alleges that the constitutional deprivations described herein resulted from persistent municipal customs or practices, failures of supervision or discipline, inadequate evidence-preservation safeguards, and deliberate indifference after repeated notice.

**A. Unequal Administration of Police Protection**

696. Plaintiff alleges that multiple BPD personnel repeatedly applied materially different standards depending upon whether Plaintiff or Meadows sought governmental intervention.

697. Plaintiff obtained a judicial Order of Protection against Meadows.

698. Plaintiff thereafter repeatedly sought enforcement of that Order.

699, Plaintiff alleges that BPD personnel repeatedly refused or failed to enforce the Order.

700. Defendant Morrow expressly advised Plaintiff that BPD would not enforce the Order unless Meadows physically assaulted Plaintiff.

701. Defendants Costantino and Skrzvnski separately advised Plaintiff that the Order could not be enforced because it was not present in the governmental system.

702. Plaintiff alleges that her valid Order later was missing from the New York State Registry.

703. During the same period, BPD personnel repeatedly exercised criminal charging authority against Plaintiff based upon accusations made by Meadows.

704. Plaintiff alleges that the repetition of this differential treatment by different BPD personnel over an extended period supports an inference that the conduct was not merely one officer's isolated discretionary error.

**B. Investigation and Handling of Favorable Evidence**

705. Plaintiff alleges recurring deficiencies concerning the investigation, preservation, and transmission of materially favorable evidence.

706. During the May 23, 2020 investigation, multiple eyewitnesses were available to provide information favorable to Plaintiff.

707. Plaintiff alleges that Dixon refused or failed to obtain favorable witness statements.

708. Plaintiff alleges that Dixon, Nightingale-Griffin, DiPasquale, Reese, and Redmon failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

709. Plaintiff alleges that subsequent criminal discovery revealed discrepancies between available eyewitness information and information transmitted in connection with Plaintiff's prosecution.

710. Plaintiff alleges that those deficiencies materially contributed to the criminal proceeding against her.

**C. Body-Worn-Camera Preservation and Accountability**

711. Plaintiff began demanding preservation of Dixon's AXON footage shortly after the May 23 incident.

712. Defendants Joyce and Lockwood received preservation demands concerning the footage.

713. Plaintiff repeatedly sought the footage through Defendant Rinaldo and other BPD personnel.

714. Plaintiff alleges that she initially was informed that responsive footage did not exist.

715. Plaintiff subsequently received only a brief portion of footage.

716. Plaintiff later obtained audit information indicating that additional footage had existed.

717. Plaintiff alleges that later records indicated uploaded footage subsequently was deleted.

718. Plaintiff alleges that the inability to preserve, locate, account for, and produce complete body-worn-camera evidence despite repeated preservation demands reflects inadequate municipal safeguards, supervision, or accountability.

**D. Actual Notice to Supervisory Personnel**

719. In late May or early June 2020, Plaintiff complained to Internal Affairs Lieutenant Michael Farley about Officer Dixon's allegedly discriminatory conduct during the May 23 police response.

720. On June 1, 2020, Plaintiff sent Captain Joyce, Commissioner Lockwood, and Timothy Ball a notice seeking preservation of Dixon's body-camera data. On June 17 she sent a further notice identifying footage from the May 20 incident and both May 23 responses to those officials and Rinaldo. On or about August 6, Rinaldo told Plaintiff the requested footage did not exist.

721. Plaintiff alleges that the District Attorney's Office requested Dixon's footage from Rinaldo in July 2020, on November 21, and again on December 1. Plaintiff alleges it was not provided in response. Reese signed the charging instrument on December 5.

722. On October 27, 2020, after speaking with Ms. Patton at the Police Commissioner's office, Plaintiff emailed her about three A-District responses. Plaintiff reported that on May 23 officers recovered property from Meadows's residence but declined to prepare a report. Plaintiff reported that after her June 311 complaint about damage to her siding, police did not follow up or prepare a report despite five calls to the station. Plaintiff also reported that on October 25 officers declined to report fence damage and removal of a panel while an order of protection was in effect. Plaintiff showed surveillance footage and property documents. Officers told her they considered the dispute civil because Meadows claimed the fence.

723. On November 4, 2020, Plaintiff followed up with the Commissioner's office, reproduced the October 27 email, requested a meeting with the Commissioner or Deputy Commissioner, and reported threats while the order of protection was in effect.

724. On December 18, 2020, Plaintiff emailed Internal Affairs about repeated refusals to report alleged order violations. Plaintiff reported that Lieutenant Morrow relayed through an A-District employee that officers would not file a violation unless Meadows physically attacked her.

725. On May 4, 2021, Plaintiff objected by email that Internal Affairs' written conclusion did not address Dixon's conduct even though her complaint included him. On May 25, Plaintiff followed up, reported that her attempts to obtain a response concerning Dixon had gone unanswered, and told the recipient she had videos she believed documented officer misconduct.

726. On October 18, 2021, Plaintiff again sought police assistance by email and reported that A-District was still refusing to file a report concerning alleged violations of the order of protection. She reported that she believed the refusal was retaliation for her prior complaints.

727. Plaintiff alleges that repeated refusals by different A-District personnel and a supervisor, together with the charging incidents described above, support an inference of a recurring practice of applying different standards to Plaintiff's and Meadows's complaints. Plaintiff alleges that the October and November reports gave the Commissioner's office an opportunity to address the

recurring reporting problem before the later refusals. Separately, Plaintiff alleges that the 2020 discrimination complaint and footage notices gave BPD officials an opportunity to address the May 23 investigation before the December 5 charge. Plaintiff relies on her May 2021 correspondence as notice that Dixon's conduct remained unaddressed before the later police encounters.

**E. Municipal Authority in the Property Dispute**

728. Plaintiff further alleges repeated use or threatened use of municipal police and regulatory authority concerning her property dispute with Meadows.

729. City inspectors determined that Plaintiff owned the disputed boundary area and that repair of Plaintiff's furnace exhaust was critical.

730. Plaintiff nevertheless was threatened with arrest if she entered the same area.

731. Plaintiff was threatened with arrest if she again removed the fence.

732. Plaintiff alleges that Bifaro later used or threatened code-enforcement authority to require relocation of an exhaust pipe that previously had been found to be up to code.

733. Plaintiff alleges that a BPD Doe officer thereafter threatened criminal charges if Plaintiff did not relocate the exhaust.

734. Plaintiff alleges that involvement by police personnel, inspectors, code personnel, and supervisory officials supports her contention that the challenged governmental treatment was not confined to one municipal employee.

**F. Criminal-History Access and Accountability**

735. The City of Buffalo maintained, supervised, and controlled the BPD law-enforcement database systems and criminal-history records concerning Plaintiff.

736. Official municipal documentation indicates that an individual seeking a BPD criminal-history record was strictly required to appear personally and present government-issued photographic identification to protect individual informational privacy.

737. Despite these stated verification protocols, Plaintiff's unredacted, confidential, and non-conviction governmental criminal-history compilation reached a private adversary and thereafter was publicly disseminated on social media.

738. Plaintiff presently does not know the identity of the governmental employee responsible for the original disclosure.

739. The City of Buffalo maintained inadequate municipal database access controls, deficient data-handling safeguards, and a lack of systemic audit-log supervision, creating a custom or

practice where confidential records can be extracted and leaked without legitimate law enforcement purposes.

740. The City of Buffalo further maintained a policy, custom, or practice of failing to adequately train, supervise, and discipline its database users and record custodians regarding individual privacy rights and federal informational privacy requirements.

741. The City received actual notice of Plaintiff's specific contention that a BPD-generated, unredacted, and sealed criminal-history record had been improperly disclosed outside official channels to a private adversary.

742. Despite receiving this notice, the City of Buffalo exercised deliberate indifference by failing to execute a comprehensive database access audit to identify the responsible municipal employee, failing to implement corrective data safeguards, and failing to mitigate the ongoing public dissemination of the record.

**G. Causation**

743. The persistent municipal customs, practices, systemic safeguarding failures, inadequate supervision, and deliberate indifference described throughout Count XII were the moving forces behind the constitutional and statutory injuries alleged herein.

744. The City's recurring investigative deficiencies and systemic failures to preserve and transmit favorable evidence directly contributed to the initiation and continuation of the criminal proceedings against Plaintiff.

745. The City's persistent practice of unequal police protection directly caused the repeated denial of enforcement regarding Plaintiff's judicial Order of Protection.

746. The City's arbitrary use of police and regulatory authority in private property matters directly caused the interference with, restriction of, and disruption to Plaintiff's access to and repair of her residence.

747. The City's systemic failure to safeguard, audit, and maintain strict accountability over its law-enforcement databases directly enabled and proximately caused the unlawful disclosure and continuous republication of Plaintiff's confidential criminal-history information.

748. Plaintiff therefore seeks relief against the City of Buffalo under 42 U.S.C. § 1983 for all constitutional, reputational, and professional injuries proven to have resulted from these municipal policies, customs, practices, deliberate indifference, and actionable failures of supervision or discipline.

**COUNT XIII NEW YORK STATE LAW — MALICIOUS PROSECUTION**

**Against the Individual Defendants Who Initiated or Continued the Criminal Proceedings**

749. Plaintiff repeats and realleges paragraphs 1 through 748 as though fully incorporated and set forth herein.

750. Plaintiff alleges that the responsible individual Defendants initiated, caused, or actively continued criminal proceedings against Plaintiff.

751. Those proceedings included the prosecution arising from the May 23, 2020 incident.

752. Those proceedings included the January 18, 2021 Petit Larceny and Criminal Mischief charges.

753. Those proceedings included the September 20, 2021 felony charge described above.

754. Plaintiff was not physically arrested, detained, jailed, or confined in connection with the criminal charges alleged herein.

755. Plaintiff instead was issued appearance tickets or otherwise subjected to criminal process requiring her to appear in criminal court and answer the charges.

756. With respect to the May 23, 2020 proceeding, Plaintiff alleges that the responsible Defendants initiated or continued the proceeding despite materially favorable eyewitness information.

757. Plaintiff alleges that multiple eyewitnesses were available to provide information favorable to Plaintiff.

758. Plaintiff alleges that Dixon refused or failed to obtain statements from witnesses possessing information favorable to Plaintiff.

759. Plaintiff alleges that Dixon and Nightingale-Griffin failed to obtain, preserve, disclose, or accurately transmit materially favorable witness information.

760. Plaintiff further alleges that materially favorable body-worn-camera evidence existed concerning the investigation.

761. Defendant Reese subsequently executed the December 5, 2020 charging instrument.

762. Plaintiff alleges that the responsible Defendants lacked probable cause to initiate or continue the May 23 proceeding.

763. With respect to the January 18, 2021 proceeding, Plaintiff alleges that Salazar charged Plaintiff with Petit Larceny and Criminal Mischief based upon Plaintiff's removal of objects Meadows had placed upon property belonging to Plaintiff.

764. Plaintiff alleges that BPD personnel already were aware of the underlying property dispute.

765. Plaintiff further alleges that City inspectors previously had determined that Plaintiff owned the relevant boundary area.

766. Plaintiff alleges that Salazar lacked probable cause to initiate the Petit Larceny and Criminal Mischief proceedings.

767. With respect to the September 20, 2021 proceeding, Plaintiff alleges that Moriarity charged Plaintiff with Criminal Possession of a Chemical or Biological Weapon in the First Degree based upon Meadows's accusation that Plaintiff intentionally coughed in her direction.

768. Plaintiff alleges that she possessed and deployed no chemical or biological weapon.

769. Plaintiff alleges that Moriarity lacked probable cause to initiate the felony proceeding.

770. Plaintiff alleges malice based upon the knowing or reckless disregard of materially favorable evidence, materially false or incomplete information used in the charging process, and the circumstances specifically alleged concerning each prosecution.

771. Plaintiff alleges that the responsible Defendants initiated or continued the proceedings for purposes other than the fair administration of justice.

772. The Petit Larceny and Criminal Mischief proceedings ultimately terminated in Plaintiff's favor through dismissal.

773. The assault proceeding arising from the May 23 incident ultimately terminated in Plaintiff's favor through dismissal.

774. Plaintiff alleges that the September 20, 2021 criminal proceeding ultimately terminated without a conviction.

775. Plaintiff suffered compulsory court appearances, reputational injury, emotional distress, financial loss, restrictions imposed through the criminal proceedings, and other damages.

## COUNT XIV
## NEW YORK STATE LAW — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendant Carolette Meadows

776. Plaintiff repeats and realleges paragraphs 1 through 775 as though fully incorporated and set forth herein.

777. Plaintiff alleges that Meadows engaged in a prolonged and escalating course of conduct specifically directed toward Plaintiff over a period of years.

778. Plaintiff does not base this cause of action upon ordinary insults, disagreements, criticism, or the ordinary incidents of a contentious neighbor dispute.

779. Plaintiff instead relies upon the cumulative course of conduct specifically alleged

throughout this Complaint.

780. Plaintiff alleges that Meadows intentionally damaged or interfered with the furnace exhaust serving Plaintiff's residence.

781. Plaintiff alleges that the interference created a dangerous condition affecting Plaintiff and members of Plaintiff's household.

782. Plaintiff alleges that Meadows continued interfering with Plaintiff's ability to access, use, maintain, and repair portions of Plaintiff's residence.

783. Plaintiff alleges that Meadows repeatedly entered or interfered with Plaintiff's property.

784. Plaintiff alleges that Meadows repeatedly damaged or interfered with Plaintiff's property.

785. Plaintiff alleges that Meadows repeatedly interfered with Plaintiff's security cameras.

786. Plaintiff alleges that Meadows repeatedly engaged in physical confrontations with Plaintiff.

787. On May 23, 2020, Plaintiff alleges that Meadows entered Plaintiff's backyard carrying an electric saw.

788. Plaintiff alleges that Meadows threatened and chased Plaintiff.

789. Plaintiff alleges that Meadows cornered Plaintiff while holding the saw.

790. Plaintiff alleges that Meadows lunged toward Plaintiff with the saw.

791. Plaintiff alleges that Meadows thereafter bit Plaintiff on the neck, breaking the skin.

792. Plaintiff alleges that Meadows grabbed Plaintiff by the hair.

793. Plaintiff alleges that Meadows repeatedly struck Plaintiff in the head and pinched Plaintiff.

794. Plaintiff further alleges that Meadows repeatedly made accusations to governmental authorities that subjected Plaintiff to criminal process.

795. Plaintiff alleges that Meadows supplied materially false information concerning the property dispute that resulted in the January 18, 2021 charges.

796. Plaintiff alleges that Meadows's accusation concerning an alleged cough resulted in the September 20, 2021 felony charge.

797. Plaintiff further alleges that Meadows obtained, possessed, used, and/or disseminated Plaintiff's governmental criminal-history information.

798. Plaintiff alleges that copies of that governmental record thereafter continued circulating publicly for years.

799. Plaintiff alleges that Meadows knew that her prolonged conduct was causing Plaintiff substantial fear, humiliation, distress, disruption, and injury.

800. Plaintiff alleges that Meadows intended to cause Plaintiff severe emotional distress or acted with reckless disregard of the substantial probability that severe emotional distress would result.

801. Plaintiff alleges that the cumulative and prolonged course of conduct exceeded the bounds of conduct reasonably tolerated in a civilized society.

802. Plaintiff alleges that the cumulative course of conduct was extreme and outrageous.

803. Plaintiff experienced severe and continuing emotional and psychological distress.

804. Plaintiff ultimately sought professional mental-health treatment.

805. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

806. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

807. Plaintiff alleges that Meadows's prolonged conduct was a substantial cause of or substantially contributed to Plaintiffs emotional and psychological injuries.

808. Plaintiff will rely upon medical and mental-health records and other admissible evidence concerning diagnosis, treatment, causation, severity, duration, and prognosis.

809. Plaintiff suffered severe anxiety, depression, fear, humiliation, loss of enjoyment of life, and disruption of her ability to feel secure within her own residence.

810. Plaintiff suffered substantial interference with her personal and professional life.

811. Plaintiff seeks compensatory damages against Meadows.

812. Plaintiff further seeks punitive damages against Meadows to the extent permitted by law and supported by the evidence.

## COUNT XV

## NEW YORK STATE LAW — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### Against Defendant Carolette Meadows — Pleaded in the Alternative

813. Plaintiff repeats and realleges paragraphs 1 through 812 as though fully incorporated and set forth herein.

814. Plaintiff pleads this cause of action in the alternative to her intentional-tort claims to the extent particular conduct by Meadows is determined to have been negligent or reckless rather than intentional.

815. Meadows owed Plaintiff a duty to exercise reasonable care so as not to create an unreasonable and foreseeable risk of physical injury to Plaintiff.

816. Plaintiff alleges that Meadows interfered with the furnace exhaust serving Plaintiff's residence.

817. Plaintiff alleges that interference with the furnace exhaust created an immediate and foreseeable danger of exposure to combustion gases.

818. Plaintiff alleges that the condition created a foreseeable risk of serious physical injury.

819. Plaintiff alleges that members of Plaintiff's household actually experienced physical symptoms.

820. Plaintiff alleges that Plaintiff and members of her household sought medical evaluation or treatment following the dangerous condition.

821. Plaintiff alleges that blood testing reflected carbon-monoxide poisoning affecting her children.

822. Plaintiff further alleges that Meadows's repeated physical confrontations and conduct affecting the safety of Plaintiff's residence caused Plaintiff reasonably to fear for her own physical safety.

823. Plaintiff alleges that her emotional injuries arose directly from circumstances involving actual or threatened physical danger and not merely from economic or property loss.

824. Plaintiff subsequently sought professional mental-health treatment.

825. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

826. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

827. Plaintiff alleges that Meadows's prolonged conduct was a substantial cause of or substantially contributed to Plaintiffs emotional and psychological injuries.

828. Plaintiff alleges that the actual physical danger, medical consequences, prolonged course of events, and diagnosed psychological conditions provide objective circumstances supporting the genuineness and severity of Plaintiff's emotional harm.

829. Plaintiff seeks compensatory damages against Meadows to the extent the conduct at issue is determined to have been negligent or reckless rather than intentional.

## DAMAGES AND INJURIES

830. As a direct and proximate result of the actionable conduct alleged herein, Plaintiff has sustained constitutional, reputational, professional, economic, emotional, psychological, property-related, and other compensable injuries.

831. Plaintiff was not physically arrested, jailed, detained, or confined in connection with the criminal charges described herein.

832. Plaintiff instead was issued appearance tickets or otherwise subjected to criminal process requiring her to appear in criminal court and defend herself against the charges.

833. Plaintiff alleges that the criminal proceedings required repeated court appearances.

834. Plaintiff alleges that the proceedings consumed substantial time and resources.

835. Plaintiff alleges that the proceedings caused reputational injury.

836. Plaintiff alleges that the proceedings caused severe emotional distress.

837. Plaintiff further alleges that the criminal proceedings resulted in restrictions affecting her constitutional rights.

838. In approximately March 2021, Plaintiff was required to surrender two firearms to her father pursuant to an Order of Protection arising from the criminal proceeding.

839. Plaintiff remained unable to possess those firearms until approximately July 2022.

840. Plaintiff alleges loss of the possession and use of those firearms during that period.

841. Plaintiff alleges that governmental interference with access to and control of her property delayed or obstructed necessary repairs.

842. Plaintiff alleges that the property-related governmental conduct caused financial expense.

843. Plaintiff alleges that the property-related governmental conduct caused disruption and loss of use and enjoyment of her residence.

844. Plaintiff alleges substantial reputational injury resulting from dissemination and continuing republication of her governmental criminal-history information.

845. Plaintiff alleges that the governmental record included arrest information concerning matters that did not result in convictions.

846. Plaintiff subsequently obtained official criminal-history information reflecting no criminal convictions.

847. Plaintiff alleges that copies of the governmental record nevertheless continued to circulate.

848. Plaintiff alleges that continuing circulation of the record caused humiliation and damage to her reputation within the community.

849. Plaintiff provides tax-preparation, bookkeeping, and related financial services.

850. Plaintiff relies upon professional trust, honesty, competence, reputation, referrals, and community relationships in obtaining and retaining clientele.

851. Plaintiff alleges that public circulation of governmental criminal-history information portraying her through repeated arrests and criminal accusations foreseeably impaired her professional reputation.

852. Plaintiff alleges that the continuing dissemination caused or contributed to loss of professional standing, loss of business opportunities, difficulty maintaining public confidence, and other economic injury.

853. Plaintiff seeks recovery only for economic losses that she can establish through admissible evidence and causally attribute to actionable conduct by Defendants.

854. Plaintiff further alleges severe and prolonged emotional and psychological injury resulting from the cumulative events described herein.

855. Plaintiff experienced anxiety.

856. Plaintiff experienced depression.

857. Plaintiff experienced fear and humiliation.

858. Plaintiff experienced loss of enjoyment of life.

859. Plaintiff experienced substantial disruption of her sense of security within her own residence.

860. Plaintiff experienced substantial interference with her personal and professional life.

861. Plaintiff ultimately sought professional mental-health treatment.

862. Plaintiff subsequently was diagnosed with Generalized Anxiety Disorder.

863. Plaintiff subsequently was diagnosed with Major Depressive Disorder.

864. Plaintiff alleges that the conduct described herein, including the prolonged conduct of Meadows, was a substantial cause of or substantially contributed to those injuries.

865. Plaintiff will rely upon medical records, treating-provider testimony, and other admissible evidence concerning diagnosis, treatment, causation, severity, prognosis, and duration to the extent supported by such evidence.

866. Plaintiff alleges continuing reputational injury because copies of the disclosed governmental criminal-history document remain outside governmental custody.

867. Plaintiff alleges that those copies remain capable of further electronic dissemination.

868. Plaintiff alleges continuing psychological and emotional consequences arising from the events described herein.

869. Plaintiff seeks past and future compensatory damages to the extent established by admissible evidence.

**PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor and against the appropriate Defendants as follows:**

870. Awarding compensatory damages in an amount to be determined at trial for Plaintiff's constitutional injuries, compulsory criminal proceedings, emotional and psychological injuries, reputational harm, proven economic loss, property-related injury, loss of use of firearms, and other proven consequential damages;

871. Awarding nominal damages for constitutional violations for which Plaintiff establishes a violation but cannot establish measurable compensatory damages;

872. Awarding punitive damages against those individual Defendants whose conduct is proven to have been malicious, oppressive, reckless, or undertaken with callous indifference to Plaintiff's federally protected rights, to the extent permitted by law;

873. Awarding Plaintiff recoverable costs to the extent permitted by law;

874. Awarding pre-judgment and post-judgment interest to the extent permitted by law; and

875. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: Buffalo, NY
November 06, 2026

I affirm this 6th day of November, 2026 the foregoing is true & accurate under penalty of perjury of the law.